UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

|  |  |  |
|---|---|---|
| SECURITIES INDUSTRY AND FINANCIAL MARKETS ASSOCIATION, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION NO. 2:23-cv-4154 |
| JOHN R. ASHCROFT, in his official capacity as Secretary of State of Missouri; and DOUGLAS M. JACOBY, in his official capacity as Missouri Securities Commissioner, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## PRELIMINARY STATEMENT

1.      This Complaint challenges two new Missouri Securities Division rules

("Rules") that force financial firms and professionals to obtain client signatures on

state-scripted documents before providing advice that "incorporates a social

objective or other nonfinancial objective."[1]  The state-mandated scripts require

financial firms and clients to acknowledge that incorporating these objectives "will

result" in investments and advice "that are not solely focused on maximizing a

---

[1] The rules are codified at 15 CSR § 30-51.170(3) and 15 CSR § 30-51.172(3).

financial return" for the client.  The Rules also require firms to provide the written scripts to clients annually, and to secure new client signatures on the scripts "no less than every three (3) years."

2. The Rules fail to acknowledge that federal law, regulations, and applicable rules already require financial advisors to act in the best interest of their clients when providing personalized investment advice.  That means that investment advice must take into consideration factors such as the client's "other investments, financial situation and needs, tax status, investment objectives, investment experience, investment time horizon, liquidity needs, risk tolerance, and any other information the customer may disclose to the member or associated person in connection with such recommendation."[2]  Under federal law, firms cannot place their interests ahead of their customers' interests for any reason—be it "social," "nonfinancial," or otherwise.

3. The Rules are also grossly overbroad.  They restrict any investment advice that is not "solely focused on maximizing a financial return."  In this regard, the Rules are incompatible with the best interest obligations of investment firms and professionals.

---

[2] Financial Industry Regulatory Authority ("FINRA") Rule 2111(a), https://www.finra.org/rules-guidance/rulebooks/finra-rules/2111.

4.    Investment advice routinely requires the consideration of multifaceted objectives that are customer-specific and may not be solely focused on maximizing financial returns.  These objectives include the customer's personal appetite for risk and ability to bear investment losses.  Investment professionals also commonly provide advice based upon estate planning, tax considerations, charitable giving, and liquidity needs.  Some customers also wish to incorporate faith or values-based objectives, or local community investment objectives, into their investment selections.

5.    The Rules treat common considerations like these as "nonfinancial objectives" and lump them together without distinction or difference.  The Rules then go one step further and require clients to sign a state-mandated script any time they are provided a recommendation or advice that considers nonfinancial objectives.  This type of regulation is entirely novel.  There is no precedent for it in the securities laws, and none of the other forty-nine states require it.

6.    This is exactly the type of piecemeal state securities regulation that Congress prohibited more than 25 years ago when it passed the National Securities Markets Improvement Act of 1996 ("NSMIA").[3]  In enacting NSMIA, Congress determined that a "patchwork quilt" of conflicting state regulations on firms and

---

[3] Public Law 104–290 (Oct. 11, 1996), https://www.congress.gov/104/plaws/publ290/PLAW-104publ290.pdf.

securities was inefficient, confusing, and burdensome.  To address this, Congress created a uniform and consistent regulatory regime across all fifty states designed to enhance the efficiency of the U.S. capital markets and ensure the free flow of capital nationally.

7.      NSMIA accomplished this by reallocating authority over the securities markets between federal and state regulators.  Under NSMIA, the U.S. Securities and Exchange Commission ("SEC") was given exclusive authority to regulate the conduct of any investment adviser managing $100 million or more in client assets.  States may not make any rules regulating the activities of these firms.  States only retain authority to investigate and bring enforcement actions with respect to fraud or deceit.  In addition, the SEC was also given exclusive authority to regulate many of the central functions of brokerage firms, including the amount of capital such firms must maintain, the kind of margin accounts they may offer, and the type of records they must make and keep.  Finally, NSMIA also prevented states from imposing conditions on federally "covered securities."  These include most of the securities ordinary investors buy and sell, such as mutual funds.

8.      The Rules violate all of these proscriptions.  First, the Rules directly regulate the activities of investment adviser representatives working for federally-registered firms—and thereby indirectly regulate the firms themselves.  Second, the Rules impose new recordkeeping requirements on brokerage firms by requiring

- 4 -

them to create and maintain state-scripted consent forms that are not required under federal law.  Third, the Rules place restrictions on the sale of covered securities.  NSMIA categorically prohibits all of this.

9.     The Rules are also preempted by the Employee Retirement Income Security Act of 1974 ("ERISA").  ERISA broadly preempts states from regulating private and employer-sponsored pension and welfare plans.  ERISA could not be clearer in "supersed[ing] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . .."  29 U.S.C. § 1144.  Federal courts have recognized ERISA as containing "one of the broadest preemption clauses ever enacted by Congress."  *PM Grp. Life Ins. v. Western Growers Assur. Tr.,* 953 F.2d 543, 545 (9th Cir. 1992) (internal quotation marks omitted).  Despite this, the Secretary has said that the Rules apply to "pension" accounts.[4]  To the extent they do, they are preempted by ERISA.

10.    The Rules also run afoul of one of the "fixed stars" of the U.S. Constitution:  "the principle that the government may not interfere with an uninhibited marketplace of ideas."  *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2303 (2023) (internal quotation omitted).  The Rules violate this principle by

---

[4] John R. Ashcroft, Opinion, *It's Time To Reign In ESG*, Mo. Times, July 18, 2023, https://themissouritimes.com/opinion-its-time-to-rein-in-esg/.

requiring firms and professionals to make controversial, politically charged statements that are not purely factual.

11. The Rules force firms to provide, and customers to sign, a state-authored script stating that incorporating a social or nonfinancial objective into investment advice "will result" in advice that is not "solely focused on maximizing a financial return." 15 CSR § 30-51.170(3)(D). But this is the furthest thing from a factual statement.

