## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

| | | |
|---|---|---|
| SECURITIES INDUSTRY AND | ) | |
| FINANCIAL MARKETS ASSOCIATION, | ) | |
| | ) | |
| **Plaintiff**, | ) | **Case No: 2:23-CV-4154-SRB** |
| v. | ) | |
| | ) | |
| | ) | |
| **JOHN R. ASHCROFT**, in his official | ) | **ORAL ARGUMENT REQUESTED** |
| capacity as Secretary of State of Missouri, and | ) | |
| **DOUGLAS M. JACOBY,** in his official | ) | |
| capacity as Missouri Securities Commissioner, | ) | |
| | ) | |
| **Defendants.** | ) | |

## **DEFENDANTS' SUGGESTIONS IN SUPPORT OF MOTION TO DISMISS**

Respectfully submitted,

GRAVES GARRETT LLC

Edward D. Greim
Missouri Bar No. 54034
James M. Humphrey
Missouri Bar No. 50200
Matthew R. Mueller
Missouri Bar No. 70263
GRAVES GARRETT LLC
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
Fax: (816) 222-0534
edgreim@gravesgarrett.com

*Counsel for Defendants*

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................... 1

ARGUMENT ......................................................................................................................... 2

I.      Standard of Review ................................................................................................ 2

II.     SIFMA lacks standing to challenge the Rules ................................................... 3

     A.   SIFMA fails to identify specific members who are harmed by the Rules .... 4

         1.   SIFMA fails to meet its burden to identify specific members ............. 4

         2.   SIFMA does not explain how its members would have standing ........ 6

     B.   SIFMA's claims necessitate the participation of individual members ........ 8

III.    SIFMA fails to allege its preemption claims are actionable under § 1983 ......... 10

IV.    NSMIA does not preempt the Rules ................................................................... 10

     A.   The IA Rule is not preempted by NSMIA ...................................................... 11

     B.   The B-D Rule is not preempted by NSMIA § 78o(i)(1) ................................. 13

     C.   SIFMA has failed to adequately plead the Rules somehow impose merit-based conditions on the offer or sale of covered securities ............................ 14

V.      The Rules are not preempted by ERISA, which specifically disclaims preemption of state securities laws ........................................................................ 16

     A.   ERISA cannot preempt the Rules because the Rules are explicitly excluded from ERISA preemption via the Saving Clause ......................................... 16

     B.   Even if the Saving Clause does not apply, there is no Preemption because the Rules do not satisfy the seven-factor test the Eighth Circuit uses to determine if a state law "relates to" ERISA plans ............................................. 17

VI.    The Rules do not violate the First Amendment ................................................ 19

     A.   The Rules satisfy First Amendment scrutiny under *Zauderer* ................. 20

     B.   The Rules also satisfy *Central Hudson* ...................................................... 26

Case 2:23-cv-04154-SRB    Document 21    Filed 10/02/23    Page 2 of 40

**VII.    The Rules are sufficiently clear for SIFMA Members to comply** .......................... 28

**CONCLUSION** ............................................................................................ 30

**CERTIFICATE OF SERVICE** ..................................................................... 31

Case 2:23-cv-04154-SRB   Document 21   Filed 10/02/23   Page 3 of 40

# TABLE OF AUTHORITIES

**Cases**                                                                 **Pages**

*Albright v. Oliver,*
510 U.S. 266 (1994) .......................................................................... 10

*Am. Farm Bureau Fed'n v. U.S. Env't Prot. Agency,*
836 F.3d 963 (8th Cir. 2016) ........................................................... 4, 8

*Am. Meat Inst. v. U.S. Dep't of Agric.,*
760 F.3d 18 (D.C. Cir. 2014) ............................................................ 22

*Ark. Blue Cross & Blue Shield v. St. Mary's Hosp., Inc.,*
947 F.2d 1341 (8th Cir. 1991) .......................................................... 18

*Babbitt v. Farm Workers,*
442 U.S. 289 (1979) ....................................................................... 6, 7

*Baker v. McCollan,*
443 U.S. 137, 144 (1979) .................................................................. 10

*Bano v. Union Carbide Corp.,*
361 F.3d 696 (2d Cir. 2004) ............................................................... 8

*Basic Inc. v. Levinson,*
485 U.S. 224 (1988) .......................................................................... 24

*Bast v. Prudential Ins. Co. of America,*
150 F.3d 1003 (9th Cir. 1998) .......................................................... 17

*Bd. of Trs. of State Univ. of N.Y. v. Fox,*
492 U.S. 469 (1989) .......................................................................... 27

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ........................................................... 3, 4, 16, 19

*Branson Label, Inc. v. City of Branson, Mo,*
793 F.3d 910 (8th Cir. 2015) .............................................................. 3

*Brooks v. Roy,*
776 F.3d 957 (8th Cir. 2015) .............................................................. 3

*Burson v. Freeman,*
504 U.S. 191 (1992) .......................................................................... 27

iv

*Cal. Div. of Labor Standards Enf't v. Dillingham Const. N.A., Inc.,*
    519 U.S. 316 (1997) ................................................................................ 18

*California v. Texas*,
    141 S. Ct. 2104 (2021) ........................................................................... 6, 7

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*,
    447 U.S. 557 (1980) ............................................................................ 26, 27

*Hill v. Colorado,*
    530 U.S. 703 (2000) ................................................................................ 29

*Cipollone v. Liggett Grp., Inc.*,
    505 U.S. 504 (1992) .................................................................... 11, 12, 13, 14

*Cressman v. Thompson,*
    798 F.3d 938 (10th Cir. 2015) .................................................................. 8

*Entm't Software Ass'n v. Blagojevich,*
    469 F.3d 641 (7th Cir. 2006) ................................................................... 23

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976) ................................................................................ 24

*Express Scripts, Inc. v. Wenzel,*
    102 F.Supp.2d 1135 (W.D. Mo. 2000) ............................................... 18, 19

*Florida Bar v. Went For It,*
    515 U.S. 618 (1995) ................................................................................ 27

*Friends of the Earth, Inc. v. Laidlaw Env'l. Servs. (TOC), Inc.,*
    528 U.S. 167 (2000) .................................................................................. 4

*FTC v. Colgate–Palmolive Co.,*
    380 U.S. 374 (1965) ................................................................................ 26

*FW/PBS, Inc. v. City of Dallas,*
    493 U.S. 215 (1990) .................................................................................. 5

*Gen. Motors Corp. v. Abrams,*
    897 F.2d 34 (2d Cir.1990) ....................................................................... 11

*Golden State Transit Corp. v. City of L.A.,*
    493 U.S. 103 (1989) ................................................................................ 10

*Gonzaga University v. Doe,*
    536 U.S. 273 (2002) ................................................................10

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) ................................................................28

*Hall v. Geiger–Jones Co.,*
    242 U.S. 539 (1917) ................................................................15

*In re Aurora Dairy Corp. Organic Milk Marketing & Sales Pracs. Litig.,*
    621 F.3d 781 (8th Cir. 2010) ................................................11

*Janus v. AFSCME,*
    138 S. Ct. 2448 (2018) ..............................................................8

*Johanns v. Livestock Mktg. Ass'n,*
    544 U.S. 550 (2005) ..................................................................8

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ..............................................................4, 5

*Milavetz, Gallop & Milavetz, P.A. v. United States,*
    559 U.S. 229 (2010) ............................................20, 21, 22, 25, 26

*Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc.,*
    406 F.3d 1052 (8th Cir. 2005) ................................................3

*N.Y. State Rest. Ass'n v. N.Y.C. Bd. of Health,*
    556 F.3d 114 (2d Cir. 2009) ............................................21, 22

*Nat'l Ass'n of Mfrs. v. SEC,*
    800 F.3d 518 (D.C. Cir. 2015) ..............................................23

*Nat'l Elec. Mfrs. Ass'n v. Sorrell,*
    272 F.3d 104 (2d Cir. 2001) ..................................................22

*Nat'l Inst. of Family & Life Advocates v. Becerra,*
    138 S. Ct. 2361 (2018) ......................................................23, 24

*Nebraska Beef Producers Comm. v. Nebraska Brand Comm.,*
    287 F.Supp.3d 740, 747 (D. Neb. 2018) ..................................3

*New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co.,*
    514 U.S. 645 (1995) ..........................................................18, 19

*Noe v. Henderson,*
    456 F.3d 868 (8th Cir. 2006) ................................................11

*Pharm. Care Mgmt. Ass'n v. Rowe,*
    429 F.3d 294 (1st Cir. 2005) ................................................................. 25

*Religious Sisters of Mercy v. Becerra,*
    55 F.4th 583 (8th Cir. 2022) .............................................................. 4, 5

