UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| SECURITIES INDUSTRY AND FINANCIAL MARKETS ASSOCIATION, <br><br> Plaintiff, <br><br> v. <br><br> JOHN R. ASHCROFT, in his official capacity as Secretary of State of Missouri; and DOUGLAS M. JACOBY, in his official capacity as Missouri Securities Commissioner, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )     CIVIL ACTION <br>     NO. 2:23-cv-4154 |

## SUGGESTIONS IN OPPOSITION TO DEFENDANTS'
## MOTION TO DISMISS FIRST AMENDED COMPLAINT

William Ray Price, Jr. (# 29142MO)
Angela B. Kennedy (# 69167MO)
**ARMSTRONG TEASDALE LLP**
101 East High Street
First Floor
Jefferson City, MO 65101

Jason S. Pinney (*pro hac vice*)
David C. Boch (*pro hac vice*)
Jeff Goldman (*pro hac vice*)
Matthew D. O'Keefe (*pro hac vice*)
**MORGAN, LEWIS & BOCKIUS LLP**
One Federal Street
Boston, MA 02110

Michael E. Kenneally (*pro hac vice*)
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Avenue NW
Washington, DC 20004

Vanessa M. Brown (*pro hac vice*)
**MORGAN, LEWIS & BOCKIUS LLP**
2222 Market Street
Philadelphia, PA 19103

*Attorneys for Plaintiff*

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 3

I.      LEGAL STANDARD.............................................................................. 3

II.     SIFMA HAS DEMONSTRATED STANDING ...................................... 3

        A.      SIFMA Has Shown That Multiple Members Have
                Standing Based On Economic And Constitutional Injuries.................. 4

                1.      Compliance Costs Support Standing As To All SIFMA's Claims ........... 4

                2.      SIFMA's Members Are Also Suffering First Amendment Injury............. 7

        B.      None Of SIFMA's Claims Requires Participation By Its Members..................... 9

III.    SIFMA HAS A CAUSE OF ACTION FOR NSMIA AND ERISA
        PREEMPTION ........................................................................................ 10

IV.     NSMIA PREEMPTS THE RULES ........................................................ 12

        A.      NSMIA Bars States From Duplicative And Unnecessary
                Regulation Of Broker-Dealers And Investment Advisers ................... 12

        B.      The B-D Rule Is Preempted Because It Requires Broker-Dealers
                To Make And Keep Records That Differ From Federal Requirements.............. 13

        C.      The IA Rule Is Preempted Because It Impermissibly
                Regulates Investment Advisers And Their Supervised Persons ......... 15

        D.      The Rules Are Preempted Because They Impose
                Merits-Based Conditions On The Sale Of Covered Securities........... 19

V.      ERISA PREEMPTS THE RULES ......................................................... 20

VI.     THE RULES VIOLATE THE FIRST AMENDMENT ......................... 24

VII.    THE RULES ARE UNCONSTITUTIONALLY VAGUE ..................... 28

CONCLUSION.................................................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*,
    600 U.S. 570 (2023) ................................................................................. *passim*

*Aetna Health Inc. v. Davila*,
    542 U.S. 200 (2004) ....................................................................................... 23

*All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*,
    570 F. Supp. 2d 533 (S.D.N.Y. 2008), *aff'd*, 651 F.3d 218 (2d Cir. 2011),
    *aff'd*, 570 U.S. 205 (2013) ........................................................................... 8, 10

*Am. Farm Bureau Fed'n v. EPA*,
    836 F.3d 963 (8th Cir. 2016) ..................................................................... 7, 10

*Ark. Blue Cross & Blue Shield v. St. Mary's Hosp., Inc.*,
    947 F.2d 1341 (8th Cir. 1991) ....................................................................... 22

*Ark. Med. Soc'y, Inc. v. Reynolds*,
    6 F.3d 519 (8th Cir. 1993) ............................................................................... 9

*Armstrong v. Exceptional Child Ctr., Inc.*,
    575 U.S. 320 (2015) ................................................................................. 11, 12

*Bacon v. Stiefel Lab'ys, Inc.*,
    677 F. Supp. 2d 1331 (S.D. Fla. 2010) ........................................................ 23

*Bano v. Union Carbide Corp.*,
    361 F.3d 696, 714 (2d Cir. 2004) .................................................................. 10

*Barnett Bank of Marion Cty., N.A. v. Nelson*,
    517 U.S. 25 (1996) ......................................................................................... 12

*Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin Cnty.*,
    115 F.3d 1372 (8th Cir. 1997) ......................................................................... 6

*Cal. Chamber of Com. v. Becerra*,
    529 F. Supp. 3d 1099 (E.D. Cal. 2021), *aff'd sub nom. Cal. Chamber of Com.*
    *v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468 (9th Cir. 2022) .................... 28

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*,
    29 F.4th 468 (9th Cir. 2022) ..................................................................... 26, 27

Case 2:23-cv-04154-SRB   Document 34   Filed 12/06/23   Page 3 of 40

*Cal. Div. of Labor Standards Enf't v. Dillingham Constr., N.A.*,
519 U.S. 316 (1997) ..................................................................................................21

*Carpenters Indus. Council v. Zinke*,
854 F.3d 1 (D.C. Cir. 2017) .......................................................................................5

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
447 U.S. 557 (1980) ..................................................................................................28

*City of Kennett v. EPA*,
887 F.3d 424 (8th Cir. 2018) ......................................................................................5

*Cressman v. Thompson*,
798 F.3d 938 (10th Cir. 2015) .....................................................................................8

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) ..................................................................................................12

*Crown Castle Fiber, L.L.C. v. City of Pasadena*,
76 F.4th 425 (5th Cir. 2023) .....................................................................................11

*Czyzewski v. Jevic Holding Corp.*,
580 U.S. 451 (2017) ....................................................................................................5

*Data Mfg., Inc. v. United Parcel Serv., Inc.*,
557 F.3d 849 (8th Cir. 2009) ......................................................................................3

*Dudley Supermarket, Inc. v. Transamerica Life Ins. & Annuity Co.*,
302 F.3d 1 (1st Cir. 2002) .........................................................................................23

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012) ..................................................................................................29

*FEC v. Cruz*,
596 U.S. 289 (2022) ....................................................................................................3

*First Nat'l Bank of E. Ark. v. Taylor*,
907 F.2d 775 (8th Cir. 1990) ....................................................................................11

*FMC Corp. v. Holliday*,
498 U.S. 52 (1990) ....................................................................................................21

*Free Speech Coal., Inc. v. Colmenero*,
No. 23-cv-917, 2023 WL 5655712 (W.D. Tex. Aug. 31, 2023) .................................8

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ................................................................................................4, 5

Case 2:23-cv-04154-SRB   Document 34   Filed 12/06/23   Page 4 of 40

*Gen. Elec. Co. v. EPA,*
  53 F.3d 1324 (D.C. Cir. 1995) ............................................................. *30*

*Glickman v. Wileman Bros. & Elliott,*
  521 U.S. 457 (1997) .......................................................................... 8

*Gobeille v. Liberty Mut. Ins. Co.,*
  577 U.S. 312 (2016) ..................................................................... 21, 22

*Goyette v. City of Minneapolis,*
  No. 20-cv-1302, 2021 WL 3222495 (D. Minn. July 29, 2021) ................. 9

*Grayned v. City of Rockford,*
  408 U.S. 104 (1972) .......................................................................... 30

*Heartland Acad. Cmty. Church v. Waddle,*
  427 F.3d 525 (8th Cir. 2005) .............................................................. 9

*Indep. Living Ctr. of S. Cal., Inc. v. Shewry,*
  543 F.3d 1050 (9th Cir. 2008) ........................................................... 11

*Iowa League of Cities v. EPA,*
  711 F.3d 844 (8th Cir. 2013) .............................................................. 4

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31,*
  138 S. Ct. 2448 (2018) ....................................................................... 8

*Jones v. Jegley,*
  947 F.3d 1100 (8th Cir. 2020) ............................................................ 3

*Ky. Ass'n of Health Plans, Inc. v. Miller,*
  538 U.S. 329 (2003) .......................................................................... 23

*Lindeen v. SEC,*
  825 F.3d 646 (D.C. Cir. 2016) ........................................................... 13

*Merit Const. All. v. City of Quincy,*
  759 F.3d 122 (1st Cir. 2014) .............................................................. 9

*Mertens v. Hewitt Assocs.,*
  508 U.S. 248 (1993) .......................................................................... 20

*Minn. Auto. Dealers Ass'n v. Stine,*
  No. 15-cv-2045, 2016 WL 5660420 (D. Minn. Sept. 29, 2016) ......... 10, 12

*Myers v. Merrill Lynch & Co., Inc,*
  No. 98-cv-03532, 1999 WL 696082 (N.D. Cal. Aug. 23, 1999) ............. 20