12. For example, a financial professional may view a company making only internal combustion engines as riskier than a similar company diversifying into electric motors. Will Defendants view such an analysis as "incorporating a social objective or other nonfinancial objective"? If so, then the Rules would seem to require that the financial professional describe her advice as not "focused on maximizing a financial return" when, in fact, the financial professional firmly believes the opposite.

13. Similarly, some investors may seek out financial professionals who incorporate faith-based principles in their advice. The Rules appear to require both the financial professional and his client to sign a state-mandated script describing a faith-based investment approach as "not solely focused on maximizing a financial return," when neither the financial professional nor the investor may actually believe that.

14.     The irony of the Rules could hardly be more pronounced.  Financial professionals may be deemed to be engaging in "dishonest" conduct for refusing to agree to statements in a state-mandated script they do not believe to be true.

15.     The Rules' restriction on speech violates a fundamental tenet of the Constitution.  The government cannot compel professionals to make policy statements on political issues.  As the Supreme Court has recognized, "professionals might have a host of good-faith disagreements, both with each other and with the government, on many topics in their respective fields," but "the people lose when the government is the one deciding which ideas should prevail." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2374–75 (2018).

16.     Nor does the Constitution allow enforcement of regulations unless a regulated entity is able to identify with "ascertainable certainty" the standards to which the entity must conform.  Here, the Rules are worded far too vaguely to allow any firm or professional to know the types of recommendations that trigger the requirement to obtain a written consent form.

17.     The questions are endless as to the scope of the Rules.  For example, are pooled investments focused on rural development within the ambit of the Rules?  What about mutual funds focused on emerging sources of energy, local community improvement bonds, or church bonds?  Or strategies that consider corporate management's ties to their communities as a factor in evaluating

- 7 -

companies' long-term prospects?  And what about managers who focus on volatility management rather than purely on expected return?  The Rules are drafted such that financial firms and professionals are left guessing as to when a written consent must be secured. This is a clear violation of the due process principles of the Constitution.

18.     When the Defendants initially proposed the Rules, a chorus of businesses objected that the effort would violate federal law.  When Missouri legislators debated a bill that would create requirements nearly identical to the Rules, several representatives observed that the language was too vague and raised Constitutional concerns.  One representative even commented that he could "see a First Amendment challenge to this."  The bill did not pass.  The Defendants proceeded with the Rules anyway.

19.     Finally, the Rules are also entirely unnecessary.  Financial firms are already subject to a robust system of federal rules and regulations governing investment recommendations and disclosures.  Furthermore Defendants have not claimed that the Rules were promulgated in response to investor concerns, inquiries, or complaints.  Thus, invalidating the Rules will not harm Missouri investors.  Instead, it will benefit investors by eliminating the exact type of costly, confusing, and burdensome state regulation that Congress prohibited more than 25 years ago when it enacted NSMIA.

## PARTIES

20.     Plaintiff Securities Industry and Financial Markets Association
("SIFMA") is the leading trade association for broker-dealers, investment banks
and asset managers operating in the U.S. and global capital markets.  On behalf of
the securities industry's one million employees, SIFMA advocates on legislation,
regulation and business policy affecting retail and institutional investors, equity
and fixed income markets and related products and services.  SIFMA serves as an
industry coordinating body to promote fair and orderly markets, informed
regulatory compliance, and efficient market operations and resiliency.  SIFMA
brings this suit on behalf of its members who will be impacted by the Rules,
including broker-dealers and investment advisers.

21.     Members of SIFMA are directly impacted by the Rules by being
forced to obtain written consents from Missouri investors using scripted language,
and by maintaining and updating the consents as required by the Rules.  Member
firms are also required to adopt policies and procedures implementing the Rules
and to make determinations as to what advice falls within the scope of the Rules.

22.     Defendant John "Jay" R. Ashcroft ("Defendant Ashcroft" or the
"Secretary") is sued in his official capacity as the Missouri Secretary of State.  The
Secretary promulgated the Rules and is responsible for their implementation.  The
Secretary of State's Office is the executive office under which the Missouri

Securities Division ("Securities Division") is organized. The Securities Division is the state regulatory agency charged with administering and enforcing state securities laws, including the Rules.

23. Defendant Douglas M. Jacoby ("Defendant Jacoby" or the "Commissioner") is sued in his official capacity as Missouri Securities Commissioner. The Commissioner leads the Securities Division.

## JURISDICTION AND VENUE

24. Federal subject matter jurisdiction exists under 28 U.S.C. § 1331 because all of the Plaintiff's claims arise under federal law.

25. Plaintiff has associational standing to bring this suit.

26. SIFMA has multiple members who would have to alter their business practices to comply with the Rules, who object to the Rules, and who have standing to bring these same claims in their own names.

27. The interests Plaintiff seeks to protect are core to the member organization's purposes.

28. The harms redressed by this lawsuit affect a large group of businesses. This lawsuit does not seek monetary relief, but rather injunctive relief and declaratory relief rendering the Rules invalid and unenforceable. As such, neither the claims asserted nor the relief requested require an individual member to

participate in this suit. *See*, *e.g.*, *Am. Farm Bureau Fed'n v. U.S. Env't Prot. Agency*, 836 F.3d 963, 968 (8th Cir. 2016).

29.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because Defendants are named in their official capacities as Missouri state officials, and both carry out their official duties in Jefferson City, Cole County, Missouri. *See Mo. Elec. Coops. v. Missouri*, 229 F. Supp. 3d 888, 891 (E.D. Mo. Jan. 17, 2017). Venue is also proper under 28 U.S.C. § 1391(b)(2) because the events giving rise to the present claims—namely, Defendants' promulgation of the Rules—took place in Jefferson City, Cole County, Missouri. *See,* L.R. 3.2(a)(2); *see also District Boundaries and Places Holding Court*, United States Courts – Western District of Missouri, https://www.mow.uscourts.gov/faq-sub-category/district-boundaries-and-places-holding-court (last visited Aug. 9, 2023).