*Schlansky v. United Merchants & Mfrs., Inc.,*
    443 F.Supp. 1054 (S.D.N.Y. 1997) ..................................................... 17

*Schumacher v. SC Data Ctr., Inc.,*
    912 F.3d 1104 (8th Cir. 2019) ............................................................... 3

*Sec. & Exch. Comm'n v. Cap. Gains Rsch. Bureau, Inc.,*
    375 U.S. 180 (1963) ............................................................................ 23

*Shea v. Esensten,*
    208 F.3d 712 (8th Cir. 2000) ............................................................... 18

*Sierra Club v. Morton,*
    405 U.S. 727 (1972) .............................................................................. 5

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) .............................................................................. 6

*Sproles v. Binford,*
    286 U.S. 374 (1932) ............................................................................ 29

*St. Louis Effort for AIDS v. Huff,*
    2014 WL 1631386, at *3 ...................................................................... 5

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ........................................................................... 4, 5

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149, 158 (2014) ...................................................................... 3

*United States v. Philip Morris USA Inc.,*
    855 F.3d 321 (D.C. Cir. 2017) ............................................................ 22

*United States v. Raines,*
    362 U.S. 17 (1960) .............................................................................. 29

*United States v. Williams,*
    553 U.S. 285 (2008) ............................................................................ 28

*Warth v. Seldin,*
    422 U.S. 490 (1975) .................................................................. 6, 9

*Watters v. Wachovia Bank, N.A.,*
    550 U.S. 1 (2007) .................................................................. 11, 19

*Wooley v. Maynard,*
    430 U.S. 705 (1977) .................................................................. 8

*Yamauchi v. Cotterman,*
    84 F.Supp.3d 993 (N.D. Cal. 2015) ............................................ 17

*Zauderer v. Off. of Disciplinary Counsel of the Supreme Court of Ohio,*
    471 U.S. 626 (1985) ............................ 20, 22, 24, 25, 26, 27

## STATUTES AND REGULATIONS

15 C.S.R. § 30-51.170(3)(D) .................................................... 21, 24

15 C.S.R. § 30-51.172(3)(D) .................................................... 21, 24

15 C.S.R. §§ 30-51.170(3)(A) ................................................... 2, 14, 22

15 C.S.R. §§ 30-51.170(3)(B) ................................................... 19, 21, 29

15 C.S.R. §§ 30-51.170(3)(C) ................................................... 2, 27

15 C.S.R. §§ 30-51.172(3)(A) ................................................... 2, 22

15 C.S.R. §§ 30-51.172(3)(B) ................................................... 2, 11, 20, 21, 29

15 C.S.R. §§ 30-51.172(3)(C) ................................................... 2, 27

15 U.S.C. § 77r(a)(3) ............................................................... 14

15 U.S.C. § 78b ..................................................................... 24

15 U.S.C. § 78o(i)(1) .............................................................. 13

15 U.S.C. §§ 78a-78pp ............................................................ 15

15 U.S.C. §§77a-77aa ............................................................. 15

17 C.F.R. § 275.203A 3(a)(1) ..................................................... 7

29 U.S.C. § 1144(a) ........................................................................... 16

29 U.S.C. § 1144(b)(2)(A) ................................................................ 16

42 U.S.C. § 1983 .............................................................................. 10

Act of Mar. 13, 1913, ch. 85, 1913 Mont. Laws 367 ....................... 15

Act of Mar. 6, 1933, ch. 47, § 4, 1933 Mont. Laws 72, 76 .............. 15

Act of May 27, 1921, ch. 499, 1921 Mass. Acts 622 ........................ 15

Fed. R. Civ. P. 12(b)(6) ...................................................................... 2

R.S. Mo. § 409.1-102 .................................................................. 11, 12

U.S.C. § 80b-3a(b)(1)(A) ............................................................ 11, 12

## OTHER AUTHORITIES

Financial Factors in Selecting Plan Investments,
    85 FR 72846-01 ......................................................................... 30

General Instructions for Part 2 of Form ADV,
    www.sec.gov/about/forms/formadv-part2.pdf ........................... 30

*Is Your Nonfinancial Performance Revealing the True Value of Your Business to Investors?,*
    Ernst & Ernst Young Global Limited 3 (2017)
    https://www.ey.com/en_gl/news/2018/11/nonfinancial-disclosures-are-essential-to-most-
    institutional-investors ................................................................. 25

SEC Release 44992,
    Federal Register, Vol. 66, No 213, at 55821 (2001) .................. 13

SEC Rule 17a-3(a)(17) ................................................................... 13

## INTRODUCTION

To protect Missouri investors, Missouri Secretary of State John R. Ashcroft (the "Secretary") recently promulgated rules that require certain broker-dealers and investment advisors to tell their customers if they will make or recommend investments for a purpose other than maximizing financial returns. The Rules neither prohibit nor disfavor such decisions. Instead—like many other Missouri securities disclosure requirements—the Rules merely require that customers know and give consent before professionals make these decisions with their money.

Plaintiff, the Securities Industry and Financial Markets Association ("SIFMA"), a trade group purporting to represent "broker-dealers, investment banks and asset managers operating in the U.S. and global capital markets," Compl. ¶ 20, opposes these customer protections and sues to enjoin both the Secretary and Missouri Securities Commissioner, Douglas Jacoby (the "Commissioner"), from enforcing them. But Defendants' Rules are traditional exercises of Missouri's power to protect customers and clients. Many other state rules require disclosures so that customers and their professionals are on the same page regarding investment objectives. SIFMA never articulates who is injured by this disclosure; it lacks standing to challenge the Rules; and the Complaint fails to state a claim upon which relief can be granted.

## FACTUAL BACKGROUND

The Secretary published the two Rules in June 2023: (1) "Dishonest or Unethical Business Practices by Broker-Dealers and Agents" (the "B-D Rule"); and (2) "Dishonest or Unethical Business Practices by Investment Advisers and Investment Adviser Representatives." (the "IA Rule") Compl. ¶¶ 68-75. They add to the Secretary's existing regulatory listing of dishonest or unethical practices. **First**, each Rule defines as an unethical practice the "failure to disclose" to a customer/client the "material fact" that a professional "incorporates a social objective or other

1

nonfinancial objective" into various investment decisions or recommendations for Missouri consumers' savings. 15 C.S.R. 30-51.170(3)(A), 30-51.172(3)(A).[1]

**Second**, each Rule defines the key terms. In each case, the definition of "incorporating" a "social objective" or "nonfinancial objective" *turns on the professional's own decision* to use some non-financial criteria "*for the purpose* of seeking to obtain an effect other than the maximization of financial return to the client." 15 C.S.R. 30-51.170(3)(B)1, 4; 30-51.172(3)(B)1, 4. This is a safe harbor. If professionals do not target a non-financial "purpose," the Rules do not apply at all.

**Third**, each Rule provides that the disclosure obligation is "satisfied by providing a clear and conspicuous prior disclosure and obtaining a written acknowledgment and consent from the customer" (15 C.S.R. 30-51.170(3)(C); 30-51.172(3)(C)). And **fourth**, each Rule provides text for the written consent, and provides that the consent shall contain language "substantially similar" to it. This consent does not require either the professional or customer to assent to any belief or factual statement about the desirability, merits, or risks of using non-financial objectives. *Id*.

SIFMA does not challenge the Secretary's authority to promulgate the Rules or the rulemaking process. Instead, SIFMA alleges (1) the Rules are preempted by the National Securities Markets Improvement Act of 1996 ("NSMIA") (Count I); (2) the Rules are preempted by the Employee Retirement Income Security Act of 1974 ("ERISA") (Count II); the Rules violate the First Amendment (Count III); and (4) the Rules are unconstitutionally vague (Count IV).

## ARGUMENT

### I.    Standard of Review

Defendants move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To state a claim under Federal Rule of Civil Procedure 8(a)(2),

---

[1] 15 C.S.R. 30-51 is attached as Exhibit A.

the pleading must contain a short and plain statement of the claim showing that the pleader is entitled to relief." *Brooks v. Roy*, 776 F.3d 957, 960 (8th Cir. 2015) (quotations omitted). "This requirement is designed to give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Id.* (citations and quotations omitted). "Although the pleading standard is liberal, the plaintiff must allege facts–not mere legal conclusions–that, if true, would support the existence of the asserted claims." *Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc.*, 406 F.3d 1052, 1062 (8th Cir. 2005). Unsupported allegations are "conclusory and not entitled to be assumed true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554-55 (2007).

Defendants also move to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1). On such a motion, "the court restricts itself to the face of the pleadings[.]" *Branson Label, Inc. v. City of Branson, Mo*, 793 F.3d 910, 914 (8th Cir. 2015); *see also Nebraska Beef Producers Comm. v. Nebraska Brand Comm.*, 287 F.Supp.3d 740, 747 (D. Neb. 2018) (stating that a court deciding a Rule 12(b)(1) facial attack to associational standing "merely needs to look and see if the plaintiff has sufficiently alleged a basis for subject matter jurisdiction.").