Case 2:23-cv-04154-SRB   Document 34   Filed 12/06/23   Page 5 of 40

*Nat'l Ass'n of Mfrs. v. SEC*,
800 F.3d 518 (D.C. Cir. 2015) ....................................................................26, 27, 28

*Nat'l Ass'n of Wheat Growers v. Bonta*,
85 F.4th 1263 (9th Cir. 2023) .....................................................................25, 26, 27

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
138 S. Ct. 2361 (2018) ......................................................................................24, 28

*Neb. Beef Producers Comm. v. Neb. Brand Comm.*,
287 F. Supp. 3d 740 (D. Neb. 2018) ...........................................................................9

*Puerto Rico v. Franklin California Tax-Free Tr.*,
579 U.S. 115 (2016) ..................................................................................................12

*Religious Sisters of Mercy v. Becerra*,
55 F.4th 583 (8th Cir. 2022) .......................................................................................7

*Rush Prudential HMO, Inc. v. Moran*,
536 U.S. 355 (2002) ..................................................................................................20

*Rydholm v. Equifax Info. Servs. LLC*,
44 F.4th 1105 (8th Cir. 2022) .....................................................................................5

*Shaw v. Delta Air Lines, Inc.*,
463 U.S. 85 (1983) .......................................................................................10, 11, 12

*Spellman v. United Parcel Serv., Inc.*,
540 F. Supp. 2d 237 (D. Me. 2008) ..........................................................................23

*Sprint Commc'ns Co. v. APCC Servs., Inc.*,
554 U.S. 269 (2008) ....................................................................................................5

*Stephenson v. Davenport Cmty. Sch. Dist.*,
110 F.3d 1303 (8th Cir. 1997) ..................................................................................29

*Temple v. Gorman*,
201 F. Supp. 2d 1238 (S.D. Fla. 2002) .....................................................................12

*United Healthcare Ins. Co. v. Levy*,
114 F. Supp. 2d 559 (N.D. Tex. 2000) .....................................................................23

*Utah v. Walsh*,
No. 23-cv-16, 2023 WL 6205926 (N.D. Tex. Sept. 21, 2023) ....................... *passim*

*Virginia v. Am. Booksellers Ass'n, Inc.*,
484 U.S. 383 (1988) ....................................................................................................9

Case 2:23-cv-04154-SRB   Document 34   Filed 12/06/23   Page 6 of 40

*Wallace v. ConAgra Foods, Inc.*,
  747 F.3d 1025 (8th Cir. 2014) ................................................................5

*Warth v. Seldin*,
  422 U.S. 490 (1975).............................................................................10

*Wieland v. U.S. Dep't of Health & Hum. Servs.*,
  793 F.3d 949 (8th Cir. 2015) ................................................................6

*Wooley v. Maynard*,
  430 U.S. 705 (1977)...............................................................................8

*Ex parte Young*,
  209 U.S. 123 (1908).............................................................................11

*Zauderer v. Office of Disciplinary Counsel*,
  471 U.S. 626 (1985)..................................................................24, 25, 26

**Statutes**

15 U.S.C. § 77r ................................................................... *passim*

15 U.S.C. § 78o(i)(1) ..............................................................2, 13, 15

15 U.S.C. § 80b-3 ................................................................. *passim*

29 U.S.C. § 1002(21)(A)..........................................................................21

29 U.S.C. § 1003(a) .................................................................................20

29 U.S.C. § 1104(a)(1).............................................................................21

29 U.S.C. § 1144......................................................................20, 22, 23

Mo. Rev. Stat. § 409 ................................................................7, 17, 19

**Other Authorities**

17 C.F.R. § 240.17a..............................................................................14. 15

17 C.F.R. § 275.204-2............................................................................17

29 C.F.R. § 2550.404a-1(b)(4), (c)(2) ................................................21, 23

15 C.S.R. §§ 30-51.................................................................. *passim*

62 Fed. Reg. 28,112, 28,125 (May 15, 1997) ......................................17, 18

Case 2:23-cv-04154-SRB   Document 34   Filed 12/06/23   Page 7 of 40

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

63 Fed. Reg. 39709 (July 24, 1998)...............................................................................18

FINRA Rule 2111(a).......................................................................................................29

H. Rep. No. 104-622 (1996) ..........................................................................................14

H. Rep. No. 104-864 (1996) ..........................................................................................13

S. Rep. No. 104-293.............................................................................................16, 18, 19

Case 2:23-cv-04154-SRB   Document 34   Filed 12/06/23   Page 8 of 40

## INTRODUCTION

In June 2023, the Secretary promulgated two new Rules that require securities firms and professionals to obtain signatures from Missouri investors on state-scripted consent forms before incorporating a "social objective" or other "nonfinancial objective" into their securities recommendations or investment advice, including discretionary investment decisions and the selection of third-party investment managers. Am. Compl. ¶¶ 1, 78.[1] The scripts require an express acknowledgement that such recommendations or advice "will result in investments and recommendations/advice that are not solely focused on maximizing a financial return" for the customer." *Id*. ¶¶ 85, 86. The Secretary has touted the Rules as necessary to "[r]ein in" investments that serve a "political agenda." Am. Compl., Ex. K. The Rules are the first of their kind. No other state has adopted them, and federal law does not require anything like the signed consents. Am. Compl. ¶¶ 5, 77.

Shortly after the Rules' promulgation, in August 2023, SIFMA challenged the Rules as invalid because they purport to: (i) regulate in areas that Congress has explicitly reserved for the federal government alone; (ii) contravene bedrock First Amendment protections against compelled speech; and (iii) impose vague requirements that leave firms guessing as to how and when the Rules apply. In response, Defendants moved to dismiss and questioned SIFMA's standing to challenge the Rules. To address Defendants' standing concerns, SIFMA filed an Amended Complaint in October 2023, which included declarations from SIFMA and six of its member firms. SIFMA then proposed that the Court be allowed to decide the legal issues in the case on cross-motions for summary judgment. Defendants refused and insisted on again moving to dismiss

---

[1] Unless otherwise indicated capitalized terms appearing in this opposition will have the meanings ascribed in Defendants' Suggestions in Support of Motion to Dismiss First Amended Complaint ("Motion to Dismiss" or "MTD").

under Rule 12(b)(1) and 12(b)(6). Defendants' Motion to Dismiss should be denied, and this case should proceed to a prompt decision on the merits.

On standing, Defendants argue that a national trade organization representing firms directly affected by preempted rules lacks standing and a cause of action to challenge those rules. That is wrong. The Supreme Court and the Eighth Circuit have routinely found that trade organizations like SIFMA have associational standing and a cause of action to challenge state laws, including on preemption grounds. SIFMA's lawsuit follows this well-trodden path.

On the merits of SIFMA's preemption claims, Defendants resort to word games and ask this Court to ignore plain statutory language. For example, Defendants contend that the signed consents that the Rules require are not new records because they can somehow be added to existing records. But states cannot require firms to make and keep records "*that differ from, or are in addition to*" federal requirements, *see* 15 U.S.C. § 78o(i)(1) (emphasis added), and federal law does not require the records that the Rules require. Similarly, Defendants argue that the Rules do not impose merit-based conditions on the sale of so-called "covered securities" because the Rules apply to firms and individuals, not the securities themselves. But federal law prohibits "*any*" merit-based restrictions on the sale of covered securities, even "*indirect*" ones. 15 U.S.C. § 77r(a)(3) (emphasis added). Defendants seek to deprive Congress's words not only of their plain meaning, but of any meaning at all.

Defendants' First Amendment arguments ignore binding Supreme Court precedent. Defendants argue there is no problem with compelled speech unless the speaker actively disagrees with the content of the compelled statement. Just last spring, however, the Supreme Court reiterated the broad principle that the government "offends the First Amendment" whether it "seeks to compel a person to speak its message when he would prefer to remain silent or to force

an individual to include other ideas with his own speech that he would prefer not to include." *303 Creative LLC v. Elenis*, 600 U.S. 570, 586-87 (2023). Defendants invoke the exception for "purely factual and uncontroversial" business disclosures. MTD at 21. But the exception plainly does not apply where, as here, the government's purported "disclosure" is really a position statement about "a question of political . . . significance." *303 Creative*, 600 U.S. at 598.

On vagueness, Defendants argue that the Rules are sufficiently clear for members to comply. But Defendants seem to be the only ones who know what they mean. The Rules use new terms that have no established meaning in the securities laws, such as "nonfinancial objectives" and "maximization of financial return to the customer." *See* 15 C.S.R. §§ 30-51.170(3)(B)(4), 30-51.172(3)(B)(4). These terms are vague and force firms to guess at their meaning and application. The Constitution prohibits that.