## BACKGROUND

### A.     Regulation of Broker-Dealers and Investment Advisers

30.     In the U.S., individuals can obtain investment services from broker-dealers and investment advisers. Federal and Missouri law both recognize the distinct business models of broker-dealers and investment advisers. Accordingly, state and federal laws, where allowed, impose and apply distinct regulatory requirements on each group.

- 11 -

31.     Brokerage firms and agents seek out sellers and buyers, effectuate transactions in securities, and from time-to-time make recommendations to their customers.  Brokerage firms are not allowed to charge fees in exchange for recommendations.  Brokerages earn their revenue through commissions, markups, markdowns, and other transaction-based sources for making investment recommendations that are in the best interest of their customers.

32.     Investment advisers and their representatives act as fiduciaries and provide ongoing advice to clients in exchange for a fee.  Unlike brokerage firms, investment advisers are not allowed to charge commissions or to profit from markups or markdowns.  Some investment advisers also work for broker-dealers and may interact with both brokerage customers and advisory clients.  Federal rules require disclosures in those circumstances.  Some investment advisers manage investment companies, such as mutual funds.

**B.     The National Securities Markets Improvement Act of 1996**

33.     In enacting NSMIA, Congress sought to eliminate both duplicative and inconsistent regulations affecting investment advisers and broker-dealers operating across state lines.  Congress's stated objective in NSMIA was to preclude a "patchwork quilt of state regulation" on top of extensive federal

- 12 -

securities laws and comprehensive SEC rules.[5]  Given the broad federal regulatory regime already in place, Congress reasoned that an additional layer of state regulation tended to make investing less efficient and more costly for consumers and firms.  It would also inhibit the free flow of capital into U.S. capital markets, which is vital for the success of the American economy.

34.  NSMIA was enacted to address these concerns.  In passing NSMIA, Congress determined that the "dual Federal and state securities regulation []" resulted in a degree of duplicative and unnecessary regulation" that in many instances was "redundant, costly, and ineffective."  *See* H. Rep. No. 104-864, at 39 (1996) ("Conference Report").  The Senate referred to this relationship as "confusing, conflicting, and involv[ing] a degree of overlap that may raise costs unnecessarily for American investors and the members of the securities industry." *See* S. Rep. No. 104-293 at 2 (1996) ("Senate Report").

35.  The purpose of NSMIA was "to eliminate duplicative and unnecessary regulatory burdens while preserving important investor protections by reallocating responsibility over the regulation of the nation's securities markets in a more logical fashion between the Federal government and the states."  Conference Report at 39–40.

---

[5] *See* Stephen M. Cutler, Dir., U.S. Sec. and Exch. Comm'n Div. of Enf't, Remarks at the F. Hodge O'Neal Corporate and Securities Law Symposium (Feb. 21, 2003), https://www.sec.gov/news/speech/spch022103smc.htm.

36.     NSMIA achieved its goals through preemption.  In passing NSMIA, "Congress explicitly pre-empted vast areas of state regulation" over federally registered investment advisers, investment adviser representatives, broker-dealers and agents.[6]

### Investment Advisers and Investment Adviser Representatives

37.     NSMIA created "a clear division of labor between the states and the federal government for supervision of investment advisers."  Senate Report at 2. NSMIA reserves state regulatory authority over "small, local" advisers.  Firms doing business on a larger scale—currently those managing $100 million or more in customer assets—answer to the SEC.  This arrangement is consistent with Congress's intention that "[t]he states should play an important and logical role in regulating small investment advisers whose activities are likely to be concentrated in their home state," while "larger advisers, with national businesses, should be registered with the [SEC] and be subject to national rules."  *Id.* at 4.

38.     NSMIA broadly preempts any state regulation of federally registered investment advisers and their investment adviser representatives "except that a state may license, register, or otherwise qualify any investment adviser representative who has a place of business located within that State."  15 U.S.C. § 80b-3a(b)(1)(A); *see also* Rules Implementing Amendments to the Investment

---

[6] Cutler, *supra* note 5.

Advisers Act of 1940, Investment Advisers Act Release No. 1633, at 69 (May 15, 1997) ("Implementing Release") (recognizing that NSMIA preempts "all regulatory requirements imposed by state law on Commission-registered advisers relating to their advisory activities or services, except those provisions that are specifically preserved. . ..").

39.     Under NSMIA, states only retain authority to regulate SEC registered investment advisers and investment adviser representatives in three limited respects.  States are allowed to "(1) investigate and bring enforcement actions with respect to fraud or deceit against an investment adviser or a person associated with an investment adviser; (2) to require filings, for notice purposes only, of documents filed with the Commission; and (3) to require payment of state filing, registration, and licensing fees."  Multi-State Investment Adviser Exemption from Prohibition on Registration With the Commission, 63 Fed. Reg. 39709 n.10 (July 24, 1998) (citing § 80b-3a(b)(2)).

40.     The Rules do not fall into any of these categories.  Rulemaking is distinct from "investigat[ing] and bring[ing] enforcement actions."  And the Rules do not concern notice-filings or state registration and licensing.

### *Broker-Dealers and Agents*

41.     NSMIA also "address[ed] issues of duplicative or inconsistent regulation" of broker-dealers.  *See* H.R. Rep. No. 104-622, at 36 (1996) ("House Report").

42.     NSMIA preempts state regulation of broker-dealers in the following areas: "capital, custody, margin, financial responsibility, making and keeping records, bonding, or financial or operational reporting requirements."  15 U.S.C. § 78o(i)(1).  States are prohibited from establishing requirements in these areas "that differ from, or are in addition to, the requirements in those areas" under federal law.  *See id*.; *see also* House Report at 36 (stating that NSMIA "preempts State laws that impose financial responsibility and reporting requirements inconsistent with or exceeding requirements established under [federal law].  This preemption extends to any regulation of capital, margin, books and records, bonding, record making and record keeping.").