## II.     SIFMA lacks standing to challenge the Rules.

SIFMA's Complaint fails for lack of subject matter jurisdiction under Rule 12(b)(1). "Article III standing must be decided first by the court and presents a question of justiciability; if it is lacking, a federal court has no subject-matter jurisdiction over the claim." *Schumacher v. SC Data Ctr., Inc.*, 912 F.3d 1104, 1105 (8th Cir. 2019) (internal quotation marks omitted). "The party invoking federal jurisdiction bears the burden of establishing standing." *Susan B. Anthony List v. Driehaus,* 573 U.S. 149, 158 (2014) (internal quotation marks omitted).

SIFMA purports to sue *only* in a representative capacity on behalf of its members who are allegedly harmed by the Rules (Compl., ¶¶ 20, 25); it does not claim its own direct harm. Thus,

SIFMA must allege sufficient facts for the Court to ascertain that it has associational standing to sue on its members' behalf. It must plead facts which establish: (1) its members have standing to sue in their own right; (2) the interests at stake in the lawsuit are germane to SIFMA's purpose; and (3) participation of individual members is not necessary. *See Am. Farm Bureau Fed'n v. U.S. Env't Prot. Agency*, 836 F.3d 963, 968 (8th Cir. 2016) (citing *Friends of the Earth, Inc. v. Laidlaw Env'l. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). SIFMA fails on the first and third factors.

## A. SIFMA fails to identify specific members who are harmed by the Rules.

Contrary to binding precedent, SIFMA names not a single member who has been or will be harmed by the Rules. Relying on vague descriptions of its members' activities, SIFMA asks the Court to accept standing without question. This requires dismissal. *See Twombly*, 550 U.S. at 555. Yet even had SIFMA named members, it cannot allege facts showing those entities have standing.

### 1. SIFMA fails to meet its burden to identify specific members.

When an association brings claims on behalf of its members, it must at the very least identify a member that would suffer harm as a result of the challenged conduct. *See Summers v. Earth Island Inst.*, 555 U.S. 488 (2009); *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 601-02 (8th Cir. 2022). In *Summers*, the Supreme Court rejected an associational standing test that asked "whether, accepting the organization's self-description of the activities of its members, there is a statistical probability that some of those members are threatened with concrete injury." 555 U.S. at 498–99. It explained that such a "novel approach to the law of organizational standing would make a mockery of [the Court's] prior cases, *which have required plaintiff-organizations to make specific allegations establishing that at least one identified member had suffered or would suffer harm*." *Id.* at 498 (emphasis added) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 563 (1992) (no standing where organization did not "submit affidavits...showing, through specific

facts...that one or more of [its] members would ... be 'directly' affected" by the allegedly illegal activity); *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972) ("Nowhere in the pleadings or affidavits did the [organization] state that its members use Mineral King for any purpose, much less that they use it in any way that would be significantly affected by the proposed actions of the respondents."); *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 235 (1990) (city's affidavit was insufficient because it failed to name individuals harmed by the challenged program).

A court cannot "accept[ ] the organizations' self-descriptions of their membership" because "the court has an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties." *Summers*, 555 U.S. at 499. "While it is certainly possible—perhaps even likely—that one individual will meet all th[e] criteria, that speculation does not suffice." *Id.* "Standing...requires...a factual showing of perceptible harm." *Id.* (third alteration in original) (quoting *Lujan*, 504 U.S. at 566). Thus, courts "require plaintiffs claiming an organizational standing to identify members who have suffered the requisite harm." *Id.*

In *Becerra*, the Eighth Circuit reversed the district court's determination that a Catholic nonprofit corporation and ministry had standing to challenge certain provisions of the Affordable Care Act because the association-plaintiff failed to specifically identify any member(s) harmed by the challenged provision. *See Becerra*, 55 F.4th at 602 ("Other than the three named plaintiffs who are CBA members…the CBA has otherwise failed to identify members who have suffered the requisite harm. Accordingly, we hold that the CBA lacks associational standing to sue on behalf of unnamed members.") (internal citations omitted); *see also St. Louis Effort for AIDS v. Huff*, No. 13-4246-CV-C-ODS, 2014 WL 1631386, at *3 (W.D. Mo. Apr. 24, 2014) ("MAIA offers no substantiation for its theory that any of its members will suffer economic harm. It offers no

evidence, affidavits, or documents. Its invitation that the Court simply assume the existence of a member with standing is insufficient.").

SIFMA's Complaint fails to specifically identify any of its members, much less any member that is harmed by the Rules. SIFMA cannot proceed before this Court behind a shroud of generic allegations regarding its membership. Unless SIFMA specifically identifies at least one member with injury, this Court lacks jurisdiction to provide the advisory opinion SIFMA seeks.

### 2. SIFMA does not explain how its members would have standing.

A plaintiff has Article III standing only where he or she has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins,* 578 U.S. 330, 338 (2016). "Where, as here, a case is at the pleading stage, the plaintiff must 'clearly ... allege facts demonstrating' each element." *Id.* at 339 (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)). Even if SIFMA had bothered to identify Member-entities, they would fail this standard.

First, SIFMA fails to allege its members' standing to challenge the IA Rule. The IA Rule only applies to those Investment Advisers conducting business in Missouri or providing advice to Missouri customers. But SIFMA does not allege any of its members meet this description. Rather, it recites bare conclusions that its members will be impacted. *See* Compl. ¶¶ 20-21, 26, 99, 114. Because the Complaint never alleges any SIFMA members are Missouri Investment Advisers to whom the IA Rule applies, SIFMA lacks standing to challenge the Rule. *See California v. Texas*, 141 S. Ct. 2104, 2114 (2021) (holding plaintiff lacks standing to challenge penalty that cannot be enforced against it); *Babbitt v. Farm Workers*, 442 U.S. 289, 298, (1979) ("A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's *operation or enforcement*") (emphasis added).

Similarly, SIFMA never alleges any members are Investment Adviser *Representatives* to whom the Rules apply. Under the IA Rule, "Investment Adviser Representative" is an individual:

> employed by or associated with an investment adviser or federal covered investment adviser who makes any recommendations or otherwise gives investment advice regarding securities, manages accounts or portfolios of clients, determines which recommendation or advice regarding securities should be given, provides investment advice or holds herself or himself out as providing investment advice, receives compensation to solicit, offer, or negotiate for the sale of or for selling investment advice, or supervises employees who perform any of the foregoing.[2]

Section 409.1-102(16). SIFMA fails to allege it has any member that meets this definition.[3] Because it fails to allege that any of its members are Investment Adviser Representatives to whom the Rules may apply, SIFMA lacks standing to challenge the application of the Rules. *See California*, 141 S. Ct. at 2114; *Babbitt*, 442 U.S. at 298.

Third, while the Complaint opines that the Rules would apply to accounts subject to ERISA, it fails to allege that any SIFMA members manage or advise plans covered by ERISA. *See, e.g.,* Compl. ¶¶ 95, 96, 133-134. Absent factual allegations that its members manage or advise plans covered by ERISA, SIFMA does not have standing to raise an ERISA preemption claim because it has not identified any member(s) who would be harmed by the Rules, even if the Rules did apply to ERISA covered plans. *See California*, 141 S. Ct. at 2114; *Babbitt*, 442 U.S. at 298.

Finally, SIFMA claims the Rules require "Affected Persons" (a defined term in the Complaint that is not limited to SIFMA members) to make statements regarding investment strategies "even in situations where the financial professional does not believe that statement to be accurate." *See* Compl. ¶ 140. Yet the Complaint fails to identify any SIFMA Member that

---

[2] This definition is subject to several exclusions not relevant in this case.
[3] SIFMA does cite to 17 C.F.R. § 275.203A 3(a)(1) multiples times in its complaint which provides the *federal* definition of Investment Adviser Representative. Not only is this definition inapplicable, but SIFMA still fails to allege it has any members that fit even the federal definition.

disagrees with the content of any required disclosure. The Complaint does not even make a general allegation that *any* SIFMA members—identified or not—disagree with the disclosures.