## ARGUMENT

### I.   LEGAL STANDARD

When adjudicating a motion to dismiss for lack of standing under Rule 12(b)(1) or failure to state a claim under 12(b)(6), the Court "assume[s] that the allegations in the complaint are true and view[s] them in the light most favorable to [the plaintiff]." *Jones v. Jegley*, 947 F.3d 1100, 1103 (8th Cir. 2020) (standing); *see also, e.g.*, *Data Mfg., Inc. v. United Parcel Serv., Inc.*, 557 F.3d 849, 851 (8th Cir. 2009) (stating a claim).

### II.   SIFMA HAS DEMONSTRATED STANDING

SIFMA has associational standing to press each claim in the Amended Complaint and seek the requested declaratory and injunctive relief. Article III standing requires "(1) an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, (3) that is likely to be redressed by the requested relief." *FEC v. Cruz*, 596 U.S. 289, 296 (2022). "An association has standing to bring suit on behalf of its members when [1] its members would otherwise have standing to sue in

3

their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). An association "need not establish that all of its members would have standing to sue individually so long as it can show that 'any one of them' would have standing." *Iowa League of Cities v. EPA*, 711 F.3d 844, 869 (8th Cir. 2013) (citation omitted); *see also* MTD at 5.

Defendants acknowledge that this case is germane to SIFMA's purpose. They contest only the first and third requirements for associational standing. Specifically, Defendants argue that: (1) SIFMA lacks standing to challenge the IA Rule (but not the B-D Rule) on the theory that the IA Rule does not apply to SIFMA's members; (2) SIFMA lacks standing to bring its First Amendment claim because it has not alleged that its members disagree with the content of the statements that the Rules require; and (3) SIFMA's claims require the participation of SIFMA's individual members. All three arguments are meritless.

### A. SIFMA Has Shown That Multiple Members Have Standing Based On Economic And Constitutional Injuries.

Multiple SIFMA members would have standing to sue in their own right based on two injuries caused by the new Rules that SIFMA seeks to redress by the requested declaratory and injunctive relief. First, the Rules are causing SIFMA's members to suffer ongoing economic injury in the form of compliance costs. The Rules also threaten additional economic harm in the event of a perceived violation. Second, the Rules are inflicting ongoing First Amendment harm by requiring SIFMA's members to make politically weighted statements that members do not wish to make and, absent the Rules, would not make.

### 1. Compliance Costs Support Standing As To All SIFMA's Claims.

It is well settled that "compliance costs" arising from a challenged regulatory requirement

4

constitute "a classic injury-in-fact." *City of Kennett v. EPA*, 887 F.3d 424, 431 (8th Cir. 2018) (citation omitted). "[T]he amount" of the economic injury "is irrelevant." *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017) (Kavanaugh, J.). "[A] loss of even a small amount of money is ordinarily an 'injury.'" *Czyzewski v. Jevic Holding Corp*., 580 U.S. 451, 464 (2017) (citing, as an example, a \$5 fine); *see also, e.g*., *Sprint Commc'ns Co. v. APCC Servs., Inc*., 554 U.S. 269, 289 (2008) (observing that the loss of "a dollar or two" is sufficient); *Wallace v. ConAgra Foods, Inc*., 747 F.3d 1025, 1029 (8th Cir. 2014) ("[A] few pennies each … is a concrete, non-speculative injury."). The rule is no different for associational standing: an injury to the "economic interests" of the association's members suffices. *Laidlaw*, 528 U.S. at 184; *see also, e.g*., *Carpenters*, 854 F.3d at 5 (finding that trade association's declaration that the challenged action would economically injure members "suffice[d] to establish Article III standing").

"SIFMA has multiple members who are altering their business practices in response to the Rules, who do not wish to do so." Am. Compl. ¶ 26; *see also id.* ¶ 115. Even though, "[a]t the pleadings stage, general factual allegations suffice to support standing," *Rydholm v. Equifax Info. Servs. LLC*, 44 F.4th 1105, 1108 (8th Cir. 2022), the Amended Complaint goes well beyond general factual allegations. It offers six concrete examples through sworn declarations from specific SIFMA members. Am. Compl. ¶ 26 & Ex. A-F ¶¶ 3, 5. Each of these six members has broker-dealer agents and investment adviser representatives in Missouri, through whom the members offer advice, recommendations, and/or securities that may incorporate social and/or nonfinancial objectives as they appear to be defined by the Rules. The declarations establish that the Rules are causing these SIFMA members to undertake ongoing compliance actions, such as making and keeping written consents or other records, creating policies and procedures, and training personnel, which the members would not undertake but for the Rules. Am. Compl., Ex.

A-F ¶ 6. These compliance actions force the six members to incur ongoing financial costs. Am. Compl., Ex. A-F ¶ 7; *see also id.*, Ex. G ¶ 8. These declarations confirm that enjoining the Rules' enforcement would alleviate these compliance costs. Am. Compl., Ex. A-F ¶ 7, Ex. G ¶ 10.

Defendants argue that SIFMA's members cannot challenge the IA Rule because it does not "appl[y]" to them. MTD at 5. But the members' standing does not depend on whether the IA Rule "applies" to them. The Eighth Circuit has firmly rejected the idea that plaintiffs lack standing to challenge a law that "imposes no direct obligation or requirement on them." *Wieland v. U.S. Dep't of Health & Hum. Servs.*, 793 F.3d 949, 954 (8th Cir. 2015). SIFMA's members need only experience a concrete and particularized injury that is "fairly traceable" to the IA Rule, even if that injury is an "indirect economic injury." *Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin Cnty.*, 115 F.3d 1372, 1379-80 (8th Cir. 1997). For example, in *Ben Oehrleins*, producers of solid waste had standing to challenge a law that did not apply to them at all, but rather regulated only the conduct of solid waste haulers that they might contract with. Yet the waste producers "satisf[ied] Article III's 'irreducible constitutional minimum' requisites for standing" because the haulers would naturally pass on part of the cost of compliance with the law by charging the waste producers higher fees. *Id.* at 1380 (citation omitted).

Here, although the statutory definition of "Investment Adviser" incorporated into the IA Rule excludes federal covered investment advisers, the Rule imposes duties on the firms' investment adviser representatives in Missouri. Am. Compl. ¶¶ 8, 90-93. By the nature of their business, the declarant SIFMA members conduct business in Missouri through their Missouri-registered investment adviser representatives. *Id.*, Ex. A-F ¶¶ 4-5. Accordingly, the IA Rule causes SIFMA firms to incur compliance costs from the activities of their employees and agents who operate as investment adviser representatives in Missouri. That is enough to create standing.

In addition, SIFMA's members have legal duties to supervise and maintain business records for their investment adviser representatives.[2] These supervisory responsibilities are affected by the IA Rule, just as they would be shaped by any other legal obligation that applies to the supervised employees and agents. That reality is another reason that SIFMA's members would have standing to challenge the IA Rule. *See, e.g.*, *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 606 (8th Cir. 2022) (holding that a plaintiff's conduct need only be "arguably restricted" by a legal requirement for that plaintiff to have standing to challenge it (citation omitted)).

Defendants also argue that SIFMA lacks standing to challenge the IA Rule because the National Securities Market Improvement Act ("NSMIA") "doesn't preempt Missouri's regulation of local [IA] Representatives." MTD at 6. This argument conflates standing with the merits. When evaluating standing, courts must "assume that on the merits the plaintiffs would be successful." *Am. Farm Bureau Fed'n v. EPA*, 836 F.3d 963, 968 (8th Cir. 2016) (citations omitted). In any event, Defendants' merits-arguments fail, as shown below in Section IV.

## 2. SIFMA's Members Are Also Suffering First Amendment Injury.

Defendants also improperly conflate standing with the merits in arguing that SIFMA's members would have to attest active disagreement with the Secretary's prescribed statements, not just attest that they do not wish to amplify the Secretary's views. Whether the First Amendment rights of SIFMA's members are actually infringed by the Rules is a merits question. Defendants' own citations confirm as much. They cite four cases on this point, and none finds a lack of Article

---

[2] Under federal law, federal covered investment advisers are obligated to supervise their investment adviser representatives. *See* 15 U.S.C. § 80b-3(e)(6). Missouri state law also purports to impose liability on a person that supervises an investment adviser representative. *See* Am. Compl. ¶ 93; Mo. Rev. Stat. § 409.4-412(h); Mo. Rev. Stat. § 409.4-412(d)(9).