43.     Following NSMIA's enactment, states were required to eliminate preexisting, state-specific recordkeeping requirements for broker-dealers, and were precluded from adopting new state-specific recordkeeping requirements.  The State of Missouri is no exception.  In 2004, the Missouri Securities Commissioner rescinded preexisting recordkeeping rules to "comply with [NSMIA]."  15 CSR § 30-51.120.  Missouri adopted new rules that simply required broker-dealers to

"make and maintain records as required for brokers or dealers under the rules promulgated under the Securities Exchange Act of 1934," including 17 CFR § 240.17a-3 and 17 CFR § 240.17a-4. *See* 15 CSR § 30-51.120(1).

### *Covered Securities*

44.     Since 1933, the federal government has required SEC registration of most securities offered to the public at large.  As part of the registration process, the SEC reviews the documents (such as a prospectus) that the offeror expects to use in describing the offered security to the public.

45.     Prior to NSMIA, many states also required state registration of securities before those securities could be offered in the state.  States also conducted preregistration reviews of prospectuses and other offering documents.

46.     NSMIA created a new class of securities called federally "covered securities."  Covered securities generally include all stocks listed on major exchanges such as the New York Stock Exchange or NASDAQ, as well as all domestic mutual funds registered for sale to the general public.

47.     As to federally covered securities, NSMIA prohibited states from requiring a prospectus review before a security could be publicly offered in the state.

48.     NSMIA also prohibited states from directly or indirectly "impos[ing] conditions" upon the offer or sale of a federally covered security based on the

- 17 -

merits of the offering. 15 U.S.C. § 77r; *see also* Senate Report at 28 (indicating that states may not "prohibit, limit or impose any merit-based conditions on the offer or sale of the preempted securities") (emphasis added).

### C. The Employee Retirement Income Security Act of 1974

49. ERISA and U.S. Department of Labor ("DOL") regulations thereunder provide a comprehensive and detailed approach to fiduciary duties and disclosure obligations with respect to plan investments.

50. "The purpose of ERISA is to provide a uniform regulatory regime over employee benefit plans. To this end, ERISA includes expansive pre-emption provisions . . ., which are intended to ensure that employee benefit plan regulation would be 'exclusively a federal concern.'" *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004).

51. ERISA broadly preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). "State law[s]" are defined to include state rules and regulations. *Id*. § 1144(c)(1)-(2).

52. According to the Supreme Court, "relates to" is to be given its broad common sense meaning such that a state law "relates to" a plan "if it has a connection with or reference to such plan." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 97 (1983).

- 18 -

53.     The Supreme Court has found the ERISA preemption clause to be "conspicuous for its breadth" and "deliberately expansive" with "the goal . . . to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government." *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 138, 142 (1990) (internal quotation marks omitted).

54.     Moreover, 29 U.S.C. § 1132 provides ERISA's exclusive civil enforcement provisions.  *See*, *e.g.*, *Felix v. Lucent Tech., Inc.*, 387 F.3d 1146, 1159 (10th Cir. 2004), *cert. denied*, 125 S. Ct. 2961 (2005).  Enforcement actions by state governments are not allowed—even if the state seeks to enforce what the state regulators believe is an ERISA requirement.  The *only* "remedy Congress has provided for the misconduct of a fiduciary is a suit by a beneficiary or participant, another fiduciary, or the Secretary of Labor."  *Smith v. Provident Bank*, 170 F.3d 609, 617 (6th Cir. 1999).

### D.     Federal Regulation of Investment Recommendations and Disclosures

55.     The Federal government already has a comprehensive, well-established, and robust system of rules in place governing investment recommendations and disclosures.

56.     Under existing federal securities laws, broker-dealers and investment advisers are required when recommending a security transaction to provide investment advice that is in the best interest of their customers.

57.     Under the Investment Advisers Act of 1940 (the "Advisers Act"), investment advisers and investment adviser representatives owe a fiduciary duty to act in the best interests of their clients.

58.     Most investment advisers are required to file a form ADV, which includes required disclosure of material information to clients and the public.  The ADV, which is required to be updated at least annually, includes a description of the investment adviser's methods of analysis and investment strategies. Investment advisers are required to explain the material risks for each significant investment strategy or method of analysis used, and each security recommended, with more detail required if those risks are significant or unusual.

59.     Broker-dealers are also required to act in the best interest of their retail customers.  The Best Interest Obligation under Rule 15*l*-1(a) of the Securities and Exchange Act of 1934 ("Reg BI") requires that broker-dealers and their associated persons act in the best interest of a retail customer when recommending a securities transaction.  Brokerage firms and agents are expressly prohibited from putting their interests ahead of their customers' interests when providing personalized investment advice.

60. Under Reg BI, prior to or at the time of a recommendation, a broker-dealer must provide full and fair disclosure, in writing, of all material facts relating to the scope and terms of the relationship with the retail customer, including material fees and costs, the type and scope of services, and "any material limitations on the securities or investment strategies involving securities that may be recommended."

61. Securities such as mutual funds are also subject to registration and disclosure requirements under the Securities Act of 1933 ("33 Act") and the Investment Company Act of 1940 ("40 Act").

62. Section 5 of the 33 Act requires delivery of a prospectus that meets the requirements of Section 10 of the 33 Act with or prior to a sale of the fund's securities. Mutual fund prospectuses must be delivered to all purchasers of a fund's shares, and statements of additional information (which expand on the information contained in prospectuses) must be made available upon request.

63. Rules 405 and 408 under the 33 Act require all material information to be included in fund disclosures that a reasonable investor would attach importance to in determining whether to purchase shares of the fund, and must not omit material information.

64. ERISA imposes a series of duties on investment advice fiduciaries to employee benefit plans. In particular, plan fiduciaries must act prudently and

solely in the interest of plan participants and beneficiaries and must diversify plan assets under ERISA Section 404(a).