If SIFMA's members agree with the disclosure, there is no First Amendment injury. *See Janus v. AFSCME*, 138 S. Ct. 2448, 2463 (2018) ("The First Amendment forbids the government from '[c]ompelling individuals to mouth support for views they find objectionable.'"); *Wooley v. Maynard*, 430 U.S. 705, 715 (1977) ("Here, as in *Barnette*, we are faced with a state measure which forces an individual, as part of his daily life indeed constantly while his automobile is in public view to be an instrument for fostering public adherence *to an ideological point of view he finds unacceptable*.") (emphasis added); *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 557 (2005) ("We have sustained First Amendment challenges to allegedly compelled expression in two categories of cases: true "compelled-speech" cases, in which an individual is obliged personally to express a message he disagrees with, imposed by the government; and "compelled-subsidy" cases, in which an individual is required by the government to subsidize a message he disagrees with, expressed by a private entity."); *Cressman v. Thompson*, 798 F.3d 938, 951 (10th Cir. 2015) (claim requires "(1) speech; (2) *to which he objects*; that is (3) compelled by some governmental action."). Because SIFMA never alleges its members disagree with the content of the disclosures, it lacks standing to bring the First Amendment Compelled Speech claim on their behalf.

**B. SIFMA's claims necessitate the participation of individual members.**

An association may only sue on behalf of its members where *both* "the claims asserted" *and* "the relief requested" allow the Court to grant relief without individual members as plaintiffs. *See Am. Farm Bureau Fed'n,* 836 F.3d at 968. SIFMA claims members are unneeded because it seeks only equitable relief, Compl. ¶ 28, but failure to seek damages does not alone satisfy the third prong of the associational standing test. *See Bano v. Union Carbide Corp.*, 361 F.3d 696, 714

(2d Cir. 2004). Rather, courts decide whether "the fact and extent" of the injuries to be equitably remedied "would require individualized proof" from members. *See Warth,* 422 U.S. at 515-16.

The preemption claims require individualized, factual showings of the burdens and costs of complying with the Rules, as well as what business practices members had to alter to comply and the associated costs of altering those practices. *See* Compl. ¶ 114 ("The Rules require Affected Persons, including SIFMA members, to incur costs and alter their business practices."). That proof will come not from SIFMA, which alleges no harm, but from its allegedly injured member entities.

Likewise, as shown above, *only* SIFMA's members that disagree with the disclosure language have standing to bring the Compelled Speech claim, and *only* those members are entitled to relief. SIFMA's Complaint identifies *no* members that disagree with the disclosure, limiting itself to concerns that some non-member professionals *may* object. Compl. ¶ 140. Whether each member disagrees with the disclosure is an individualized inquiry requiring member participation.

Finally, the vagueness claim necessitates a showing that SIFMA's members cannot reasonably ascertain what is required by the Rules as alleged in the Complaint. *See* Compl. ¶ 147. If SIFMA's claims survive this motion to dismiss, its burden of proof cannot be satisfied without individualized proof from its members. Because that individualized proof is necessary to resolving the claims, the participation of those individual members as plaintiffs is required.

Each of these flaws—failing to identify specific members and to establish that they have standing—are sufficient independent bases for the Court to dismiss this matter for lack of standing. These deficiencies leave the Court and the Defendants guessing at who—if anyone—is harmed by the Rules and why SIFMA, rather than those individuals or firms, sues here. Because SIFMA has not met its burden to establish standing, the Court lacks subject matter jurisdiction.

### III.  SIFMA fails to allege its preemption claims are actionable under § 1983.

SIFMA implies—with no explanation—that all of its claims are actionable under 42 U.S.C. § 1983. *See* Compl. at 33, 36, 37, 38. Section 1983 provides a cause of action for any person who, under color of law, has been deprived a legal right, but it is not itself a source of substantive federal rights. *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (plurality opinion) (citing *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)). Instead, to properly state a § 1983 claim, plaintiffs must identify a violation of a specific federal right, *id.*, especially with claims of preemption: "it would obviously be incorrect to assume that a federal right of action pursuant to § 1983 exists every time a federal rule of law pre-empts state regulatory authority." *Golden State Transit Corp. v. City of L.A.*, 493 U.S. 103, 107 (1989); *see also Gonzaga University v. Doe*, 536 U.S. 273, 276 (2002) (Congress must have "unambiguously conferred" a right on a plaintiff for it to have a § 1983 claim).

Here, SIFMA makes no such showing on its preemption claims, Counts I (NSMIA) and II (ERISA). Instead, SIFMA merely inserts "(42 U.S.C. § 1983)" in the heading of all of its claims. Fatally, SIFMA has not alleged that its preemption claims are rooted in any federal *right*. Nor has SIFMA alleged either law "unambiguously confers" a right. Neither ERISA nor NSMIA expressly confer any "federal rights;" they are instead rules of the road for regulators, indirectly serving consumers. Thus, SIFMA cannot proceed under § 1983 on its preemption claims (Counts I and II).

### IV.  NSMIA does not preempt the Rules.

SIFMA asserts various provisions of NSMIA preempt the Rules, but fails to properly plead its claims. Even had they been well-pleaded, SIFMA's preemption claims fail as matter of law.

> Federal preemption exists when (1) Congress explicitly prohibits state regulation; (2) Congress implicitly prohibits state regulation by pervasively occupying the regulatory field; (3) state law directly conflicts with federal law; or (4) a federal agency, acting within the scope of its delegated authority, intends its regulations to have preemptive effect.

*Noe v. Henderson*, 456 F.3d 868, 870 (8th Cir. 2006). "Whether a particular federal statute preempts state law depends upon congressional purpose." *In re Aurora Dairy Corp. Organic Milk Marketing & Sales Pracs. Litig.*, 621 F.3d 781, 791-92 (8th Cir. 2010). "Consideration of issues arising under the Supremacy Clause starts with the assumption that the historic police powers of the States are not to be superseded by Federal Act unless that is the clear and manifest purpose of Congress." *Cipollone v. Liggett Grp., Inc*, 505 U.S. 504, 516 (1992) (internal quotations omitted). As relevant here, "[c]onsumer protection is quintessentially a field which the States have traditionally occupied." *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 35-36 (2007) (Stevens, J., dissenting) (internal quotations omitted), *see also Gen. Motors Corp. v. Abrams*, 897 F.2d 34, 41–42 (2d Cir.1990) ("[C]onsumer protection law is a field traditionally regulated by the states.").

## A. The IA Rule is not preempted by NSMIA.

SIFMA's claim that 15 U.S.C. § 80b-3a(b)(1)(A) preempts the IA Rule fails as a matter of law because § 80b-3a(b)(1)(A) preemption and the IA Rule do not cover the same (1) persons or (2) conduct. NSMIA exempts *only certain individuals* from a *narrow area* of state regulation:

> (1) In general
>
> No law of any state or political subdivision thereof *requiring the registration, licensing, or qualification* as an investment adviser or supervised person of an investment adviser shall apply to any person –
>
> (A) *That is registered under section 80b-3 of this title as an investment adviser*, or that is a *supervised person* of such person, *except that a State may license, register, or otherwise qualify any investment adviser representative who has a place of business located within that State[.]*

NSMIA § 80b-3a(b)(1)(A) (emphasis added).

*i.* *The IA Rule does not regulate the persons covered by NSMIA preemption.*

The IA Rule requires disclosure by "investment adviser[s]" and "investment adviser representative[s]" as those terms are defined by R.S. Mo. § 409.1-102. § 30-51.172(3)(B). Under

§ 409.1-102, the definition of "Investment adviser" specifically excludes "[a] federal covered investment adviser." § 409.1-102(15)(E). A "'Federal covered investment adviser" means a person registered under the Investment Advisers Act of 1940." § 409.1-102(15)(6). The Investment Advisers Act of 1940 is codified as 15 U.S.C. § 80b-1 through 15 U.S.C § 80b-21. Thus, the IA Rule explicitly excludes precisely those for which NSMIA preemption applies at § 80b-3a(b)(1).

SIFMA recognizes this fatal flaw, *see* Compl., ¶ 89, but tries to dodge it by claiming that "[t]he Investment Adviser Rule *indirectly* applies to federal covered investment advisers *with investment adviser representatives* who are subject to the Rule." Compl. ¶ 92 (emphasis added). But NSMIA precludes this dodge by making a clear carveout from federal preemption for state regulation of these very representatives: "except that a State may license, register, or otherwise qualify any investment adviser representative who has a place of business located within that State[.]" § 80b-3a(b)(1)(A). NSMIA's express limits on its own preemptive effect are the last word, for "Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted." *Cipollone*, 505 U.S. at 517.

    *ii.*      *The IA Rule does not regulate the conduct preempted by NSMIA.*

Even if § 80b-3a(b)(1)(A) and the IA Rule did cover the same persons, SIFMA's claim still fails because § 80b-3a(b)(1)(A) only preempts state rules "requiring the registration, licensing, or qualification" of persons. Because SIFMA's Complaint concedes that "the Rules do not concern . . . state registration and licensing," Compl. ¶ 40, SIFMA can only survive dismissal if the IA Rule "requires" "qualification" of covered persons. SIFMA pleads no facts suggesting that the IA Rule does "require" qualification, but any such effort would be futile as a matter of law. That is because the Rule's plain text makes clear that it defines unethical practices and prescribes a disclosure-and-consent process to avoid them. It "requires" no "qualification," nor does it list qualifications

for licensure. This Court should not extend § 80b-3a(b)(1)(A) beyond its intended bounds, which are defined by its text. *See Cipollone*, 505 U.S. 517. In short, the IA Rule is not preempted.