III standing. *See* MTD at 7.[3]

The SIFMA members' declarations establish that the declarants prefer not to speak the message that Defendants demand. Am. Compl., Ex. A-F ¶ 8. That suffices for standing. *See, e.g.*, *All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 570 F. Supp. 2d 533, 540 (S.D.N.Y. 2008) ("[T]hat the Associations' members are required to speak the Government's message in exchange for the Leadership Act subsidy is a sufficient injury-in-fact for their compelled speech claim."), *aff'd*, 651 F.3d 218 (2d Cir. 2011) (agreeing that association member that "'wishe[d] to remain neutral' on the issue of prostitution" had suffered "injury resulting from being compelled to affirmatively state the government's position on prostitution"), *aff'd*, 570 U.S. 205 (2013); *Free Speech Coal., Inc. v. Colmenero*, No. 23-cv-917, 2023 WL 5655712, at *4 (W.D. Tex. Aug. 31, 2023) ("[C]ompelled speech necessarily involves a constitutional interest."); *see also 303 Creative*, 600 U.S. at 583 (noting that 10th Circuit had recognized plaintiff's standing based on fact that "she had established a credible threat that … Colorado will … force her to create speech she does not believe or endorse").[4]

---

[3] The four cases also do not help Defendants on the merits. In *Glickman v. Wileman Bros. & Elliott*, 521 U.S. 457 (1997), the Court rejected a First Amendment claim for several reasons—including that the challenged state law did "not compel any person to engage in any actual or symbolic speech," *id.* at 469, or "to endorse or to finance any political or ideological views," *id.* at 458. In *Wooley v. Maynard*, 430 U.S. 705, 713 (1977), by contrast, the compelled-speech claim succeeded because the state was "requiring [the challenger] to participate in the dissemination of an ideological message." Similarly, in *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2464 (2018), the compelled-speech claim succeeded because "the compelled subsidization of private speech seriously impinges on First Amendment rights." Finally, in *Cressman v. Thompson*, 798 F.3d 938 (10th Cir. 2015), the compelled-speech claim failed because the plaintiff had "*not* been compelled to express a view he otherwise would not." *Id.* at 963 (citation omitted). The court made clear, however, that a plaintiff need not have an "ideological" objection to compelled speech if the speech would "alter the speaker's own message." *Id.* at 964 (citation and brackets omitted).

[4] In addition to being wrong, Defendants' argument is also academic because the economic injury to SIFMA members caused by the Rules is enough to establish standing for its First Amendment

### B.    None Of SIFMA's Claims Requires Participation By Its Members.

Defendants' final standing argument is that SIFMA's preemption and constitutional claims require the participation of SIFMA's individual members.  MTD at 8-9.  The Eighth Circuit and its district courts have consistently held, to the contrary, that claims for declaratory and injunctive relief—as opposed to damages—do not require individual members' participation.  *See, e.g.*, *Heartland Acad. Cmty. Church v. Waddle*, 427 F.3d 525, 533 (8th Cir. 2005) ("[B]ecause Heartland seeks only declaratory and prospective injunctive relief, the participation of individual students who were affected by the mass removal of students in 2001 is not required."); *Ark. Med. Soc'y, Inc. v. Reynolds*, 6 F.3d 519, 528 (8th Cir. 1993) ("[I]njunctions, a declaratory judgment, and other prospective relief … do not require the participation of individual members."); *Goyette v. City of Minneapolis*, No. 20-cv-1302, 2021 WL 3222495, at *6 (D. Minn. July 29, 2021) ("[B]ecause CWA seeks declaratory and injunctive relief, the participation of individual plaintiffs is not required."); *Neb. Beef Producers Comm. v. Neb. Brand Comm.*, 287 F. Supp. 3d 740, 750 (D. Neb. 2018) ("It is only when an association seeks relief in damages for alleged injuries to its members, or other relief that must be specifically tailored to the individual injury of a member, that an individual member's participation may be required.").

Nothing about SIFMA's claims requires tailoring the requested declaratory or injunctive relief to each member's individual injury.  To the contrary, SIFMA's requested relief—invalidation of the Rules—would resolve each member's injuries.  This theory is neither new nor controversial.  Courts widely recognize that challenges to state and local rules on theories of preemption, compelled speech, or unconstitutional vagueness do not require participation of individual association members.  *See, e.g.*, *Merit Const. All. v. City of Quincy*, 759 F.3d 122, 127

---

claim.  *See, e.g.*, *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988) (recognizing that "significant and costly compliance measures" support standing for free-speech claim).

(1st Cir. 2014) ("[N]othing about an ERISA preemption challenge calls for enlisting the participation of individual [association] members."); *All. for Open Soc'y*, 651 F.3d at 229 ("[I]t is self-evident that … individualized proof is *not* required for the compelled speech and vagueness claims.").

Defendants cite zero on-point cases for their contrary view. *See* MTD at 8-9. The *American Farm Bureau* case, 836 F.3d at 968, merely recited the standard test for associational standing and found its requirements satisfied. The *Warth v. Seldin* case, 422 U.S. 490, 515 (1975), confirmed the propriety of associational standing in cases seeking declaratory and injunctive relief. And the *Bano v. Union Carbide Corp.* case, 361 F.3d 696, 714 (2d Cir. 2004), did likewise—at least when, as here, "the organization seeks a purely legal ruling without requesting that the federal court award individualized relief to its members." Defendants assert, without support, that SIFMA's claims require "individualized showings of the [Rules'] burden and cost." MTD at 8. The Supreme Court has held otherwise. Because SIFMA "seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Warth*, 422 U.S. at 515.

## III. <u>SIFMA HAS A CAUSE OF ACTION FOR NSMIA AND ERISA PREEMPTION</u>

It is well-established that plaintiffs can seek the aid of federal courts when confronted with state or local rules that are preempted by federal law, such as NSMIA and the Employee Retirement Income Security Act ("ERISA"). "The Supreme Court has long recognized that a plaintiff may invoke the equitable powers of the federal courts in order to seek 'relief against state officers who are violating, or planning to violate, federal law,' including on the basis of preemption." *Minn. Auto. Dealers Ass'n v. Stine*, No. 15-cv-2045, 2016 WL 5660420, at *8 (D. Minn. Sept. 29, 2016) (quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015), and citing *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983)). In *Shaw*, the

10

Supreme Court specifically recognized an equitable claim for "injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute." 463 U.S. at 96 n.14; *see also Ex parte Young*, 209 U.S. 123, 160-62 (1908). The claim in *Shaw*, moreover, was a claim of *ERISA preemption*, specifically. 463 U.S. at 96. The Amended Complaint cited *Shaw* and *Ex parte Young*, Am. Compl. ¶ 24, yet the Motion to Dismiss ignores both cases.

Defendants would not have had to look far to find other cases that echo this same principle. In *First National Bank of Eastern Arkansas v. Taylor*, 907 F.2d 775, 776 n.3 (8th Cir. 1990), the Eighth Circuit recognized that "the Supreme Court has … made clear that a party may apply directly to federal court for relief based on an affirmative claim of preemption." Other courts of appeals have recognized the same. *See, e.g.*, *Crown Castle Fiber, L.L.C. v. City of Pasadena,* 76 F.4th 425, 434 (5th Cir. 2023) (recognizing that a preemption plaintiff has "a cause of action … at equity, regardless of whether it can invoke § 1983," even if the preemptive statute "does not confer a private right"); *Indep. Living Ctr. of S. Cal., Inc. v. Shewry*, 543 F.3d 1050, 1055 (9th Cir. 2008) ("The Supreme Court has repeatedly entertained claims for injunctive relief based on federal preemption, without requiring that the standards for bringing suit under § 1983 be met[.]").

Defendants rely primarily on *Armstrong*. But far from supporting Defendants, *Armstrong* affirms that when a plaintiff "claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted." 575 U.S. at 326 (citing *Ex parte Young*, 209 U.S. at 155-56). To be sure, *Armstrong* found that the Medicaid Act expressed an implicit legislative intent to abrogate any equitable remedy for that statute, but that finding was limited to the unique circumstances of the Medicaid Act, which provided that the sole remedy for violating the statute's requirements was withholding funding from the violator, and because its relevant requirement was not judicially administrable. 575 U.S. at 328. Defendants

cite no comparable features of the NSMIA-related statutes, or ERISA, that could show Congress deliberately "displace[d] the equitable relief that is traditionally available to enforce federal law." *Id.* at 329. And again, as to ERISA preemption, the Supreme Court has already determined that the traditional equitable cause of action is available. *Shaw*, 463 U.S. at 96 & n.14*; see also Minn. Auto. Dealers Ass'n*, 2016 WL 5660420, at *8 ("[E]quitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command" (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982))). Courts have also decided preemption challenges under NSMIA. *See, e.g.*, *Temple v. Gorman*, 201 F. Supp. 2d 1238, 1244 (S.D. Fla. 2002) (rejecting plaintiffs' state law claims as preempted by NSMIA).

## IV. NSMIA PREEMPTS THE RULES

"A fundamental principle of the Constitution is that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (citing U.S. Const. art. VI, cl. 2). Congress can preempt state law expressly by stating that state regulation in certain areas is prohibited. *See, e.g.*, *Barnett Bank of Marion Cty., N.A. v. Nelson*, 517 U.S. 25, 31 (1996) (recognizing that express preemption occurs when the "language in the federal statute [] reveals an explicit congressional intent to pre-empt state law"). When a federal statute contains an express preemption clause, courts do not invoke any presumption against pre-emption. *See Puerto Rico v. Franklin California Tax-Free Tr.*, 579 U.S. 115, 125 (2016). Here, the Rules are preempted by NSMIA's express language. In addition, the Rules are conflict preempted because they "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *See Crosby*, 530 U.S. at 373.