### E. The Rules

#### *Rule Proposals and Related Legislation*

65.     The Secretary proposed an initial version of the Rules in January 2023.  According to the Secretary's office, the proposed Rules would implement standards "pertaining to security investments" and restrict "investment strategies that propagate values-based agendas that are not purely focused on generating profit for their clients."[7]

66.     On February 16, 2023, SIFMA, together with the American Council of Life Insurers, the Financial Services Institute, the Insured Retirement Institute and the National Association of Insurance and Financial Advisors, sent a letter to the Defendants, noting, among other things, that the proposed Rules were vague, presupposed that securities with social objectives were not focused on returns on investment, and were preempted by federal law.

67.     At the same time, a bill was proposed in the Missouri House of Representatives that would add substantially similar provisions to the Missouri Securities Act.  That bill was filed as HB 824, but was subsequently amended

---

[7] Press Release, JoDonn Chaney, *Ashcroft Requires Transparency Regarding ESG*, Off. of Mo. Sec'y of State (Jan. 11, 2023), https://www.sos.mo.gov/default.aspx?PageId=10283.

through the legislative process onto HB 863, which related to green municipal bonds. While this legislation was third read and passed by the House, it was never voted upon by the Senate Committee on Insurance and Banking; hence the legislation did not pass before the General Assembly adjourned in May 2023.

### *Adoption of the Rules*

68.     After HB 863 failed to pass, the Secretary finalized his rule proposal to amend 15 CSR § 30-51.170 in June of 2023. That section is captioned "*Dishonest or Unethical Business Practices by Broker-Dealers and Agents*." The rule was amended to add Subsection (3) ("Broker-Dealer Rule").

69.     The Order of Rulemaking for the Broker-Dealer Rule was published in the Missouri Register on June 1, 2023. A true and accurate copy of the publicly available document is attached as Exhibit A.[8]

70.     The Broker-Dealer Rule was published in the Code of State Regulations on June 30, 2023. A true and accurate copy of the publicly available document is attached as Exhibit B.[9]

71.     The Broker-Dealer Rule became effective on July 30, 2023, thirty (30) days after publication in the Code of State Regulations.

---

[8] *See also* 48 Mo. Reg. 11, at 962–63 (June 1, 2023), https://www.sos.mo.gov/CMSImages/AdRules/moreg/2023/v48n11June1/v48n11.pdf.
[9] *See also*. 15 CSR § 30-51.170, at 14-16. https://www.sos.mo.gov/cmsimages/adrules/csr/current/15csr/15c30-51.pdf.

72.     The Secretary also acted to amend 15 CSR 30-51.172.  That section is captioned "*Dishonest or Unethical Business Practices by Investment Advisers and Investment Adviser Representatives*."  The rule was amended to add Subsection (3) ("Investment Adviser Rule").

73.     The Order of Rulemaking for the Investment Adviser Rule was published in the Missouri Register on June 1, 2023. *See* Exhibit A.[10]

74.     The Investment Adviser Rule was published in the Code of State Regulations on June 30, 2023.  *See* Exhibit B.[11]

75.     The Investment Adviser Rule became effective on July 30, 2023, thirty (30) days after publication in the Code of State Regulations.

76.     The Rules are novel state regulations.  No other state has adopted such rules.

### *Operation of the Rules*

77.     The Rules make it a dishonest or unethical business practice in Missouri for broker-dealers, agents, investment advisers and investment adviser representatives ("Affected Persons") to fail to disclose to any client[12] or prospective client if the Affected Person "incorporates a social objective or other

---

[10] *See also* 48 Mo. Reg. 11, at 963–64 (June 1, 2023), https://www.sos.mo.gov/CMSImages/AdRules/moreg/2023/v48n11June1/v48n11.pdf.
[11] *See also* 15 CSR § 30-51.172, at 17-19. https://www.sos.mo.gov/cmsimages/adrules/csr/current/15csr/15c30-51.pdf.
[12] The Investment Adviser Rule refers to "clients."  The Broker-Dealer Rule refers to "customers."

nonfinancial objective" into: (i) a discretionary investment decision to buy or sell a security or commodity for a client; (ii) advice or a recommendation and/or solicitation to client for the purchase or sale of a security or commodity; or (iii) the selection, or advice or a recommendation to a client regarding the selection, of a third-party manager or subadviser to manage the investments in the client's account, without disclosing to the client the existence of such incorporation. 15 CSR §§ 30-51.170(3)(A), 30-51.172(3)(A). This means that the Rules can serve as the basis for the Commissioner to revoke or suspend the registration of any broker, adviser, or representative currently registered in Missouri.

78. The Rules define the phrase "[i]ncorporates a social objective" to mean "the material fact to consider socially responsible criteria in the investment or commitment of client funds for the purpose of seeking to obtain an effect other than the maximization of financial return to the client." 15 CSR §§ 30-51.170(3)(B)(3), 30-51.172(3)(B)(1).

79. The Rules define the phrase "[s]ocially responsible criteria" to mean "any criterion that is intended to further, or is branded, advertised, or otherwise publicly described by" the Affected Person "as furthering[] any of the following: A. International, domestic, or industry agreements relating to environmental or social goals; B. Corporate governance structures based on social characteristics; or

C. Social or environmental goals."  15 CSR §§ 30-51.170(3)(B)(5), 30-51.172(3)(B)(5).

80.    The Rules define the phrase "[n]onfinancial objective," to mean "the material fact to consider criteria in the investment or commitment of client funds for the purpose of seeking to obtain an effect other than the maximization of financial return to the client."  15 CSR §§ 30-51.170(3)(B)(4), 30-51.172(3)(B)(4).

81.    The Rules specifically require "written acknowledgment and consent" from the client either at the establishment of the relationship or prior to effecting discretionary trading or providing advice.  15 CSR §§ 30-51.170(3)(C), 30-51.172(3)(C).

82.    The Rules further require the mandated script to "be provided to the client on an annual basis," and for firms to obtain renewed customer signatures on the script every three years.  15 CSR §§ 30-51.170(3)(C)(3), 30-51.172(3)(C)(3).