**B.   The B-D Rule is not preempted by NSMIA § 78o(i)(1).**

SIFMA next claims "NSMIA preempts the B-D Rule because it requires broker-dealers to make and keep records that differ from, or are in addition to, the records required by SEC rules." Compl. ¶ 122. SIFMA finds the source of this "express"[4] preemption in 15 U.S.C. § 78o(i)(1):

> No law, rule, regulation, or order, or other administrative action of any State or political subdivision thereof shall establish [. . .] making and keeping records [. . .] requirements for brokers, dealers [. . .] that differ from, or are in addition to, the requirements in those areas established under this chapter.

But SIFMA's claim fails because the B-D Rule does not require anyone to make or keep records "that differ from" or are "in addition to" federal requirements. SEC rules allow for the disclosure of investment objectives in a Customer Account Record, which is all these Rules do.

SEC Rule 17a-3(a)(17) requires broker-dealers to create a "Customer Account Record" containing certain minimum information as to each customer, including: customer name; tax identification number; address; phone number; date of birth; employment status; annual income; net worth; and *investment objectives*. The SEC publishes supplements explaining the meaning and construction of this requirement. *See* SEC Release 44992, Federal Register, Vol. 66, No. 213, at 55821 (2001). This Release states that the purpose of the Customer Account Record is to "reduce the number of misunderstandings between customers and broker-dealers regarding the customer's situation or investment objectives." *Id*. The SEC also indicates that the wording of the Customer Account Report need not be federally standardized. *Id*. (Stating, for example, "[b]ecause different terms ascribed to categories of investment objectives may vary among firms . . ."). The SEC even acknowledges that the Customer Account Record "may consist of more than one document." *Id*.

---

[4] Compl., at ¶118.

Here, the B-D Rule does not require a new record; instead, it merely adds an investing objective disclosure to part of the Customer Account Record required by Rule 17a-3(a): whether the customer desires their broker-dealer to "incorporate a social [or] nonfinancial objective into a discretionary investment decision[.]" 30-51.170(3)(A). Further, because the Customer Account Record need not be limited to a single document or page, it is even possible for broker-dealers to include a B-D Rule disclosure/consent as a separate *document*, without adding an additional *record* at all. Nor does the B-D Rule disclosure differ from any federally-required disclosure.

SIFMA's repeated reference to a "state-mandated script" allegedly created by the Rules does not alter this analysis. *See* Compl. ¶¶ 1; 5; 8; 11; 13. Though the B-D Rule proposes a statement of consent, *see* § 30-51.170, broker-dealers may alter the language and incorporate it into a new or pre-existing document as part of the single Customer Account Record. And again, there is no federally-required disclosure from which the disclosure "differs." Thus, SIFMA cannot plausibly allege that preemption of the B-D Rule was the "clear and manifest purpose of Congress." *Cipollone*, 505 U.S. at 516. The claim thus fails as a matter of law.

## C. SIFMA has failed to adequately plead the Rules somehow impose merit-based conditions on the offer or sale of covered securities.

SIFMA also claims both Rules are preempted by 15 U.S.C. § 77r(a)(3) because they "restrict the ability of financial professionals to recommend or advise strategies that include the purchase of covered securities issued by investment companies and operating companies that have 'non-financial' objectives" by "impos[ing] merit-based conditions on the offer or sale of covered securities." Compl., ¶¶ 127, 128. SIFMA's assertion misconstrues the Rules entirely and is therefore an allegation without factual support or any available supporting inferences in support.

Section 77r(a)(3) only preempts regulations which "directly or indirectly prohibit, limit, or impose conditions, based on the merits of such offering or issuer, upon the offer or sale of any

security described in paragraph (1).[5] This particular provision in NSMIA has a long and well-documented history. Generally, prior to the Great Depression, the states regulated the purchase and sale of securities. *See e.g., Act of Mar. 13, 1913, ch. 85, 1913 Mont. Laws 367; Act of May 27, 1921, ch. 499, 1921 Mass. Acts 622.* These "blue-sky" laws required both pre-sale registration of securities and pre-sale "qualification" or "merit" review. *See Hall v. Geiger–Jones Co*., 242 U.S. 539, 550 (1917) ("The name that is given to the law indicates the evil at which it is aimed; that is, ... speculative schemes which have no more basis than so many feet of 'blue sky'...."). Generally, "blue sky" laws were aimed *at securities* a state deemed unfair, unjust or inequitable. *See, e.g.*, Act of Mar. 6, 1933, ch. 47, § 4, 1933 Mont. Laws 72, 76.

After the Great Depression, Congress started regulating securities, employing a model requiring pre-sale disclosure of material information *by entities offering securities to investors*. *See* Securities Act of 1933, 15 U.S.C. §§77a-77aa, and Securities Exchange Act of 1934, 15 U.S.C. §§ 78a-78pp. Aware of the problems caused by concurrent state and federal regulation of securities, Congress later enacted NSMIA, which is designed to alleviate the burdens of dual regulation of *securities* themselves. H.R. CONF. REP. NO. 104-864, at 39. In short, Congress enacted NSMIA § 77r(a) to prevent state laws requiring merits review of particular securities. Neither the text nor history of § 77r(a), however, shows Congressional intent to preempt state regulations mandating that investment professionals disclose a particular investment strategy to their customers.

Notably, § 77r(a) applies to "covered securities" or securities which "will be covered" at the conclusion of the transaction. Herein lies SIFMA's first error: the Rules regulate "affected persons," *not* "covered securities." Compl. ¶¶77 ("The Rules make it a dishonest or unethical business practice in Missouri for . . . ('Affected Persons') to fail to disclose . . .").

---

[5] Paragraph (1) enumerates "covered security[ies] and securities which "will be a covered security upon completion of the transaction[.]" § 77r(a)(1).

SIFMA next makes the bare assertion that "[t]he Rules impose merit-based conditions on the offer or sale of covered securities," but fails to provide any factual basis for that claim and it should not be assumed true. *See Twombly*, 550 U.S. at 554-55.[6] The actual text of the Rules belies SIFMA's assertion. As SIFMA has prominently pled, the Rules require disclosure of "Affected Person's" investment "*strategy*," incorporating a "social objective." *See* Compl. ¶ 65, 127, 140. Requiring financial professionals to disclose non-financial investment strategies to their customers is far removed from the type of security-focused state regulation § 77r(a) actually preempts.

## V. **The Rules are not preempted by ERISA, which specifically disclaims preemption of state securities laws.**

SIFMA claims that "to the extent that the Rules apply to ERISA plan assets, the Rules are preempted by ERISA." Compl. ¶ 134. This claim is rooted in 29 U.S.C. § 1144(a), which states:

> [T]he provisions of this subchapter and subchapter III shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title.

Compl. ¶ 132. This claim must fail. First, though ignored by SIFMA, ERISA contains a saving clause explicitly exempting from preemption state regulation relating to "insurance, banking, or securities," such as the Rules. § 1144(b)(2)(A). Second, even had ERISA not expressly excluded the Rules from preemption, SIFMA cannot plead that the Rules "relate to" ERISA.

### A. **ERISA cannot preempt the Rules because the Rules are explicitly excluded from ERISA preemption via the Saving Clause.**

While § 1144(a) of ERISA sometimes preempts state laws relating to an employee-benefit plan, that preemption is qualified by a "securities saving clause." § 1144(b)(2)(A). It provides in pertinent part: "nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities." *Id*. The Saving Clause

---

[6] In fact, SIFMA has failed to identify a single security "restricted" by the Rules.

makes clear that ERISA and state securities regulations should be construed as complementary, rather than contradictory, to each other. *Schlansky v. United Merchants & Mfrs., Inc.*, 443 F.Supp. 1054, 1062 (S.D.N.Y. 1997). Courts are not often tasked with adjudicating challenges to state securities laws based on ERISA preemption, but the Saving Clause is consistently enforced. In *Yamauchi v. Cotterman*, the beneficiary of a corporation's 401k plan brought an action against a bank alleging state common law claims for breach of fiduciary duty, negligent misrepresentation, fraudulent misrepresentation, and fraud. 84 F.Supp.3d 993, 1004 (N.D. Cal. 2015). The defendants claimed the beneficiary's state law claims were preempted by ERISA. *Id*. The court, however, determined that the beneficiary's claims were not preempted because they arose out of the defendants' actions related to banking (loan servicing and assignment), pushing such duties— including negligent misrepresentation, fraudulent misrepresentation, and fraud—outside of ERISA preemption. *Yamauchi v. Cotterman*, 84 F.Supp.3d 993, 1004 (N.D. Cal. 2015) (*citing Bast v. Prudential Ins. Co. of America*, 150 F.3d 1003, 1008 (9th Cir. 1998)).