### A. NSMIA Bars States From Duplicative And Unnecessary Regulation Of Broker-Dealers And Investment Advisers.

Before NSMIA, broker-dealers and investment advisers were subject to a "patchwork quilt

of state regulation" that conflicted with federal securities laws and regulations in several key areas.[5] Congress determined that this "dual Federal and state securities regulation [] resulted in a degree of duplicative and unnecessary regulation" that in many instances was "redundant, costly, and ineffective." *See* H. Rep. No. 104-864, at 39 (1996) ("Conference Report"). Congress passed NSMIA "to eliminate duplicative and unnecessary regulatory burdens while preserving important investor protections by reallocating responsibility over the regulation of the nation's securities markets in a more logical fashion between the Federal government and the states." *Id.* at 39-40; *see also Lindeen v. SEC*, 825 F.3d 646, 650 (D.C. Cir. 2016) (recognizing that NSMIA was "[d]esigned to alleviate the redundant, costly, and ineffective dual federal/state regulatory system" (citation omitted)). NSMIA achieved Congress's goals by amending the Securities Exchange Act of 1934 ("Exchange Act") and the Investment Advisers Act of 1940 ("Advisers Act") to expressly preempt state regulation of broker-dealers and investment advisers in several applicable respects.

**B.    The B-D Rule Is Preempted Because It Requires Broker-Dealers To Make And Keep Records That Differ From Federal Requirements.**

NSMIA prevents states from requiring broker-dealers to make and keep records that differ from, or are in addition to, federal requirements:

> No law, rule, regulation, or order, or other administrative action of any State or political subdivision thereof shall establish capital, custody, margin, financial responsibility, ***making and keeping records***, bonding, or financial or operational reporting requirements for brokers, dealers, municipal securities dealers, government securities brokers, or government securities dealers ***that differ from, or are in addition to, the requirements in those areas established under this chapter***.

15 U.S.C. § 78o(i)(1) (emphasis added). This language "***preempts State laws*** that impose financial

---

[5] *See* Stephen M. Cutler, Dir., U.S. Sec. and Exch. Comm'n Div. of Enf't, Remarks at the F. Hodge O'Neal Corporate and Securities Law Symposium (Feb. 21, 2003), https://www.sec.gov/news/speech/spch022103smc.htm.

responsibility and reporting requirements *inconsistent with or exceeding requirements* established under the Exchange Act." *See* H. Rep. No. 104-622 at 36 (1996) (emphasis added). Furthermore, "[t]his preemption extends to *any* regulation of capital, margin, books and records, bonding, record making and record keeping." *Id*. (emphasis added).

NSMIA expressly preempts the B-D Rule. Under the B-D Rule, if a broker-dealer "incorporates a social objective or other nonfinancial objective" in advising a customer, the firm is required to "obtain[] written acknowledgment and consent from the customer." 15 C.S.R. § 30-51.170(3)(A), (C). The written consent document is required to "contain language that is substantially similar to" specific language scripted by the Rule. *Id*. § 30-51.170(3)(D). The consent requires a "signature." MTD at 27. The Rule further prescribes that the document "shall be provided to the customer on an annual basis," and firms must obtain additional signed consents "no less than every three (3) years," 15 C.S.R. § 30-51.170(3)(C). Accordingly, the B-D Rule requires firms to make new documents.

The Rules also require firms to keep the documents. SEC rules, and the Missouri rules incorporating them, both require broker-dealers to preserve copies of "all communications with customers … relating to its business… ." *See* 17 C.F.R. § 240.17a-4;15 C.S.R. § 30-51.120 (requiring broker-dealers to "make and maintain records as required for brokers or dealers" as required under 17 C.F.R. § 240.17a-3 and 17 C.F.R. § 240.17a-4).[6] Here, the written consents are customer communications relating to firm business. Accordingly, they must be preserved.

Finally, these written consents are not required to be made or kept under federal rules. The

---

[6] Missouri has recognized the preemptive power of NSMIA as it relates to recordkeeping. In 2004, the Missouri Securities Commissioner changed its broker-dealer recordkeeping rules "to comply with [NSMIA]." 15 C.S.R. § 30-51.120. That is an express acknowledgement that NSMIA preempts states from instituting their own recordkeeping requirements for broker-dealers—which is exactly what the B-D Rule purports to do.

14

SEC has promulgated extraordinarily detailed rules about what types of records broker-dealers must make, and how long they must keep them. *See* 17 C.F.R. §§ 240.17a-3 & 240.17a-4. The signed consents are not among them.

Defendants struggle to overcome NSMIA's clear preemptive language. In their Motion, Defendants assert the creative argument that the B-D Rule "does not require a new record" because the signed consent can somehow be appended to an existing "Customer Account Record" already required by SEC Rule 17-a-3(a)(17). MTD at 14. But the SEC has already prescribed what types of communications a "Customer Account Record" must contain. The Secretary's consents are not listed among those requirements. Nor are other documents that firms may create to comply with the B-D Rule, such as policy updates and training materials. Accordingly, the B-D Rule requires firms to create documents "that differ from, or are in addition to" federal requirements. 15 U.S.C. § 78o(i)(1). NSMIA does not allow that.

Moreover, Defendants' argument, if credited, would reduce NSMIA's records-preemption clause to wastepaper. States could avoid preemption simply by designating a new record as part of an existing record. That is directly contrary to what Congress intended in passing NSMIA.[7]

### C. The IA Rule Is Preempted Because It Impermissibly Regulates Investment Advisers And Their Supervised Persons.

NSMIA broadly preempts state regulation of federally registered investment advisers and their supervised persons:

> ***No law of any State or political subdivision*** thereof requiring the registration, licensing, or qualification as an investment adviser or supervised person of an investment adviser ***shall apply to any person***—

---

[7] Notably, the SEC release on books and records requirements that Defendants cite in support of their argument acknowledges that "NSMIA prohibits States from establishing books and records rules that differ from, or are in addition to, the Commission's rules." *See* MTD at 14 (citing SEC Release 44992, Fed. Reg. Vol. 66, No. 213 (2001)).

that is registered under section 80b-3 of this title as an investment adviser,[8] or that is a supervised person of such person, ***except*** that a State may license, register, or otherwise qualify any investment adviser representative who has a place of business located within that State.

15 U.S.C. § 80b-3a(b)(1)(A) (emphasis added). Congress established this provision because it wanted to "divid[e] regulatory responsibility" between the SEC and the states. S. Rep. No. 104-293 at 2. Accordingly, NSMIA creates "***a clear division of labor*** between the states and the federal government for supervision of investment advisers." *Id*. (emphasis added). States have plenary regulatory authority over smaller advisers, *see id*. § 80b-3a(a), while the SEC alone is tasked with regulating larger national firms, *see id*. § 80b-3a(b). Congress intended that "larger advisers, with national businesses, should be registered with the [SEC ***and be subject to national rules***" alone. S. Rep. No. 104-293 at 4 (emphasis added).

Under NSMIA, Congress only allowed states to continue regulating SEC-registered investment advisers in three discrete areas. First, Congress permitted state regulators to collect fees from SEC-registered investment advisers. 15 U.S.C. § 77r(c)(2)(B) Second, states can require firms to file copies of documents filed with the SEC—but "***solely for notice purposes.***" 15 U.S.C. § 77r(c)(2)(A) (emphasis added). Third, states can "investigat[e] and bring[] enforcement actions with respect to fraud or deceit." 15 U.S.C. § 80b-3a(b)(2). None of these circumstances permits states to impose substantive limitations on the activities of investment advisers registered with the SEC. On matters of substance, the scope of preemption is total. In implementing rules related to NSMIA preemption under the Advisers Act, the SEC stated:

> The Coordination Act [under NSMIA] gives the Commission primary responsibility to regulate advisers that remain registered with the Commission ***by preempting state regulation of those advisers***. … States retain authority over Commission-registered advisers under state investment adviser statutes to investigate and bring enforcement actions with respect to fraud or deceit against an

---

[8] 15 U.S.C. § 80b-3 establishes federal registration requirements for investment advisers.

investment adviser or a person associated with an investment adviser; to require filings, for notice purposes only, of documents filed with the Commission; and to require payment of state filing, registration, and licensing fees."

Rules Implementing Amendments to the Investment Advisers Act of 1940, Investment Advisers Act Release No. 1633 at 69, 62 Fed. Reg. 28,112, 28,125 (May 15, 1997) ("Implementing Release").