83.    The Rules state that the "[w]ritten consent" required "shall contain language that is substantially similar to" language set forth in the rules.  15 CSR §§ 30-51.170(3)(D), 30-51.172(3)(D).

84.    The Broker-Dealer Rule specifies the following language:

"I, [NAME OF CUSTOMER], consent to my [as applicable, NAME OF BROKER-DEALER OR AGENT] incorporating a social objective or other nonfinancial objective into any discretionary investment decision my [as applicable, BROKER-DEALER OR AGENT] makes for my account; any recommendation, advice, or solicitation my [as applicable, BROKER-DEALER OR AGENT] makes to me for the

- 26 -

purchase or sale of a security or commodity; or the selection my [as applicable, BROKER-DEALER OR AGENT] makes, or recommendation or advice my [as applicable, BROKER-DEALER OR AGENT] makes to me regarding the selection of, a third-party manager or subadviser to manage the investments in my account. Also, I acknowledge and understand that incorporating a social objective or other nonfinancial objective into discretionary investment decisions, recommendations, advice, and/or the selection of a third-party manager or subadviser to manage the investments, in regards to my account, will result in investments and recommendations/ advice that are not solely focused on maximizing a financial return for me or my account."

15 CSR § 30-51.170(3)(D).

85.     The Investment Adviser Rule specifies the following language:

"I, [NAME OF CLIENT], consent to my [as applicable, NAME OF INVESTMENT ADVISER OR INVESTMENT ADVISER REPRESENTATIVE] incorporating a social objective or other nonfinancial objective into any discretionary investment decision my [as applicable, INVESTMENT ADVISER OR INVESTMENT ADVISER REPRESENTATIVE] makes for my account; any recommendation or advice my [as applicable, INVESTMENT ADVISER OR INVESTMENT ADVISER REPRESENTATIVE] makes to me for the purchase or sale of a security or commodity; or the selection my [as applicable, INVESTMENT ADVISER OR INVESTMENT ADVISER REPRESENTATIVE] makes, or recommendation or advice my [as applicable, INVESTMENT ADVISER OR INVESTMENT ADVISER REPRESENTATIVE] makes to me regarding the selection of, a third-party manager or subadviser to manage the investments in my account. Also, I acknowledge and understand that incorporating a social objective or other nonfinancial objective into discretionary investment decisions, recommendations, advice, and/or the selection of a third-party manager or subadviser to manage the investments, in regards to my account, will result in investments and recommendations/advice that are not solely focused on maximizing a financial return for me or my account."

15 CSR § 30-51.172(3)(D).

86. The Broker-Dealer Rule applies to "broker-dealer[s]" and "agent[s]." 15 CSR § 30-51.170(3).

87. The Broker-Dealer Rule applies to Plaintiff's members who are broker-dealers registered with the State of Missouri.

88. The Investment Adviser Rule applies to all "investment adviser[s]" and "investment adviser representative[s]" covered by Missouri law. 15 CSR § 30-51.172(3).

89. While the definition of "Investment Adviser" under Missouri law excludes "federal covered investment adviser[s]," § 409.1-102, RSMo, state law nonetheless includes "an individual employed by or associated with a[] . . . federal covered investment adviser" within the definition of "Investment adviser representative," so long as the individual has a place of business in Missouri, has more than five clients who are natural persons, and more than ten percent of the individual's clients are natural persons. 17 C.F.R. § 275.203A 3(a)(1).

90. The Investment Adviser Rule does not explicitly exclude federal covered investment advisers or supervised persons of a federal covered investment adviser, including investment adviser representatives.

91. The Investment Adviser Rule applies to investment adviser representatives of federal covered investment advisers if the representative

- 28 -

maintains an office in Missouri, has more than five clients who are natural persons, and has a client base more than ten percent of which consists of natural persons.

92.     The Investment Adviser Rule indirectly applies to federal covered investment advisers with investment adviser representatives who are subject to the Rule.

93.     The Rules do not define what it means to "consider" socially responsible criteria or other nonfinancial objectives.

94.     The Rules do not define what "the maximization of financial return to the customer" means.

95.     The Rules apply to accounts subject to ERISA.

96.     The Rules apply to pension accounts.

97.     The Rules apply to sales of covered securities as defined under federal law.

98.     The Rules do not explain how Affected Persons are to handle currently-held investments that are potentially implicated by the Rules.

99.     The Rules apply equally to Affected Persons who are SIFMA members and to similarly situated firms and professionals that are not SIFMA members.

- 29 -

*Public Statements Regarding the Rules*

100.   On July 18, 2023, The Missouri Times published a statement written by Defendant Ashcroft regarding the Rules ("Statement"). A copy of the Statement is attached as Exhibit C.[13]

101.   The Statement reflects that the Rules apply to retirement savings and pension assets. *See* Statement ("[W]e can require those who are entrusted with Missourians' retirement savings to put their interests ahead of progressive activists."); (indicating that the rules apply to "pension or portfolio" assets).

102.   The Statement recognizes the Rules relate to a controversial issue.

103.   The Statement acknowledges that the Rules relate to a political issue. *See id.* ("[T]his [is] not just about politics . . ..").

104.   The Statement acknowledges that the Rules were issued after the Missouri General Assembly failed to pass similar legislation. *See id.* (indicating the Rules were issued "in the wake of the legislature's failure to advance legislation that would protect investors").

105.   The Statement indicates that other states may follow Missouri in adopting the Rules. *See id.* ("Georgia, Mississippi, and Wyoming are some of the states following Missouri's leadership . . ..").

---

[13] John R. Ashcroft, Opinion, *It's Time To Reign In ESG*, Mo. Times, July 18, 2023, https://themissouritimes.com/opinion-its-time-to-rein-in-esg/.

106. Comments by members of the Missouri General Assembly on the proposed—but not passed—effort to incorporate the new Rules into law acknowledged that the subject matter of the Rules is political in nature and vague. *See*, *e.g.*, *2023 Legislative Session – Day Forty – Wednesday, March 22 – Afternoon*, Mo. House of Representatives Floor Debate, at 3:13:14 PM (statement of Rep. Terry Thompson) (Mar. 22, 2023) ("[T]here is no true definition of it out there because it's all subjective.");[14] *id.* at 3:13:16 PM (statement of Rep. Peter Meredith) ("I get that . . . there's no definition in the real world . . . because it's really a political phrase that's been taken over.").