Similarly here, the Rules only apply to Covered Persons' activities as investment and securities professionals. Even SIFMA admits the obvious: that the Rules constitute "state securities regulation[.]" Compl. ¶ 5; *see also id.* ¶ 22 ("The Securities Division is the state regulatory agency charged with administering and enforcing state securities laws, including the Rules."). Thus, the Rules, as SIFMA admits, are securities regulations, and are excluded from ERISA preemption.

**B. Even if the Saving Clause does not apply, there is no preemption because the Rules do not satisfy the seven-factor test the Eighth Circuit uses to determine if a state law "relates to" ERISA plans.**

Even if this Court were to conclude ERISA's explicit Saving Clause does not foreclose preemption, preemption still fails because the Rules do not "relate to" ERISA plans. ERISA "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this

title." § 1144(a). Though this preemption was historically broad, the Supreme Court's 1995 decision in *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co.* marked a pivot in ERISA preemption. *See* 514 U.S. 645 (1995). The Court began "with the starting presumption that Congress does not intend to supplant state law," especially if the "state action [occurs] in fields of traditional state regulation[.]" *Id*. at 654–55. To preempt, a "clear and manifest purpose" by Congress is required. *Id*. at 655. Thus, the Court retreated from its broad, literal reading of "relate to": if the phrase "were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course." *Id*.

Courts now conclude a state law "relate[s] to" a covered ERISA plan only if it has a (1) "connection with;" or (2) "reference to" such a plan. *Cal. Div. of Labor Standards Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 324 (1997). When state laws contain no "reference to" ERISA plans, the Eighth Circuit weighs seven factors to determine preemption:

> (1) Whether the state law negates an ERISA plan provision, (2) whether the state law affects relations between primary ERISA entities, (3) whether the state law impacts the structure of ERISA plans, (4) whether the state law impacts the administration of ERISA plans, (5) whether the State law has an economic impact on ERISA plans, (6) whether preemption of the state law is consistent with other ERISA provisions, and (7) whether the state law is an exercise of traditional state power.

*Shea v. Esensten*, 208 F.3d 712, 718 (8th Cir. 2000) (quoting *Ark. Blue Cross & Blue Shield v. St. Mary's Hosp., Inc.*, 947 F.2d 1341, 1344-45 (8th Cir. 1991)).

Here, SIFMA alleges none of the necessary predicates to its ERISA claim. First, the Complaint is devoid of any allegation that the Rules "relate to" ERISA plans.[7] Though SIFMA does allege the Rules "apply to ERISA plan assets," Compl. ¶ 133, "relates to" is a term of art and not all regulations which may apply to ERISA plan assets trigger preemption. *See Express Scripts,*

---

[7] The text of the Rules also do not contain any "reference to" ERISA—and SIFMA does not allege otherwise.

*Inc. v. Wenzel*, 102 F.Supp.2d 1135, 1147 (W.D. Mo. 2000) (reasoning that some connections to ERISA are "attenuated and too remote to warrant preemption") (citing *Travelers*, 514 U.S. at 655).

Second, assuming SIFMA did allege the Rules "relate to" ERISA plans, SIFMA pleads no facts which would satisfy the Eighth Circuit's test—and SIFMA's bare and incorrect conclusion that "the Rules are preempted by ERISA" is not enough. *See Twombly*, 550 U.S. 544, 554-55 ("a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions") (internal quotations omitted). There is nothing in the Rule itself suggesting that the disclosure/consent provision negates ERISA plan provisions; affects relations between primary ERISA entities; impacts plan structure or administration; has an economic impact on the plans; is consistent with other ERISA preemptions; or it outside traditional state power. ERISA rules prescribe not certain forms of disclosure, but instead, a fiduciary duty standard and risk-return considerations.[8] Again, the Rules exist not to stifle any particular investment strategy, but to protect consumers—a traditional state power. *See Watters*, 550 U.S. at 35–36. Because SIFMA has failed to adequately plead the Rules are preempted by ERISA, this Court must dismiss SIFMA's Count Two.

## VI.     **The Rules do not violate the First Amendment.**

SIFMA next attacks the disclosure Rules because they "compel speech" on "controversial political issue[s]…even in situations where the financial professional does not believe [the disclosure] to be accurate." *See* Compl. ¶¶ 140-141. As addressed above, SIFMA lacks standing to bring this claim, as it failed to allege that a single one of its members—or their financial professionals—disagrees with the content of the required disclosures. *See* Section II(a)(2)(iv). That

---

[8] *See* 29 CFR §§ 2550.404a-1(c)(1) ("Investment loyalty duties"), 2550.404a-1(b)(4) (economic effects of climate change on a particular investment and other ESG factors can be permissible part of a fiduciary's economic risk-return analysis, but it "depends on the individual facts and circumstances.").

aside, the First Amendment claims are fundamentally incoherent. The disclosures only apply when a financial professional subjectively takes action with "the purpose of seeking to obtain an effect other than the maximization of financial return to the customer." 15 C.S.R. §§ 30-51.170(3)(B), 30-51.172(3)(B). When the professional makes the decision to act with this goal in mind, he or she must simply tell the client and obtain consent. This fully complies with the First Amendment under either of the two potentially applicable tests, the *Zauderer* or *Central Hudson* standards.

The Rules are simple consumer protection disclosures aimed at combatting fraud and deception in commercial speech which reflect an almost century-old understanding of the purpose of professional investment advisers: "'to render to clients on a *personal* basis, competent, *unbiased*, and continuous advice regarding the sound management of their investments.'" *Lowe v. S.E.C.*, 472 U.S. 181, 192-196 (1985) (emphasis added).[9] This competent advice necessarily includes "[j]udgment of the client's circumstances and of the soundness of his financial *objectives* and of the risks he may assume." *Id*. at 196 (internal quotations omitted) (emphasis added). Such relationships necessarily require a two-way disclosure, so that the client can determine whether the advisor will seek to satisfy particular objectives, and so that the advisor can learn whether the client wants those objectives implemented. Such disclosures foster speech, product development, and customer satisfaction—all regular subjects of state regulation. Courts consistently conclude disclosures such as the Rules may coexist with the First Amendment.

**A. The Rules satisfy First Amendment scrutiny under *Zauderer*.**

A compelled disclosure of commercial speech between a professional and a customer survives First Amendment scrutiny so long as (1) the disclosure is "factual and uncontroversial,"

---

[9] Quoting *Investment Trusts and Investment Companies*, Report of the Securities and Exchange Commission, Pursuant to Section 30 of the Public Utility Holding Company Act of 1935, Investment Counsel, Investment Management, Investment Supervisory, and Investment Advisory Services, H.R.Doc. No. 477, at 32, 76th Cong., 2d Sess. (1939).

(2) the disclosure is related to the good or services the speaker provides, and (3) the disclosure is reasonably related to a sufficient government interest. *See Zauderer v. Off. of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626 (1985); *see also Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 249 (2010) (challenge to provision that imposes a disclosure requirement on commercial speech rather than an affirmative limitation on that speech is governed by *Zauderer*). The standard under *Zauderer* is akin to a rational basis test. *See N.Y. State Rest. Ass'n v. N.Y.C. Bd. of Health*, 556 F.3d 114, 132 (2d Cir. 2009) ("NYSRA") ("In light of *Zauderer*, this Circuit thus held that rules 'mandating that commercial actors disclose commercial information' are subject to the rational basis test"). Disclosures intended to prevent consumer deception, like those required by the Rules, are frequently upheld.

*i. The Disclosures are factual and uncontroversial.*

The Rules require certain financial professionals to tell their clients:

> [T]hat incorporating a social objective or other nonfinancial objective into discretionary investment decisions, recommendations, advice, and/or the selection of a third-party manager or subadviser to manage the investments, in regards to my account, will result in investments and recommendations/ advice that are not solely focused on maximizing a financial return for me or my account.

15 C.S.R. § 30-51.170(3)(D) (B-D Rule); 15 C.S.R. § 30-51.172(3)(D) (IA Rule). The Disclosures are truthful, logical syllogisms: if a financial professional decides to consider any "nonfinancial objective," it cannot be that the professional's advice is "solely" focused on maximizing a financial return for the client. In other words, if the financial professional considers *both* factors A and B in giving client advice, it is always true that (1) the professional did not *solely* consider either A or B, and (2) that investments, recommendations and advice are not *solely* "focused" on A or B.