Missouri law directly recognizes the broad scope of preemption under NSMIA. For example, the Missouri Securities Act prohibits the Secretary from adopting rules related to fraud and deceit for supervised persons of SEC-registered investment advisers. *See* Mo. Rev. Stat. § 409.5-502 ("A rule adopted under this act may define an act, practice, or course of business of an investment adviser or an investment adviser representative, ***other than a supervised person of a federal covered investment adviser***, as fraudulent, deceptive, or manipulative, and prescribe means reasonably designed to prevent investment advisers and investment adviser representatives, ***other than supervised persons of a federal covered investment adviser***, from engaging in acts, practices, and courses of business defined as fraudulent, deceptive, or manipulative." (emphasis added)).

The IA Rule is preempted because it exceeds the authority reserved to states under NSMIA. Although the Rule excludes federally-covered investment advisory firms, Mo. Rev. Stat. § 409.1-102(15), it applies to qualifying investment adviser representatives working on behalf of those firms, *see id*. § 409.1-102(16); *see also* MTD at 5-6. These representatives must comply with the IA Rule and obtain written consents from customers as required. 15 C.S.R. § 30-51.172. Moreover, federally-covered investment advisers have supervisory responsibility for their investment adviser representatives, including for their recordkeeping obligations. 15 U.S.C. § 80b-3(e)(6); 17 C.F.R. § 275.204-2. That means the IA Rule foists regulatory obligations on federally-covered investment advisers. NSMIA does not permit any of this.

17

Defendants argue that NSMIA "invit[es] state regulation of [] IAs' representatives" because it permits states to "license, register, or otherwise qualify any investment adviser representative who has a place of business located within that State." MTD at 12 (emphasis omitted) (citing 15 U.S.C. § 80b-3a(b)(1)(a)). But the IA Rule has nothing to do with those activities.[9] Accordingly, this carveout does not authorize the Rule.

Defendants also argue that even if NSMIA preempts state regulation of persons covered by the IA Rule, "SIFMA's claim still fails because § 80b-3a(b)(1)(A) only preempts state rules 'requiring the registration, licensing, or qualification' of persons." MTD at 13. This argument is wrong. As the SEC has recognized, NSMIA "preempts ***not only*** a state's specific registration, licensing, or qualification requirements, but ***all regulatory requirements imposed by state law on Commission-registered advisers relating to their advisory activities or services***, except those provisions that are specifically preserved by the Coordination Act." Implementing Release at 28,125 (emphasis added); *see also* Multi-State Investment Adviser Exemption from Prohibition on Registration with the Commission, 63 Fed. Reg. 39709 (July 24, 1998) (stating that NSMIA "preempts most state regulatory requirements for Commission-registered investment advisers and their supervised persons, but permits a state to continue to license, register, or otherwise qualify an 'investment adviser representative' who has a place of business in the state." (footnotes omitted)). Moreover, Defendants' argument conflicts with Congressional statements indicating that NSMIA divides regulatory authority between federal and state regulators. *See* S. Rep. No. 104-293 at 2 (stating that NSMIA creates a "clear division of labor" between the states and the federal government). In addition, Defendants' interpretation is contrary to Missouri law, which

---

[9] Missouri separately requires the registration, licensing, and qualification of investment adviser representatives. *See*, *e.g.*, 15 C.S.R. §§ 30-51.010, 30-51.020.

acknowledges the broad scope of NSMIA preemption by prohibiting the Secretary from adopting rules governing investment adviser representatives for federal covered investment advisers in the areas of fraud or deceit. Mo. Rev. Stat. § 409.5-502(b). Finally, Defendants' interpretation conflicts with the structure and design of NSMIA. For example, if NSMIA only preempted state rules requiring the registration, licensing or qualification of investment advisers, there would have been no need to narrowly preserve the ability of the states to investigate fraud. *See* 15 U.S.C. § 80b-3a(b)(2).

### D. The Rules Are Preempted Because They Impose Merits-Based Conditions On The Sale Of Covered Securities.

NSMIA also preempts state-imposed conditions on the sale of federal-covered securities based on the state's perception of the merits of the offering:

> Except as otherwise provided in this section, no law, rule, regulation, or order, or other administrative action of any State or any political subdivision thereof—
>
> > ***shall directly or indirectly prohibit, limit, or impose conditions, based on the merits of such offering or issuer***, upon the offer or sale of any [covered security].

15 U.S.C. § 77r(a)(3) (emphasis added). "Covered securities" broadly include stocks listed on major exchanges, such as the New York Stock Exchange, and most mutual funds registered for sale to the general public. *See id*. § 77r(b); Am. Compl. ¶¶ 7, 47.

Under NSMIA, states may not—***even indirectly***—"impose any merit-based conditions upon the offer or sale of" covered securities. S. Rep. No. 104-293 at 28 (1996) ("Senate Report"). The Rules plainly do. Many covered securities, including mutual funds, consider social or nonfinancial objectives in their investment strategies. Before a firm can recommend such funds to a Missouri investor, the firm must comply with the Rules. These regulatory constraints are contingent on the merits of the covered securities.

Defendants acknowledge that the Rules require firms to obtain signed consents before

19

recommending certain covered securities. *See* MTD at 27. Nonetheless, Defendants argue that Section 77r(a)(3) does not apply because the Rules regulate firms and people, "*not* 'covered securities.'" MTD at 16. This argument misconstrues the broad scope of preemption under NSMIA. The language in Section 77r(a)(3) is not limited to state regulation that is directed to specific covered securities.[10] *See, e.g.*, *Myers v. Merrill Lynch & Co., Inc*, No. 98-cv-03532, 1999 WL 696082, at *10 (N.D. Cal. Aug. 23, 1999) (holding that plaintiff's claims under state unfair competition law are preempted by Section 77r(a)(3)). Instead, the plain language of the statute explicitly preempts state rules that even "***indirectly***" impose merit-based conditions on the sale of "***any***" covered securities. *Id*. (emphasis added). That is exactly what the Rules do. They impose an extra hurdle before certain covered securities can be offered to Missouri investors, based on the substantive characteristics of those securities.

## V.   <u>ERISA PREEMPTS THE RULES</u>

ERISA is a "comprehensive and reticulated statute" governing the administration of private employee benefit plans. *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251 (1993) (citation omitted); *see* 29 U.S.C. § 1003(a). Congress designed ERISA to "induc[e] employers to offer benefits by assuring a predictable set of liabilities, under uniform standards of primary conduct and a uniform regime of ultimate remedial orders and awards when a violation has occurred." *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 379 (2002). An important part of this statutory design is ERISA's preemption provision, which declares that ERISA's provisions "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by the statute. 29 U.S.C. § 1144(a). "Requiring ERISA administrators to master the relevant laws

---

[10] Defendants also criticize SIFMA for failing to identify a single security restricted by the Rules. MTD at 16 & n.4. In its Amended Complaint, SIFMA identifies entire categories of covered securities that are restricted by the Rules, including mutual funds.

of 50 States and to contend with litigation would undermine the congressional goal of 'minimiz[ing] the administrative and financial burden[s]' on plan administrators—burdens ultimately borne by the beneficiaries." *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 321 (2016) (citation omitted). The Supreme Court has described ERISA's preemption provision as "**conspicuous for its breadth**," *FMC Corp. v. Holliday*, 498 U.S. 52, 58 (1990) (emphasis added), and "**deliberatively expansive**," *Cal. Div. of Labor Standards Enf't v. Dillingham Constr., N.A.*, 519 U.S. 316, 324 (1997) (emphasis added). And there is no "presumption against pre-emption" when "a state law … enters a fundamental area of ERISA regulation and thereby counters the federal purpose" behind the statute. *Gobeille*, 577 U.S. at 326.

A state law "relate[s] to an[] employee benefit plan" and is preempted by ERISA whenever it has a "connection with" ERISA plans—*i.e.*, "governs a central matter of plan administration" or "interferes with nationally uniform plan administration." *Id.* at 319-20 (citations and alteration omitted). The Rules have the requisite connection with ERISA plans for two main reasons.

First, the Rules govern central matters of plan administration by regulating core ERISA fiduciary functions. Financial professionals and firms who are subject to the IA Rule qualify as fiduciaries of ERISA plans. *See* 29 U.S.C. § 1002(21)(A). Fiduciaries have federal statutory duties of loyalty and prudence. *See* 29 U.S.C. § 1104(a)(1). These duties are given further content through U.S. Department of Labor ("DOL") regulations, which specifically permit fiduciaries to consider social or nonfinancial objectives in certain circumstances. *See generally Utah v. Walsh*, No. 23-cv-16, 2023 WL 6205926, at *1-2 (N.D. Tex. Sept. 21, 2023); 29 C.F.R. § 2550.404a-1(b)(4), (c)(2). "For nearly three decades, DOL has posited that ERISA's obligations do not forbid consideration of collateral or non-financial benefits in the selection of competing investments that serve the plan's economic interests equally." *Utah*, 2023 WL 6205926, at *1. By imposing

conditions on ERISA fiduciaries' authority under federal law to recommend or select investments for social or nonfinancial reasons—an authority reinforced by binding federal regulations—the Rules directly interfere with core fiduciary functions, with the relations among ERISA fiduciaries and the plans they serve, and with the structure and administration of ERISA plans. *Cf. Ark. Blue Cross & Blue Shield v. St. Mary's Hosp., Inc.*, 947 F.2d 1341, 1346 (8th Cir. 1991) (observing that fiduciaries, plans, and beneficiaries all qualify as "primary ERISA entities").