107. One member's comments reflect that the Rules would interfere with the ability of financial professionals to evaluate risks in providing advice. *See 2023 Legislative Session – Day Forty-Three – Monday, March 27*, Mo. House of Representatives Floor Debate, at 6:45:00 PM (Mar. 27, 2023) (statement of Rep. Peter Meredith) (stating that firms are not considering social and nonfinancial objectives "because they're inserting their personal political views, it's because they're identifying risks, financial risks, and their job is to manage financial risks .

---

[14] A recording of the floor debate is publicly available at https://sg001-harmony.sliq.net/00325/Harmony/en/PowerBrowser/PowerBrowserV2/20200831/43/8211.

. .. This bill would interfere with them doing their job and upholding their fiduciary duty to identify risks and invest accordingly.").[15]

108.  Members questioned whether HB 863 may apply to faith-based investing.  *See id.* at 6:51:49 PM (statement of Rep. Sarah Unsicker) ("I am wondering about freedom of religion issues . . .  So do you know how this would affect that?"); *id*. at 6:53:09 PM ("Do you think that the person who wrote this bill might have an idea or a clue about this? Because I think it could be a significant issue.").

109.  Those members' concerns prefigured the difficulties described above. Must all financial professionals who incorporate faith-based principles declare themselves as failing to focus exclusively on their clients' financial wellbeing, even when both they and their clients believe the opposite?

110.  One member acknowledged that the bill may violate the First Amendment.  *See id*. at 6:53:20 PM (statement of Rep. Doug Clemens) ("You know, I have a funny feeling with the way this body operates that we're going to be looking at the courts, ultimately, but I can certainly see a First Amendment challenge to this . . ..").

---

[15] A recording of the floor debate is publicly available at https://sg001-harmony.sliq.net/00325/Harmony/en/PowerBrowser/PowerBrowserV2/20200831/43/8253.

111.   As of the date of this filing, Plaintiff has been unable to locate any public statements by Defendants describing any investor concerns, inquiries or complaints that that Rules were designed to address.

## COUNT ONE (42 U.S.C. § 1983)

### THE RULES ARE PREEMPTED BY NSMIA

112.   Plaintiff incorporates by reference the allegations contained in paragraphs 1-111.

113.   Under Article VI of the United States Constitution, "the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

114.   The Rules require Affected Persons, including SIFMA members, to incur costs and alter their business practices.

*Regulation of Investment Advisers and Investment Adviser Representatives*

115.   NSMIA amended the Investment Adviser Act to mandate that "No law of any State … requiring registration, licensing, or qualification as an investment adviser shall apply to any person … that is registered under [the Investment Adviser Act] as an investment adviser, or that is a supervised person of such person, except that a State may license, register, or otherwise qualify any

- 33 -

investment adviser representative who has a place of business located within that State…" 15 U.S.C. § 80b-3a(b)(1)(A).

116.   The Investment Adviser Rule applies to investment adviser representatives of federal covered investment advisers if the representative maintains an office in Missouri, has more than five clients who are natural persons, and has a client base more than ten percent of which consists of natural persons.

117.   To the extent the Rules apply to federal covered investment advisers and investment adviser representatives, the Rules are preempted by NSMIA.

### *Regulation of Broker-Dealer Recordkeeping Requirements*

118.   NSMIA expressly preempts states from establishing regulations requiring broker-dealers to "mak[e] and keep[] records" that "differ from, or are in addition to" the requirements established under federal rules.  15 U.S.C. § 78o(i)(1).

119.   The Broker-Dealer Rule requires broker-dealers to obtain a "written acknowledgment of consent" from customers that is substantially similar to scripted language set forth in the rule.

120.   The Broker-Dealer Rule requires firms to provide the required script to customers on an annual basis and obtain an updated written consent from them every three years.

- 34 -

121. The records required by the Broker-Dealer Rule are not required by federal law or SEC rules.

122. NSMIA preempts the Broker-Dealer Rule because it requires broker-dealers to make and keep records that differ from, or are in addition to, the records required by SEC rules.

### *Imposing Conditions on the Sale of Covered Securities*

123. Under NSMIA, no state "shall directly or indirectly prohibit, limit, or impose conditions, based on the merits of such offering or issuer, upon the offer or sale of any" covered security. 15 U.S.C. § 77r(a)(3).

124. Under federal law, both operating companies and investment companies issuing covered securities may legally pursue objectives other than maximum financial gain.

125. Investment companies that offer mutual funds commonly state objectives other than maximum financial gain.

126. Operating companies also commonly have objectives other than maximum financial gain.

127. On their face, the Rules restrict the ability of financial professionals to recommend or advise strategies that include the purchase of covered securities issued by investment companies and operating companies that have "non-financial" objectives.

128.    The Rules impose merit-based conditions on the offer or sale of covered securities.

129.    To the extent that the Rules apply to covered securities under NSMIA, the Rules are preempted by NSMIA.

**COUNT TWO (42 U.S.C. § 1983)**

**THE RULES ARE PREEMPTED BY ERISA**

130.    Plaintiff incorporates by reference the allegations contained in paragraphs 1-129.

131.    Under Article VI of the United States Constitution, "the Laws of the United States … shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

132.    ERISA preempts state and local laws that "relate to" ERISA plans.  29 U.S.C. § 1144(a).  State and local laws that have a "reference to" or "connection with" ERISA plans "relate to" them and are preempted.  *Gobeville v. Liberty Mut. Ins. Co.*, 136 S. Ct. 936, 943 (2016).