Importantly, what triggers the disclosure is financial professionals' *own judgment*: they must have considered a particular criterion "*for the purpose* of seeking to obtain an effect other than the maximization of financial return to the customer." 15 C.S.R. §§ 30-51.170(3)(B), 30-

51.172(3)(B). Merely choosing what appears *to others* to be a non-financial criterion is not enough to trigger disclosure. If the professional lacked a non-financial "purpose" in using the non-financial criterion, there is no disclosure to make. Thus, none of this involves a debate about whether particular social or other criteria do or do not actually maximize financial returns—the question is a purely factual one: whether the professional has actually made a decision to use non-financial criterion for a non-financial purpose (that is, a purpose other than maximizing financial returns).

Such factual consumer disclosures are repeatedly upheld by courts in the face of First Amendment challenges. *See Zauderer*, 471 U.S. 626 (disclosures related to nature of contingent fee arrangements for attorneys); *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229 (2010) (disclosures related to nature of bankruptcy related assistance provided by debt relief agencies); *Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 21 (D.C. Cir. 2014) (en banc) ("AMI") (disclosures of country of origin information for meat; *NYSRA*, 556 F.3d at 134 (disclosure of calorie information at restaurants); *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 115 (2d Cir. 2001) (disclosure that products contain mercury); *United States v. Philip Morris USA Inc.*, 855 F.3d 321, 328 (D.C. Cir. 2017) (warning regarding health risks of tobacco products).

Next, SIFMA erroneously argues that the disclosures relate to a "controversial political issue." First, SIFMA fails to identify what that issue is. *See* Compl. ¶ 140. SIFMA may want to construe the Rules as an "anti-ESG" measure, but SIFMA is stuck with the plain text of the Rules rather than its own unprovable opinions. The Rules require professionals to disclose *any* time they consider a "nonfinancial objective" for the purpose of achieving something other than maximization of financial return for a customer, *regardless* of whether that "nonfinancial objective" has anything to do with ESG. *See* 15 C.S.R. §§ 30-51.170(3)(A), 30-51.172(3)(A). This encompasses not just environmental objectives, but also faith-based principles, or only investing

in American made goods. The disclosures are not targeted at any particular political issues. Rather, they exist to ensure that clients are fully informed regarding how the investments are being handled, regardless of the perceived "politics" of whatever nonfinancial objective is considered.

In the few cases where courts have found a "controversial political issue," the trigger for disclosure itself required the disclosing entity to make a controversial value judgment. *See Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015) (disclosures regarding use of "conflict minerals" that originated "in the Democratic Republic of the Congo or an adjoining country" was controversial); *Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641, 651–53 (7th Cir. 2006) (compelled disclosure of "sexually explicit" nature of video games); *Nat'l Inst. of Family & Life Advocates v. Becerra,* 138 S. Ct. 2361, 2371 (2018) ("NIFLA") (disclosures related to abortion). But here, a disclosing professional is not called to take any position on the underlying issues which relate to the investments. The Rules are even more neutral than this. First, the professional does not need to make disclosures violating his or her own beliefs about the slightly more esoteric question of whether those issues can be valid investment objectives. And second, the professional does not need to engage with the even more esoteric question of whether particular investment criteria do or do not actually maximize financial return. That is because, as explained above, the Rules only apply when the professional has in fact decided to employ criteria "*for the purpose* of seeking to obtain an effect" that is avowedly non-financial.

Thus, the Rules reduce to a non-controversial truism: when the adviser decides to act with the purpose of advancing something other than the maximization of return, clients must know and agree. That is the triggering principle, and under *Zauderer* and its progeny, it is *that* principle that must be controversial. As a matter of law, this truism is not controversial. If SIFMA were to suggest otherwise, it would be an alarming development, as all of securities regulation hinges on

the principle of customer knowledge and consent when professionals seek to act in their best interest. *See Sec. & Exch. Comm'n v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 186 (1963) ("A fundamental purpose, common to securities regulation, is "to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry.").[10] In short, SIFMA cannot prevail on this prong.

> ii. *The Disclosures are related to the services offered by Investment Advisers and Broker-Dealers to their customers.*

The Rules' disclosure requirements are explicitly related to the services that the financial professionals provide to their clients. Compare *Zauderer*, 471 U.S. at 651-2 (compelled attorney speech regarding attorney contingent fee arrangements with clients related to services offered) with *NIFLA,* 138 S. Ct. at 2372 (disclosure regarding state sponsored services unrelated to the services offered by licensed clinics). Disclosures are only triggered when the professional provides "discretionary investment decisions, recommendations, advice, and/or the selection of a third-party manager or subadviser to manage the investments, in regards to [a customer] account…" 15 C.S.R. § 30-51.170(3)(D) (B-D Rule); 15 C.S.R. § 30-51.172(3)(D) (IA Rule). This advice is precisely the reason the client engages and compensates the financial professional in the first place.

> iii. *The Disclosures are reasonably related to the State's significant interest in preventing consumer deception.*

The State of Missouri has a significant interest in preventing consumer deception and the disclosures required by the Rules are reasonably related to advancing that interest. Missouri consumers rely heavily on the advice provided by their financial professionals, given the information asymmetry between the professional and the client. In that context, increasing the flow

---

[10] Securities regulation serves many useful purposes, including: (1) to insure the maintenance of fair and honest markets, 15 U.S.C. § 78b; *Basic Inc. v. Levinson,* 485 U.S. 224, 230 (1988); (2) to provide investors with full disclosure of material information concerning public offerings of securities in commerce, *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 195 (1976); (3) to protect investors against fraud, *id.;* and (4) to promote ethical standards of honesty and fair dealing, *id.*

of information from the professional to the consumer regarding how investment decisions are made is an efficient prophylactic measure to prevent consumer confusion and deception.

This interest in preventing consumer confusion and deception is sufficient to satisfy *Zauderer*. The Supreme Court's pointed observation there determines the outcome of this case:

> Because the extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides, appellant's constitutionally protected interest in *not* providing any particular factual information in his advertising is minimal. An advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers.

*Zauderer*, 471 U.S. at 628 (emphasis in original); *see also Milavetz*, 559 U.S. at 250 (disclosures upheld where they were "intended to combat the problem of inherently misleading commercial advertisements"); *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 316 (1st Cir. 2005) (Boudin, C.J., and Dyk, J., concurring) (majority opinion) (holding that no "extensive First Amendment analysis" is required where the challenged provision involves "simply routine disclosure of economically significant information designed to forward ordinary regulatory purposes").

Relatedly, increasing customer information flow may well foster the growth of investment products that do include non-financial objectives. Full disclosure will allow customers to find professionals and products that match their non-financial goals. It will also allow firms to develop talent keyed to these non-financial criteria, and then compete for customers based on their success. The alternative—masking the use of non-financial criteria—will lead to surprised and dissatisfied customers, undifferentiated products, poor competition, and poor performance in meeting *both* financial *and* non-financial goals. Firms should embrace rather than reject this change.[11]

---

[11] *See Is Your Nonfinancial Performance Revealing the True Value of Your Business to Investors?*, ERNST & YOUNG GLOBAL LIMITED 3 (2017), https://www.ey.com/en_gl/news/2018/11/nonfinancial-disclosures-are-essential-to-most-institutional-investors ("Nonfinancial performance plays a pivotal role in the investment decisions for most of the surveyed investors, and for a greater percentage of investors than in previous years.").

Regardless, the D.C. Circuit has said that the "evidentiary parsing" required by more rigorous First Amendment tests "is hardly necessary when the government uses a disclosure mandate to achieve a goal of informing consumers about a particular product trait, assuming of course that the reason for informing consumers qualifies as an adequate interest." *AMI*, 760 F.3d 18, 26 (D.C. Cir. 2014) (en banc). *Zauderer* similarly forecloses that argument and permits the Court to acknowledge the State's interest in preventing deception on a motion to dismiss: "[w]hen the possibility of deception is as self-evident as it is in this case, we need not require the State to 'conduct a survey of the ... public before it [may] determine that the [advertisement] had a tendency to mislead.'" 471 U.S. at 652–653 (quoting *FTC v. Colgate–Palmolive Co.*, 380 U.S. 374, 391–392 (1965)). Thus, the State's interest in preventing consumer deception when nonfinancial objectives factor into investment decisions is sufficient to justify the disclosures, and the disclosures are reasonably related to that interest.