Second, the Rules interfere with nationally uniform plan administration by imposing significant additional disclosure and recordkeeping requirements on ERISA fiduciaries who consider social or nonfinancial objectives in the ways that ERISA permits, particularly through the Rules' prescribed written consents. *See* 15 C.S.R. §§ 30-51.170(3), 30-51.172(3); *supra* Section IV.B–C. Contrary to Defendants' speculations, *see* MTD at 18, "reporting, disclosure, and recordkeeping are central to, and an essential part of, the uniform system of plan administration contemplated by ERISA." *Gobeille*, 577 U.S. at 323. "Differing, or even parallel, regulations from multiple jurisdictions could create wasteful administrative costs and threaten to subject plans to wide-ranging liability." *Id.* In this way, too, the Rules affect the administration of ERISA plans and significantly increase administrative costs.

Defendants argue that even if the Rules "relate to" ERISA plans within the meaning of 29 U.S.C. § 1144(a), they are still exempt from preemption under 29 U.S.C. § 1144(b)(2)(A), which qualifies ERISA's express preemption provision for "any law of any State which regulates insurance, banking, or securities." Defendants are incorrect. Even assuming that the Rules "regulate[] … securities" in the relevant sense,[11] the Supreme Court has instructed that state laws

---

[11] Defendants' argument that the Rules "regulate securities" under ERISA directly contradicts one of their arguments against NSMIA preemption, which disclaims this very interpretation of the Rules. *See* MTD at 16 ("[T]he Rules regulate 'affected persons,' not 'covered securities.'").

that fall within Section 1144(b)(2)(A) are still preempted when—as here—they threaten ERISA's "comprehensive remedial scheme." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 217-18 (2004). That scheme is threatened whenever state laws seek to provide relief for what are, in substance, alleged breaches of ERISA's fiduciary duties—including accusations that "an ERISA fiduciary gave an ERISA plan inadequate investment advice" when it "failed to provide adequate information concerning its investment practices." *Dudley Supermarket, Inc. v. Transamerica Life Ins. & Annuity Co.*, 302 F.3d 1, 3-4 (1st Cir. 2002).

Here, the conflict is especially clear, because DOL has issued—and a court has upheld— an ERISA regulation that authorizes the sort of fiduciary activities that Defendants seek to curtail. 29 C.F.R. § 2550.404a-1(b)(4), (c)(2); *Utah v. Walsh*, 2023 WL 6205926, at \*5. By creating a non-ERISA prohibition against ERISA-compliant fiduciary decision making, the Rules undermine ERISA's exclusive enforcement scheme and are therefore preempted. *See, e.g.*, *Bacon v. Stiefel Lab'ys, Inc.*, 677 F. Supp. 2d 1331, 1348-49 (S.D. Fla. 2010) (holding that Florida Securities Act cause of action for damages arising from securities purchase was effectively seeking ERISA benefits and thus was preempted); *Spellman v. United Parcel Serv., Inc.*, 540 F. Supp. 2d 237, 249 (D. Me. 2008) (holding that state penalty for insurers who did not provide disability benefits pending a final determination by the workers' compensation board improperly supplemented ERISA's exclusive remedial scheme and thus was preempted); *United Healthcare Ins. Co. v. Levy*, 114 F. Supp. 2d 559, 566 (N.D. Tex. 2000) (holding that state professional board's attempt to

---

Defendants cannot have it both ways. For the reasons discussed above, *see supra* Section IV.D, the Rules extend to regulate securities. If, however, that were not the case, then ERISA's carveout would be even further removed because on its face it applies only to state laws that "regulate … securities," not all state laws that affect the securities industry. *Cf. Ky. Ass'n of Health Plans, Inc. v. Miller*, 538 U.S. 329, 334 (2003) (holding that "not all state laws 'specifically directed toward' the insurance industry" are covered by Section 1144(b)(2)(A) because this language "saves laws that regulate *insurance*, not insurers").

discipline ERISA fiduciary for its benefit coverage determinations created an alternative to ERISA's enforcement mechanisms and thus was preempted).

## VI.   THE RULES VIOLATE THE FIRST AMENDMENT

The First Amendment generally bars the government from "compel[ling] a person to speak its own preferred messages." *303 Creative*, 600 U.S. at 586.  This prohibition applies "whether the government seeks to compel a person to speak its message when he would prefer to remain silent or [seeks] to force an individual to include other ideas with his own speech that he would prefer not to include." *Id.*  Laws that require professionals to "speak a particular message," and thereby "alter the content of their speech," are "content-based regulation[s] of speech" subject to strict scrutiny—that is, they are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Nat'l Inst. Of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (citation and brackets omitted).

Defendants do not even attempt to argue that the Rules can satisfy strict scrutiny.  Instead, they ask the Court to apply rational basis scrutiny or intermediate scrutiny.  *See* MTD at 20-28. While Supreme Court "precedents have applied more deferential review to some laws that require professionals to disclose factual, noncontroversial information in their 'commercial speech,'" *Nat'l Inst. of Fam. & Life Advocs.*, 138 S. Ct. at 2372, that is a narrow exception with no application here.  It originated in *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 629 (1985), where the Supreme Court largely nullified state restrictions on lawyer advertising but upheld the state's determination that requiring disclosure of a particular fact in "no recovery, no legal fees" advertisements did not violate the First Amendment.  *Id.* at 650-53.  This disclosure—namely, the fact that non-winning clients might have to pay litigation costs—did not implicate "politics … or other matters of opinion," and was appropriate because "members of the public are often unaware of the technical meanings of such terms as 'fees' and 'costs'" and might (incorrectly) use them

24

interchangeably. *Id.* at 651-52 (citation omitted). By its terms, *Zauderer*'s exception applies only to required disclosures of "purely factual and uncontroversial information." *303 Creative*, 600 U.S. at 596 (citation omitted). The speech required here, however, is neither purely factual nor uncontroversial.

First, the speech the Rules require is not purely factual because it is misleading. *See, e.g.*, *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1276 (9th Cir. 2023) ("Information that is purely factual is necessarily 'factually accurate[.]'"). The B-D Rule, for example, provides a government script that says, "I acknowledge and understand that incorporating a social objective or other nonfinancial objective into discretionary investment decisions, recommendations, advice, and/or the selection of a third-party manager or subadviser to manage the investments, in regards to my account, will result in investments and recommendations/advice that are not solely focused on maximizing a financial return for me or my account." 15 C.S.R. § 30-51.170(3)(D). The script for the IA Rule is substantively identical. *Id.* § 30-51.172(3)(D). The state is requiring securities firms to tell their clients that consideration of social or nonfinancial objectives will inherently jeopardize financial returns.

That message is not purely factual. First, as the DOL has stated in formal rulemaking, "'environmental, social, and governance issues' ('ESG')"—the very considerations that Defendants cite as the paragon of a "nonfinancial objective," Am. Compl., Exs. K, L—"may present purely financial considerations" and for that reason may constitute "proper components of the fiduciary's primary analysis" of investment choices. *Utah v. Walsh*, 2023 WL 6205926, at *1 (quoting 80 Fed. Reg. at 65136 (Oct. 26, 2015)). Second, even if one were to presume that social objectives, writ large, are ***not*** predictors of profitability, an investment professional could still use those "nonfinancial criteria" as a tiebreaker between two otherwise equivalent securities without

25

compromising profitability. *Id.* at *4-5. These are complexities quite unlike the scenario in *Zauderer*, involving an attorney's binary decision on whether to pass along litigation costs to unsuccessful contingency clients.

Defendants' lone response is another word game. On Defendants' telling, the scripts are "truthful, logical syllogisms" because the individual broker-dealer or investment adviser does not "[i]ncorporate[] a social objective" or a "[n]onfinancial objective" within the Rules' peculiar definitions unless the individual acts "for the purpose of seeking to obtain an effect other than the maximization of financial return to the customer." MTD at 21-23 (quoting 15 C.S.R. §§ 30-51.170(3)(B), 30-51.172(3)(B)).