133.    The Rules apply to ERISA plan assets, such as pension accounts.

134.    To the extent that the Rules apply to ERISA plan assets, the Rules are preempted by ERISA.

## COUNT THREE (42 U.S.C. § 1983)

## THE RULES VIOLATE THE
## FIRST AMENDMENT PROTECTION AGAINST COMPELLED SPEECH

135.    Plaintiff incorporates by reference the allegations contained in paragraphs 1-134.

136.    Under Article VI of the United States Constitution, "the Laws of the United States … shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

137.    "The First Amendment, which applies to the states through the Fourteenth Amendment, prohibits laws 'abridging the freedom of speech.'" *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 750 (8th Cir. 2019) (citing U.S. Const. amend. I).

138.    "The Supreme Court has 'held time and again that freedom of speech includes both the right to speak freely and the right to refrain from speaking at all.'" *Id.* (quoting *Janus v. Am. Fed'n of State, Cnty., and Mun. Emps., Council 31*, 138 S. Ct. 2448 (2018)).  "For corporations as for individuals, the choice to speak includes within it the choice of what not to say." *Pacific Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 16 (1986) (plurality op.).

139. "The loss of First Amendment freedoms . . . unquestionably constitutes irreparable injury." *Crow v. Watson Chapel Sch. Dist.*, 540 F.3d 752, 762 (8th Cir. 2008).

140. The Rules require Affected Persons to issue state-scripted documents and to secure written consents conforming to the state's prescribed language related to a controversial matter of public debate. The statements the Rules require are not purely factual but rather constitute a regurgitation of a script created by Defendants relating to a controversial political issue. Specifically, the Rules require financial professionals to describe common investment strategies, and many federal covered securities, as "not solely focused on maximizing a financial return for me or my account" even in situations where the financial professional does not believe that statement to be accurate.

141. The Rules violate the First Amendment protection against compelled speech by requiring Affected Persons to adopt and express the government's position on a controversial matter subject to public debate that is not purely factual.

<u>**COUNT FOUR (42 U.S.C § 1983)**</u>

**THE RULES ARE UNCONSTITUTIONALLY VAGUE**

142. Plaintiff incorporates by reference the allegations contained in paragraphs 1-141.

- 38 -

143.   Under Article VI of the United States Constitution, "the Laws of the United States … shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

144.   Under Constitutional due process principles limiting state regulation, "[i]t is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  "The due process clause thus prevents . . . deference [to administrative agencies] from validating the application of a regulation that fails to give fair warning of the conduct it prohibits or requires. . . . In the absence of notice—for example, where the regulation is not sufficiently clear to warn a party about what is expected of it—an agency may not deprive a party of property by imposing civil or criminal liability." *Gen. Elec. Co. v. U.S. Env't. Prot. Agency*, 53 F.3d 1324, 1328–29 (D.C. Cir. 1995) (internal quotation marks omitted).

145.   A state rule is unconstitutionally vague if it fails to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he act accordingly." *Grayned*, 408 U.S. at 108.  "If, by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith" would be unable to "identify, with 'ascertainable certainty,' the standards

with which the agency expects parties to conform," a regulation may be void for vagueness. *Gen. Elec. Co.*, 53 F.3d at 1329.

146. The Rules require Affected Persons to issue disclosures and obtain written consents if their advice "incorporates a social objective or other nonfinancial objective" into offering a recommendation or making an investment decision on its client's behalf.

147. The Rules fall far short of providing regulated persons with the ability to ascertain with certainty what strategies or securities include "social" or "nonfinancial objectives." Accordingly, the Rules are unconstitutionally vague.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court:

(1)     Issue a declaratory judgment, under 28 U.S.C. § 2201, that the Rules are invalid as preempted by NSMIA and ERISA;

(2)     Issue a declaratory judgment, under 28 U.S.C. § 2201, that the Rules constitute unconstitutional state compulsion of speech in violation of the First and Fourteenth Amendments of the United States Constitution;

(3)     Issue a declaratory judgment, under 28 U.S.C. § 2201, that the Rules are void as impermissibly vague under the Fourteenth Amendment of the United States Constitution;

(4)     Permanently enjoin Defendants and their officers, employees, and agents from implementing, applying, or taking any action whatsoever to enforce the Rules; and

(5)     Grant such other and further relief as this Court deems just and proper.

Dated:  August 10, 2023

SECURITIES INDUSTRY AND FINANCIAL MARKETS ASSOCIATION

By its Attorneys,

*/s/ Angela B. Kennedy*

William Ray Price, Jr.                    #29142MO
Angela B. Kennedy                       #69167MO
**ARMSTRONG TEASDALE LLP**
101 East High Street
First Floor
Jefferson City, MO 65101
+1.573.636.8394
wprice@atllp.com
akennedy@atllp.com

Of counsel, with applications to appear *pro hac vice* forthcoming:

Jason S. Pinney
David C. Boch
Jeff Goldman
Matthew D. O'Keefe
**MORGAN, LEWIS & BOCKIUS LLP**
One Federal Street
Boston, MA  02110-1726
+1.617.341.7700
jason.pinney@morganlewis.com
david.boch@morganlewis.com
jeff.goldman@morganlewis.com
matthew.okeefe@morganlewis.com

Vanessa M. Brown
**MORGAN, LEWIS & BOCKIUS LLP**
1701 Market Street
Philadelphia, PA 19103-2921
+1.215.963.5000
vanessa.brown@morganlewis.com

- 42 -

*Certificate of Service*

I, Angela B. Kennedy, hereby certify that on August 10, 2023 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and that I have mailed by United States Postal Service the document to the following non CM/ECF participants:

John R. Ashcroft
Missouri Secretary of State
600 W. Main St., Room 208
Jefferson City, MO 65101

Douglas M. Jacoby
Missouri Securities Commissioner
600 W. Main Street, Room 229
Jefferson City, MO 65101

*/s/ Angela B. Kennedy*
Angela B. Kennedy
Attorney for Plaintiff
**ARMSTRONG TEASDALE LLP**
101 East High Street
First Floor
Jefferson City, MO 65101

Date: August 10, 2023