**B. The Rules also satisfy *Central Hudson*.**

Even if the Court applies *Central Hudson* rather than *Zauderer*, the Rules nevertheless survive First Amendment scrutiny. *Central Hudson* employs a four-step analysis. First, the Court must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 566 (1980) ("*Central Hudson*"). Next, the Court asks whether the asserted governmental interest is substantial. *Id.* If both inquiries yield positive answers, the Court must then determine whether the regulation: directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest. *Id.* The Supreme Court has described review under *Central Hudson* as "intermediate" scrutiny. *See Milavetz*, 559 U.S. at 250.

Assuming, *arguendo*, that SIFMA's members' commercial speech is protected by the First Amendment, the disclosures required by the Rules nevertheless satisfy this intermediate scrutiny. As discussed above, courts have consistently recognized that the State's interest in preventing consumer deception is a substantial state interest, *see* Section VI(a)(iii), and the State need not produce empirical studies to show the significance of the harm it seeks to remedy, for the Supreme Court has pointed out that it may demonstrate the substantiality of its interest with anecdotes, "history, consensus, and 'simple common sense.'" *Florida Bar v. Went For It, Inc*., 515 U.S. 618, 628 (1995) (quoting *Burson v. Freeman*, 504 U.S. 191, 211 (1992)) The Rules directly advance that interest by requiring the disclosure of nonfinancial objectives that factor into financial professionals' decisions. *See* Section IV(a)(ii), above.

The disclosure requirements are no more extensive than necessary to serve the State's interest in preventing consumers from being misled or deceived. Defendants are not required to show "the manner of restriction is absolutely the least severe that will achieve the desired end." *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989). The Supreme Court has repeatedly recognized that disclosure requirements are a naturally less intrusive alternative to outright prohibitions on speech. *See Zauderer*, 471 U.S. at 651 ("…[I]n virtually all our commercial speech decisions to date, we have emphasized that because disclosure requirements trench much more narrowly on an advertiser's interests than do flat prohibitions on speech."); *Central Hudson*, 447 U.S. at 565 (state cannot "completely suppress information when narrower restrictions on expression would serve its interest as well," while recognizing that "the possibility that some limited supplementation, by way of warning or disclaimer or the like, might be required."). Here, the Rules only require a disclosure to be made to the customer at the establishment of the relationship or prior to effecting advice, that it be provided on an annual basis,

Case 2:23-cv-04154-SRB   Document 21   Filed 10/02/23   Page 36 of 40

and that the customer signature be updated every three years. 15 C.S.R. §§ 30-51.170(3)(C), 30-51.172(3)(C). And the content of the disclosures themselves are no more substantial than is necessary to apprise the customer of the factors their financial professional is considering in making investment decisions on their behalf, for anything less than the minimal disclosure required would not provide sufficient information to the client to understand those factors.

Additionally, the disclosure requirement is not burdensome. IAs and B-Ds already are required to have their clients execute paperwork which, among other things, requires the client to identify their investment goals. An IA or B-D could satisfy the disclosure requirements in the Rules by allowing the client to check a "nonfinancial objective" box and, if the client selects that box, providing the disclosure mandated by the Rules. This minor paperwork is no more onerous than the activities already required of these financial professionals.

## VII.    **The Rules are sufficiently clear for SIFMA members to comply.**

Finally, SIFMA claims that the Rules themselves are unconstitutionally vague and that despite its members' compliance with far more burdensome and convoluted requirements under NSMIA, ERISA, the Securities Acts of 1933 and 1934, and a whole host of other laws, they simply cannot decipher these Rules. Importantly, SIFMA does not claim that its members are unable to discern what the Rules require of them, but only that they are incapable of understanding when the Rules are triggered in the first place. Compl. ¶¶ 146-47. Specifically, SIFMA claims that the Rules are vague because they do not adequately define the terms "social" or "nonfinancial objectives" such that a financial professional can determine when the disclosure is required. Compl. ¶ 147.

A law is unconstitutionally vague only if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams,* 553 U.S. 285, 304 (2008); *see also Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) (law is vague if it fails to "give the

person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly."). The vagueness analysis does not entitle courts to nullify state legislation or rules based on interpretations that are speculative or intentionally obtuse. *Cf. Hill v. Colorado*, 530 U.S. 703, 732 (2000) ("[S]peculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications.'" (quoting *United States v. Raines*, 362 U.S. 17, 23 (1960)). SIFMA claims that it cannot comprehend what it means to "consider" a "social" or "nonfinancial objective" and that the Rules fail to define what "the maximization of financial return to the customer" means. *See* Compl. ¶¶ 93-94.

Failing to define every term used in the Rules does not render them constitutionally infirm. Undefined terms are given their plain and ordinary meaning. The word "consider" and the phrase "maximization of financial return to the customer" are to be given their plain and ordinary meaning. *See* Compl. ¶¶ 93-94. "The requirement of reasonable certainty does not preclude the use of ordinary terms to express ideas which find adequate interpretation in common usage and understanding… The use of common experience as a glossary is necessary to meet the practical demands of legislation." *Sproles v. Binford*, 286 U.S. 374, 393 (1932) (holding statute requiring trucks to follow the "shortest practicable route" was not too vague to be understood).

And while ordinary meaning can suffice, the terms about which SIFMA complains—"socially responsible criteria" and "nonfinancial objective"—are specifically and clearly defined.[12] The Rules are straightforward: if a financial professional's advice uses any nonfinancial

---

[12] *See* 15 C.S.R. §§ 30-51.170(3)(B)(5), 30-51.172(3)(B)(5) (defining "socially responsible criteria" to mean "any criterion that is intended to further, or is branded, advertised, or otherwise publicly described by the broker-dealer or agent as furthering, any of the following: A. International, domestic, or industry agreements relating to environmental or social goals; B. Corporate governance structures based on social characteristics; or C. Social or environmental goals; *see also* 15 C.S.R. §§ 30-51.170(3)(B)(4), 30-51.172(3)(B)(4) (defining "nonfinancial objectives" to "mean[] the material fact to consider criteria in the investment or commitment of customer funds for the purpose of seeking to obtain an effect other than the maximization of financial return to the customer.

criteria aimed at any goal other than maximizing financial return, the professional must tell their client. Curiously, SIFMA's hypotheticals demonstrate a sophisticated understanding of when the Rules apply, the very factor it claims to be unable to ascertain. Faith-based principles incorporated into investment advice, when the professional has *a purpose other than maximizing return,* are a nonfinancial objective which would trigger disclosure. Compl. ¶ 13. The same is true for pooled investments that focus on rural development when the professional has *a purpose other than maximizing the individual investor's return*. *Id.* ¶ 17. So too for investing in a company because the professional wants to encourage a particular management structure, rather than because the professional has *a purpose of maximizing the investment's return*. *Id.* In each case, the plain text of the Rules show that it is the professional's *own known and intended* "purpose" to obtain an "effect" *other than profit maximization* that triggers disclosure and consent—it is not some unknowable outside standard. No financial professional or investor must make a disclosure or sign a consent where their actual purpose is to maximize financial return.[13] The Rules require the disclosures be made any time a nonfinancial objective is taken into account, regardless of whether that nonfinancial objective is ESG related, an "America First" approach, or entirely apolitical.

## CONCLUSION

For the foregoing reasons, the Complaint must be dismissed.

---

[13] SIFMA suggests (Compl., ¶ 17) that "volatility management" would require disclosures, but nowhere do the Rules suggest that controlling volatility or risk are not "financial" objectives. Indeed, because the expected financial performance of an asset over time does depend on volatility and risk, it is irrational to claim that diversification strategies undertaken to reduce risk and volatility would require special disclosure under the Rules. The ERISA rules, among numerous other sources, expressly recognize that risk and diversification are ordinary financial interest-maximizing objectives. *See, e.g.*, 29 CFR §§ 2550.404a-1(b(2) (recognizing that "appropriate consideration" for fiduciary charged with managing account "solely" in the best interest of participants and beneficiaries includes "risk of loss" and "diversification"). At any rate, such an odd construction of the Rules would render them largely superfluous, as disclosures regarding volatility, risk, and diversification are already required outside of the Rules. *See, e.g.,* General Instructions for Part 2 of Form ADV, available online at: https://www.sec.gov/about/forms/formadv-part2.pdf (requiring IAs to disclose their Methods of Analysis, Investment Strategies, and Risk of Loss).

Respectfully submitted this 2nd day of October, 2023.

GRAVES GARRETT LLC

*/s/ Edward D. Greim*
Edward D. Greim
Missouri Bar No. 54034
James M. Humphrey
Missouri Bar No. 50200
Matthew R. Mueller
Missouri Bar No. 70263
GRAVES GARRETT LLC
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
Fax: (816) 222-0534
edgreim@gravesgarrett.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I certify that on October 2, 2023, I filed and served the foregoing on counsel of record for all parties via the CM/ECF system.

*/s/ Edward D. Greim*
Edward D. Greim
Counsel for Defendants