Defendants' reliance on these definitions is misplaced. A state cannot defend misleading compelled speech by citing a technical definition that would be unfamiliar to the listener. The Ninth Circuit clearly explained this point in a recent case invalidating California's requirement that retailers "disclose" that they were selling products containing chemicals "known to the State of California to cause cancer." *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 472 (9th Cir. 2022). Such a statement does not qualify as purely factual under *Zauderer* when the state law defines terms in compelled disclosures in ways that consumers do not understand. *Id.* at 479. The California law was therefore invalid because it gave "a 'known' carcinogen … a complex legal meaning," which consumers "would not glean from the warning without context." *Id.*; *accord Nat'l Ass'n of Wheat Growers*, 85 F.4th at 1278. The D.C. Circuit has similarly recognized that if a state could render its required disclosures purely factual merely by statutory definition, "there would be no end to the government's ability to skew public debate." *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015). "For instance, companies could be compelled to state that their products are not 'environmentally sustainable' or 'fair trade' if the

government provided 'factual' definitions of those slogans—even if the companies vehemently disagreed that their [products] were 'unsustainable' or 'unfair.'" *Id.* The First Amendment does not permit that result. *See id.*[12]

In addition to not being purely factual, the speech that the Rules compel is highly controversial. To start, DOL's view—that it can be prudent to consider social or other non-financial investment criteria—shows, at a minimum, a difference of opinion among regulators. *See, e.g.*, *Nat'l Ass'n of Wheat Growers*, 85 F.4th at 1277-78; *Cal. Chamber of Com.*, 29 F.4th at 478. Moreover, the Rules' required scripts express only one side of a debate over the merits of "social objectives" investing, a dispute that is far from "non-ideological." *Nat'l Ass'n of Mfrs.*, 800 F.3d at 530 (citation omitted).

Defendants attempt to deny the controversial and politicized nature of the Rules, *see* MTD at 22, but ignore Defendant Ashcroft's own public description of the Rules as part of an effort to "Rein in ESG." Am. Compl., Ex. K. In the Secretary's own words, ESG "driv[es] investments toward liberal priorities that are in conflict with investors' interests," including "oppos[ing] fossil fuels, push[ing] unionization of private companies, [and] push[ing] radical racial and gender equity over merit." *Id.*; *see also* Am. Compl., Ex. L (criticizing the "Biden administration" for supporting ESG Investment and arguing that "ESG funds … unquestionably serve a political agenda rather than focus on delivering for investors."). Having promoted the Rules as political statements,

---

[12] Defendants' reliance on the Rules' definitions also ignores that these definitions require disclosure not only when the individual *issues* recommendations or advice for a purpose other than maximizing financial return, but also whenever the individual "***consider[s]***" doing so. 15 C.S.R. §§ 30-51.170(3)(B), 30-51.172(3)(B) (emphasis added). The Rules thus purport to apply even if the individual who considers non-financial criteria ultimately decides not to issue a recommendation or advice based on such criteria. Of course, it does not follow—as a logical syllogism or otherwise—that considering and then ***dismissing*** nonfinancial investment criteria "will result in investments and recommendations/advice that are not solely focused on maximizing a financial return." 15 C.S.R. §§ 30-51.170(3)(D), 30-51.172(3)(D).

Defendants cannot now reasonably claim they require nothing controversial.

For similar reasons, the Rules cannot survive intermediate scrutiny under *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 556 (1980)—even assuming the standard described in that case has any applicability here. First, *Central Hudson* was not a case about compelled speech but rather one in which the Supreme Court invalidated New York State's ban on all advertising by electric utilities. Second, while *Central Hudson* acknowledged the possible acceptability of advertising bans in circumstances where the government interest is substantial *and* the government lacks a more limited option, *id.* at 564, Defendants here do not even argue that they lack a less coercive method of publicizing their views about "social" investing. The only government interest cited by Defendants is a purported "interest in preventing consumer deception." MTD at 26. If that is honestly Defendants' goal, then they have "many alternatives to compelled private speech at [their] disposal." *Cal. Chamber of Com. v. Becerra*, 529 F. Supp. 3d 1099, 1121 (E.D. Cal. 2021), *aff'd sub nom. Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468 (9th Cir. 2022). A "public-information campaign," for example, could advance the state's desired message "without burdening a speaker with unwanted speech." *Nat'l Inst. of Fam. & Life Advocs.*, 138 S. Ct. at 2376; *see also Nat'l Ass'n of Mfrs.*, 800 F.3d at 530 ("[R]equiring a company to publicly condemn itself is undoubtedly a more 'effective' way for the government to stigmatize and shape behavior than for the government to have to convey its views itself, but that makes the requirement more constitutionally offensive, not less so." (citation omitted)). The *Central Hudson* exception applies when a government has no other option, not, as here, when a government chooses coerced speech as its preferred option.

## VII. THE RULES ARE UNCONSTITUTIONALLY VAGUE

"A fundamental principle in our legal system is that laws which regulate persons or entities

28

must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *see also Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1308 (8th Cir. 1997) ("In short, a regulation is void-for-vagueness if it 'forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application.'" (citations omitted)).

Under these principles, the Rules are unconstitutionally vague. For example, the Rules fail to adequately to define the term "nonfinancial objective." Under the Rules' text, a nonfinancial objective means to "consider criteria in the investment or commitment of customer funds for the purpose of seeking to obtain an effect other than the maximization of financial return to the customer." 15 C.S.R. §§ 30-51.170(3)(B)(4), 30-51.172(3)(B)(4). That definition, especially paired with the term "consider," can be construed to apply to routine investment advice. The Rules provide no guidance regarding what it means to "consider" a nonfinancial objective. Would the Rules apply to a broker-dealer that considers, and then rejects, incorporating a nonfinancial objective into an investment decision? Or an investment adviser who considers nonfinancial objectives before properly recommending a conservative investment that is consistent with the client's conservative risk tolerance? Where the Constitution demands foreseeability, the Rules leave SIFMA's members guessing.

In actuality, federal regulations already require securities firms and professionals to "consider" myriad "criteria" in providing investment advice. Those criteria include "age, other investments, financial situation and needs, tax status, investment objectives, investment experience, investment time horizon, liquidity needs, [and] risk tolerance." *See* FINRA Rule 2111(a). Many of these factors, when "considered," could result in investment advice that arguably runs **contrary** to the "maximization of financial return." *See* Am. Compl. ¶ 2 & n.2.

"Maximization of financial return" means, in Defendants' parlance, "profit maximization." MTD at 30. This definition appears to prioritize raw return—*i.e.*, profit—over any other consideration—including a client's preference to reduce risk, avoid tax liability, or follow a conservative investment strategy. This could be read to suggest that a recommendation that is not designed to maximize profit risks violating the Rules, even when it is based on the customers' stated "nonfinancial objectives." This lack of clarity is more than the Constitution allows.

In a footnote, Defendants suggest that despite the language of the Rules, "it is irrational to claim" that strategies undertaken to reduce risk in investor accounts "would require special disclosure under the Rules." *See* MTD at 30 n.9. But that is not what the Rules say. The Rules say a "nonfinancial objective" means to consider criteria to obtain an effect other than the "maximization of financial return to the customer." 15 C.S.R. §§ 30-51.170(B)(4); 30-51.172(B)(4). All sorts of considerations relate to a customers' personal investment objectives and may steer recommendations or advice away from "profit maximization." Defendants cannot save their Rules from unconstitutional vagueness by pledging, in a motion to dismiss, to enforce their Rules in a more limited fashion than their prior drafting would appear to allow. A rule is unconstitutionally vague if it "impermissibly delegates basic Policy matters to [individuals] for resolution on an ad hoc and subjective basis." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972). Moreover, as regulated entities, SIFMA's members must be able to "identify, with '*ascertainable certainty*,' the standards with which the agency expects parties to conform." *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995) (emphasis added). The Rules do not come close to meeting this standard.

## CONCLUSION

For all these reasons, the Court should deny Defendants' motion to dismiss.

30

Dated:  December 6, 2023                    Respectfully submitted,


_/s/ Angela B. Kennedy_____
William Ray Price, Jr.  #29142MO
Angela B. Kennedy  #69167MO
**ARMSTRONG TEASDALE LLP**
101 East High Street
First Floor
Jefferson City, MO 65101
+1.573.636.8394
wprice@atllp.com
akennedy@atllp.com

_/s/ Jason S. Pinney_____
Jason S. Pinney – _pro hac vice_
David C. Boch – _pro hac vice_
Jeff Goldman – _pro hac vice_
Matthew D. O'Keefe – _pro hac vice_
**MORGAN, LEWIS & BOCKIUS LLP**
One Federal Street
Boston, MA 02110-1726
+1.617.341.7700
jason.pinney@morganlewis.com
david.boch@morganlewis.com
jeff.goldman@morganlewis.com
matthew.okeefe@morganlewis.com

Michael E. Kenneally – _pro hac vice_
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Avenue NW
Washington, DC 20004
+1.202.739.5893
michael.keanneally@morganlewis.com

Vanessa M. Brown – _pro hac vice_
**MORGAN, LEWIS & BOCKIUS LLP**
2222 Market Street
Philadelphia, PA 19103-2921
+1.215.963.5000
vanessa.brown@morganlewis.com

_Attorneys for Securities Industry and Financial
Markets Association_

31

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of December, 2023, a copy of the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system all counsel of record.

*/s/ Angela B. Kennedy*