## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

| | | |
|---|---|---|
| **SECURITIES INDUSTRY AND** | ) | |
| **FINANCIAL MARKETS ASSOCIATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No: 2:23-CV-4154-SRB** |
| **v.** | ) | |
| | ) | |
| | ) | |
| **JOHN R. ASHCROFT**, in his official | ) | **ORAL ARGUMENT REQUESTED** |
| capacity as Secretary of State of Missouri, and | ) | |
| **DOUGLAS M. JACOBY,** in his official | ) | |
| capacity as Missouri Securities Commissioner, | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS' REPLY IN SUPPORT OF
## MOTION TO DISMISS FIRST AMENDED COMPLAINT

Respectfully submitted this 21st day of December, 2023.


**GRAVES GARRETT LLC**
Edward D. Greim
Missouri Bar No. 54034
James M. Humphrey
Missouri Bar No. 50200
Matthew R. Mueller
Missouri Bar No. 70263
Jackson C. Tyler
Missouri Bar No. 73115
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
Fax: (816) 222-0534
edgreim@gravesgarrett.com

*Counsel for Defendants*

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

ARGUMENT ........................................................................................................................ 2

    I.     SIFMA lacks associational standing to bring its NSMIA preemption claim. ......... 2

    II.    SIFMA abandons its reliance on § 1983 and seeks relief solely pursuant to the
            Court's equitable powers. ......................................................................................... 2

    III.   NSMIA does not preempt the Rules. ........................................................................ 3

           a.  The IA Rule is not preempted by NSMIA. ..................................................... 3

           b.  NSMIA does not preempt the Broker-Dealer ("B-D") Rule. ......................... 5

           c.  The Rules do not impose merit-based conditions on covered securities. ......... 6

    IV.   ERISA does not preempt the Rules. .......................................................................... 7

    V.    SIFMA lacks standing to bring the compelled speech claim and the Rules do not
            violate the First Amendment. .................................................................................. 10

           a. Despite various bites at the apple, SIFMA still fails to identify any member
               that disagrees with the disclosures required by the Rules. ............................ 10

           b. *303 Creative* did not overrule *Zauderer* or *Central Hudson*. ...................... 11

           c. The disclosures satisfy *Zauderer* because they are factual and
               uncontroversial. ............................................................................................ 12

    VI.   The Rules—which are triggered by a covered person's subjective agreement that
            they are acting for a nonfinancial purpose—are not vague. ................................... 14

CONCLUSION .................................................................................................................. 15

CERTIFICATE OF SERVICE .......................................................................................... 16

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                    <u>Pages</u>

*1-800-411-Pain Referral Serv., LLC v. Otto*,
    744 F.3d 1045 (8th Cir. 2014) .................................................................. 12, 13

*303 Creative LLC v. Elenis*,
    600 U.S. 570 (2023) ................................................................................... 11, 12

*Aetna Health Inc. v. Davila*,
    542 U.S. 200 (2004) ........................................................................................... 9

*Bacon v. Stiefel Lab'ys, Inc.*,
    677 F.Supp.2d 1331 (S.D. Fla. 2010) ............................................................... 9

*Baptist Health v. Thompson*,
    458 F.3d 768 (8th Cir.2006) ............................................................................. 3

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ......................................................................................... 3

*Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin Cnty.*,
    115 F.3d 1372 (8th Cir. 1997) .......................................................................... 2

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*,
    29 F.4th 468 (9th Cir. 2022) ........................................................................... 13

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*,
    447 U.S. 557 (1980) .............................................................................. 11, 12, 14

*Chamber of Com. of U.S. v. Whiting*,
    563 U.S. 582 (2011) ......................................................................................... 3

*Cressman v. Thompson*,
    798 F.3d 938 (10th Cir. 2015) ........................................................................ 10

*Dudley Supermarket, Inc. v. Transamerica Life Ins. & Annuity Co.*,
    302 F.3d 1 (1st Cir. 2002) ................................................................................ 9

*Gobeille v. Liberty Mut. Ins. Co.*,
    577 U.S. 312 (2016) ...................................................................................... 7, 8

*Hanover Cnty. Unit of the NAACP v. Hanover Cnty.*,
    461 F. Supp. 3d 280 (E.D. Va. 2020) ........................................................ 10, 11

*Ky. Ass'n of Health Plans, Inc. v. Miller*,
    538 U.S. 329 (2003) ................................................................................................8, 9

*Myers v. Merrill Lynch & Co., Inc*,
    No. 98-cv-03532, 1999 WL 696082 (N.D. Cal. Aug. 23, 1999) ............................6, 7

*Pennhurst State School & Hosp. v. Halderman*,
    465 U.S. 89 (1984) .....................................................................................................5

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*,
    487 U.S. 781 (1988) ..................................................................................................13

*Rush Prudential HMO, Inc. v. Moran*,
    536 U.S. 355 (2002) ...............................................................................................8, 9

*Smith v. Provident Bank*,
    170 F.3d 609 (6th Cir. 1999) .....................................................................................9

*Spellman v. United Parcel Serv., Inc.*,
    540 F.Supp.2d 237 (D. Me. 2008) ............................................................................9

*Temple v. Gorman*,
    201 F.Supp.2d 1238 (S.D. Fla. 2002) .......................................................................2

*United Healthcare Ins. Co. v. Levy*,
    114 F.Supp. 2d 559 (N.D. Tex. 2000) ......................................................................9

*Zauderer v. Off. of Disciplinary Counsel of the Supreme Court of Ohio*,
    471 U.S. 626 (1985) ...........................................................................................11, 12

## STATUTES, RULES, AND REGULATIONS

15 C.S.R. § 30-51.120 .....................................................................................................5

15 C.S.R. § 30-51.170 ...................................................................................1, 7, 14, 15

15 C.S.R. § 30-51.172 ...................................................................................1, 7, 14, 15

17 C.F.R. § 275.204-2 ....................................................................................................4

29 C.F.R. § 2550.404a-1 ................................................................................................7

15 U.S.C. § 77r(a)(3) ...................................................................................................6, 7

15 U.S.C. § 80b-3 ...........................................................................................................4

15 U.S.C. § 80b-3a ............................................................................................3, 4

29 U.S.C. § 1144 ...................................................................................................8

42 U.S.C. § 1983 ...................................................................................................2

RSMo § 409.5-502 ............................................................................................4, 5

SEC Rule 17a-3(a)(17) ..........................................................................................5

**OTHER AUTHORITIES**

NASAA 2002 Model Rules, Rule USA 2002 502(b) ..........................................4, 5

# INTRODUCTION

As so-called "ESG" investments are increasingly marketed to consumers, those who act for a purpose other than advancing their client's financial goals should have to tell the client that fact. It is not controversial that clients are entitled to full information regarding how their money is being invested, just as a patient is entitled to full information regarding the risks and benefits of a treatment being offered by a doctor. The Rules here go no further. They prohibit no investments or advice. But SIFMA vehemently opposes these consumer protection disclosures, at times saying they are unnecessary because its Members already make similar disclosures, Am. Compl., ¶¶19, 145, and at other times saying they would not disclose this information but for the Rules. Resp., 8.

Perhaps SIFMA's confusion is from its misreading of the Rules. They do not mandate that "firms [] tell their clients that consideration of social or nonfinancial objectives *will inherently jeopardize* financial returns." Resp., 25 (emphasis added). Rather, when a covered person subjectively believes they are acting for a nonfinancial purpose, they must tell the client that fact: decisions or recommendations being made on their behalf "are not solely focused on maximizing a financial return for me or my account." 15 C.S.R. § 30-51.170(3)(D); 15 C.S.R. § 30-51.172(3)(D). The disclosures say nothing about "jeopardizing" financial return and do not even opine that the consideration of nonfinancial factors *will not* maximize financial return. The disclosures are not focused on the *outcome* of the investment at all. Rather, they focus on the *input*: transparency in the decision-making process, including the fact that the financial adviser subjectively considered nonfinancial objectives. The courts and federal law have long respected the State's ability to craft policies and require disclosures to protect its consumers, even in the realm of securities and financial advising. These Rules are no different.

1

For the reasons stated below and in Defendants' opening motion [Doc. 28] and suggestions in support [Doc. 29], SIFMA's First Amended Complaint [Doc. 24] must be dismissed.

## I.  SIFMA lacks associational standing to bring its NSMIA preemption claim.

SIFMA concedes Defendants' point that it has no Members to whom the IA Rule directly applies. Instead, it relies wholly on twice-removed associational standing: its Members employ Missouri investment adviser representatives (IARs) to whom the IA Rule *does* apply. Resp., 6-7. These Members, it says, are indirectly injured by increased compliance costs and possible supervisory liability for their IARs' Rule violations.[1] Yet this reframing of the injury means SIFMA more clearly fails the third prong of associational standing: individual Member participation is now necessary to determine whether the Rules' secondary effects really do cause actual, concrete harm to SIFMA's members which would be redressed by a favorable outcome. This concession also means NSMIA preemption fails on the merits because, as SIFMA concedes, the Rule only reaches federal covered IARs, which NSMIA permits. *See* Sect. III(a), below.

## II.  SIFMA abandons its reliance on § 1983 and seeks relief solely pursuant to the Court's equitable powers.

SIFMA initially invoked 42 U.S.C. § 1983 as providing subject matter jurisdiction for "all of Plaintiff's claims." Am. Compl., ¶24. Defendants' motion to dismiss addressed why § 1983 was unavailable for SIFMA's preemption claims and why its pleading fell short on that front. MTD, 9. SIFMA now abandons § 1983 as to its preemption claims, instead relying solely on the Court's equitable powers. Resp., 10-12. SIFMA's response shows why an equitable preemption action is a poor fit here. Nearly every ERISA case SIFMA cites relates to state law causes of action which directly and expressly conflicted with ERISA's sole cause of action provision. The same is true

---

[1] SIFMA relies on *Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin Cnty.*, 115 F.3d 1372, 1379-80 (8th Cir. 1997), but the "waste producer" plaintiffs in that matter ultimately were held to lack standing under the Eighth Circuit's prudential factor analysis, because they were attempting to assert the rights of third-party waste haulers. *Id.* at 1383.

2

for SIFMA's NSMIA preemption claim. *Temple v. Gorman*, to which SIFMA cites, only deals with preemption of state law claims. 201 F.Supp.2d 1238, 1242-43 (S.D. Fla. 2002). But the Rules do not create a new cause of action. And the remedial schemes created by Congress, especially under ERISA, show its intent that disputes be resolved pursuant to those schemes, rather than an equitable action. The Court should respect Congress's decision not to confer a private preemption cause of action under either statute, particularly when invoked to press an illusory conflict.

## III.    NSMIA does not preempt the Rules.[2]

### a.    The IA Rule is not preempted by NSMIA.

The parties agree that (1) the IA Rule does not apply to federally covered investment advisors and (2) the IA Rule does apply to IARs conducting business in Missouri. The Parties merely disagree on the scope of NSMIA's express preemption provision and its carveouts.

NSMIA preempts state rules regarding the (1) "registration, licensing, or qualification" of (2) federal-covered investment advisers and their supervised persons. 15 U.S.C. § 80b-3a(b)(1)(A); Resp., 15-16. Fatally for its preemption claim, SIFMA admits that "the IA Rule has nothing to do with these activities." Resp., 18. SIFMA is left to argue that express NSMIA preemption is far broader than its plain language, but it can cite only an SEC release[3] and legislator statements regarding NSMIA's purpose. Resp., 18. This is not law. NSMIA is unambiguous and preempts only the limited set of activities expressly identified. An express preemption clause must be construed narrowly according to its plain language. *See Chamber of Com. of U.S. v. Whiting*, 563

---

[2] To the extent SIFMA, for the first time, asserts a claim of conflict preemption, that claim should be dismissed. SIFMA asserts without support that "the Rules are conflict preempted because they 'stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Resp., 12. But SIFMA fails to support this bare allegation factually or legally. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 544-55 (2007).

[3] SIFMA does not argue that the statute is ambiguous or that this Court should defer to the SEC's interpretation of the express preemption provision at the expense of the plain language. Where Congress's intent is unambiguous, no deference is owed. *See Baptist Health v. Thompson*, 458 F.3d 768, 773 (8th Cir.2006) (cleaned up) ("[W]e ask first whether the intent of Congress is clear as to the precise question at issue. If, by employing traditional tools of statutory construction, we determine that Congress' intent is clear, that is the end of the matter.").

U.S. 582, 594 (2011) ("When a federal law contains an express preemption clause, we 'focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent.'"). The SEC cannot expand the scope of that preemption by mere commentary.

What is more, NSMIA *expressly reserves to the states* the authority to investigate and enforce fraud, deceit, and other unlawful conduct. *See* NSMIA § 80b-3a(b)(2). Evidenced by its citation to RSMo § 409.5-502, SIFMA recognizes that the IA Rule fits squarely within this clear reservation of state authority and is excluded from preemption even under the SEC's interpretation.

SIFMA also concedes that the IA Rule does not regulate federal-covered investment advisers, Resp., 17, arguing instead that it *indirectly* applies to these IAs because they have "supervisory responsibility for their investment adviser representatives." *Id*. This argument fails because the IA Rule does not impose strict liability, and thus holds no federal-covered IAs liable for in-state IARs' Rule violations. Further, the federal provisions SIFMA cites impose no indirect liability for compliance with state law. Section 80b-3(e)(6) does impose liability on IAs for failure to supervise individuals' compliance with various, enumerated, federal laws, but it says nothing of required supervision for compliance with any state law.[4] *Id*. Likewise, 17 C.F.R. § 275.204-2 (to which SIFMA makes no specific citation) imposes record-keeping requirements for IAs but makes no mention of IARs or, even more broadly, supervised persons of IAs.

Finally, SIFMA is wrong that the IA Rule conflicts with RSMo § 409.5-502(b). Defendants routinely investigate and pursue Missouri-based IARs of federal-covered IAs for violating state fraud-and-deceit rules like those at issue, but this does not extend to federal-covered IAs or their non-IAR "supervised persons."[5] The statute has never been understood to prohibit such rules; if it

---

[4] If it did, of course, the whole of state regulation of in-state federal-covered IARs—the very class of people NSMIA specifically carves out—would be preempted. This would create an absurd reading of the statute.
[5] This practice follows the National Conference of Commissioners on Uniform State Laws' ("NCCUSL") Official Comments to the Uniformed Securities Act, from which RSMo § 409.5-502(b) is derived. The official comment

did, then SIFMA apparently believes that all Missouri IARs of federal covered IAs are exempt from Missouri fraud and deceit rules—a truly revolutionary claim. At any rate, whether the Rule complies with state law is immaterial to federal preemption and is not an issue for a federal court.[6]

### b. NSMIA does not preempt the Broker-Dealer ("B-D") Rule.

The B-D Rule's required documentation fits squarely within a record the SEC already requires: the Customer Account Record. SEC Rule 17a-3(a)(17). That record requires B-Ds to obtain information regarding the customer's investment objectives, *id,* and SEC Rule 17a-3(a)(17) specifically allows for flexibility in documenting these objectives. MTD, 14. SIFMA claims the B-D Rule is preempted because it requires a "new" record, Resp., 14, but never addresses the plain text of Rule 17a-3(a)(17), which explicitly permits flexibility in documenting customer objectives by allowing an "alternative document" to be provided to each customer explaining investment objectives. SEC Rule 17a-3(a)(17)(i)(B)(1)-(2). Rule 17a-3(a)(17) clearly allows variation and "alternative documents" for documenting a customer's investment objectives, including the B-D Rule's limited documentation.[7] The B-D Rule is not preempted.[8]

---

[6] specifies that "The rulemaking authority under Sections 502(b) and (c) would provide the basis for existing NASAA rules concerning investment advisers, to the extent these rules are not preempted by [NSMIA]." The existing NASAA (North American Securities Administrators Association) rules regarding fraud and deceit at the time were actually broader than the Rules at issue here in that they applied even to federal-covered investment advisers. NASAA 2002 Model Rules, at 36, Rule USA 2002 502(b). This evidences Missouri's intent to regulate up to the limits under its authority under NSMIA, which as shown above allows regulation of some IARs of federal-covered IAs.

[6] To the extent SIFMA now attempts to morph its NSMIA preemption claim into an effort to force Defendants to comply with SIFMA's incorrect interpretation of RSMo § 409.5-502, the Court lacks jurisdiction to grant such relief. *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 107 (1984) ("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.").

[7] SIFMA cites to 15 C.S.R. § 30-51.120 for the proposition that Defendants acknowledge "NSMIA preempts states from instituting their own recordkeeping requirements for broker-dealers." Resp., 14, n. 6. This is wrong. Section 30-51.120 merely indicates B-Ds must comply with NSMIA, not that NSMIA preempts all state requirements. Defendants do not argue that NSMIA preemption is never possible, only that the B-D Rule is not preempted.

[8] SIFMA also mentions "policy updates and training materials" as documents not required by the SEC. Resp., 14. That is immaterial here: the B-D Rule never mentions these documents, much less require they be kept.

### c. The Rules do not impose merit-based conditions on covered securities.

SIFMA mischaracterizes the Rules' text and operation, claiming they impose merit-based conditions on the sale of covered securities. Resp., 19-20. Yet the Rules are triggered not by the quality of any covered security or any assessment of its merits, but by the objective considered by "covered persons" when providing investment advice. *See e.g.*, MTD, 12, 15-16, 22, 29, 30. SIFMA's own pleading betrays its feigned ignorance. *See e.g.*, Am. Compl., ¶¶ 78, 151.[9]

SIFMA now asserts that the Rules require disclosure when a fund that *itself* incorporates nonfinancial objectives is recommended. Resp., 19, 27. This assertion is not grounded in the text of the Rules, which only cover the defined IAs, IARs, and B-Ds, not fund managers. As the Rules state, and the parties agree, the Rules only apply to the objectives incorporated by certain Covered Persons, not the objectives of individuals who manage mutual funds.[10] To reiterate the effect of the Rules' plain language by example: a fund manager could structure a fund for the distinct purpose of supporting businesses that reduce their carbon footprint, but an Affected Person does not trigger disclosure if he or she recommends that fund because of its superior return on investment, rather than the fund's goal of supporting "green" businesses—the operative facts have nothing to do with a particular fund or security, but with the objectives of the covered person.[11]

SIFMA cites *Myers v. Merrill Lynch & Co., Inc*,[12] as exemplifying that "the language in Section 77r(a)(3) is not limited to state regulation that is directed to specific covered securities." Resp., 20. This is wrong on multiple fronts. First, the restriction at issue in *Myers* was not a state regulation, but a practice of the *defendant investment banks*. *Id*. at *1. Second, the restriction did

---

[9] The Rules only "require Affected Persons to issue disclosures and obtain written consents if their advice 'incorporates a social objective or other nonfinancial objective' into offering a recommendation or making an investment decision on its client's behalf."). Am. Compl., ¶151.
[10] *See e.g.*, Am. Compl. ¶ 78; MTD, 16.
[11] Though invited by Defendants, SIFMA has still neglected to identify a single covered security on which the Rules place a merit-based condition. Instead, SIFMA superficially mentions "mutual funds." Resp., 19-20.
[12] No. 98-cv-03532, 1999 WL 696082, at *10 (N.D. Cal. Aug. 23, 1999).

apply to *specific securities*: those offered by syndicates that imposed a "syndicate penalty bid." *Id*.

Third, the court never analyzed the scope of § 77r(a)(3) and merely assumed NSMIA's application.

*Id*. at \*9. Fourth, the preemption at issue in *Myers* was not for a particular state rule, but for an

individual's private, state-court cause of action. *Id*.[13] That is not this case.

## IV. ERISA does not preempt the Rules.

SIFMA asserts the Rules are preempted by ERISA and that ERISA's broad savings clause

exempting "securities" regulations from the scope of preemption is inapplicable. This is wrong.

First, the Rules do not "relate to" ERISA in such a way to trigger preemption in the first

place. Rather than addressing the factors used by the Eighth Circuit and this Court in determining

whether a rule "relates to" ERISA, factors which Defendants argued in their motion, MTD, 18-19,

SIFMA creates its own factors—but even these are dry wells. *See* Resp., 21-22. First, SIFMA

asserts the Rules interfere with a core function of ERISA fiduciaries because a federal regulation

allows ERISA fiduciaries to consider non-economic factors. *Id*. This is a curious assertion because

the federal regulation is actually more strict that the Rules, allowing consideration of non-

economic only when those factors serve the economic interests of the plan beneficiaries equally.[14]

29 C.F.R. § 2550.404a-1(b)(4), (c)(2). The Rules, on the other hand, do not prohibit consideration

of such non-economic factors in any situation. *See* 15 C.S.R. §§ 30-51.170(3)(B), 30-51.172(3)(B).

Second, SIFMA argues the Rules add a record-keeping requirement onto ERISA plans.

Resp., 22 (citing *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 323 (2016)). Even assuming the

Rules do add an additional record-keeping requirement to ERISA plans, *see* MTD, 13-15, that

---

[13] To further support its own mischaracterizations of the Rules, SIFMA alleges that "Defendants acknowledge that the Rules require firms to obtain signed consents before recommending certain covered securities" and cite to Defendants' Motion to Dismiss at page 27. Resp., 19-20. This is false. No such statement appears anywhere in Defendants' Motion to Dismiss and SIFMA's suspect assertion should not be given any weight.

[14] The Rules also do not conflict with 29 C.F.R. § 2550.404a-1(b)(4), (c)(2) because both that regulation and the Rules still allow an ERISA fiduciary to consider non-financial factors.

7

requirement alone does not trigger preemption. In *Gobeille*, the court determined that a Vermont regulation requiring ERISA plans to report detailed information about the administration of benefits in a systematic manner was a direct regulation of a fundamental ERISA function. *Id.* But the court specifically acknowledged that some requirements are too "innocuous and peripheral" to ERISA plan administration to trigger preemption. *Id.* Such is the case with the Rules. Although the Rules are an important consumer protection device, any associated record keeping requirements are "innocuous and peripheral" and do not interfere with ERISA plan administration.

Finally, even if the Rules did "relate to" ERISA, SIFMA does not overcome ERISA's Saving Clause, which expressly exempts from preemption "any law of any State which regulates . . . securities." 29 U.S.C. § 1144(b)(2)(A). The Rules are clearly securities regulations. SIFMA contends that Defendants' assertion on this point contradicts its earlier argument that the Rules do not regulate individual securities themselves, Resp., 22-23, but this argument is tedious and misleading. As SIFMA itself pointed out and did not dispute, the Rules exist in the realm of state securities regulation. *See e.g.*, Am. Compl., at ¶¶6, 22.

Similarly, the Rules are not excluded from ERISA's Saving Clause. Citing to *Ky. Ass'n of Health Plans, Inc. v. Miller*,[15] SIFMA implies that even if the Rules are within the realm of securities regulation (which SIFMA itself pleaded), they are still exempt from ERISA's Saving Clause because they do not "regulate securities." Resp., 23. Presumably, SIFMA means that because the Rules do not regulate specific securities themselves, they are not saved from ERISA preemption. But SIFMA fails to apply the legal underpinnings of *Miller* to the Rules. *Miller* cited heavily to *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355 (2002), in which the Supreme Court looked to three factors to determine if a regulation had a sufficient connection to insurance to save

---

[15] 538 U.S. 329, 334 (2003).

it from ERISA preemption. *Id*. at 366-67. On their face, these factors do not readily apply to securities regulations, but the *Rush* court simplified its analysis as "parsing the 'who' and the 'what': when insurers are regulated with respect to their insurance practices, the state law survives ERISA." *Id*. at 366. Although the application of ERISA's Saving Clause typically arises in connection with insurance regulations, as in *Miller* and *Rush*, the Sixth Circuit in *Smith v. Provident Bank*, 170 F.3d 609, 615 (6th Cir. 1999) applied the same reasoning to the securities context and stated that a securities regulation is covered by the Saving Clause if it "substantively regulates a relationship" rather than "merely provid[ing] alternative remedies for [ERISA] harms." *Id*. Applying *Smith*, the Rules are saved from ERISA preemption because they regulate the relationship between Affected Persons and their clients.

The Rules also do not "threaten ERISA's remedial scheme," Resp., 23, because they do not "duplicate[], supplement[], or supplant[] the ERISA civil enforcement remedy." *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004). The Rules do not create a private cause of action or provide for any legal remedy as required to be excluded from ERISA's saving clause. *Smith*, 170 F.3d at 615 (reasoning that because the state law cause of action at issue did not simply "regulate or define what constitutes a 'wrongful' transfer of a security but provides remedies for such a transfer," that regulation was not saved from preemption.) The Rules, unlike those at issue in *Smith*, merely define the "terms of the relationship between [adviser] and [client]." *Id*. (quoting *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 50-51 (1987)).[16]

---

[16] SIFMA cites to several cases to argue that the Rules threaten ERISA's remedial scheme, Resp., 22-23, but all of these cases deal with state causes of action or remedies—not simply defining the relationship between adviser and client. *See e.g., Aetna*, 542 U.S. at 221; *Dudley Supermarket, Inc. v. Transamerica Life Ins. & Annuity Co.*, 302 F.3d 1, 2-3 (1st Cir. 2002); *Bacon v. Stiefel Lab'ys, Inc.*, 677 F.Supp.2d 1331, 1348-49 (S.D. Fla. 2010); *Spellman v. United Parcel Serv., Inc.*, 540 F.Supp.2d 237, 249 (D. Me. 2008); *United Healthcare Ins. Co. v. Levy*, 114 F.Supp. 2d 559, 566 (N.D. Tex. 2000).

**V.  SIFMA lacks standing to bring the compelled speech claim and the Rules do not violate the First Amendment.**

   **a.  Despite various bites at the apple, SIFMA still fails to identify any member that disagrees with the disclosures required by the Rules.**

Though SIFMA claims a First Amendment injury on their behalf, no SIFMA member has professed that they disagree with the disclosures required by the Rules. Rather, they merely say that they would rather not disclose to their clients when nonfinancial factors are considered. Resp., 7-8. SIFMA claims this is all that its members must do to establish standing. But disagreement is an essential element of a compelled speech claim. *See Cressman v. Thompson*, 798 F.3d 938, 951 (10th Cir. 2015) ("…[M]erely objecting to the fact that the government has required speech is not enough; instead, a party must allege some disagreement with the viewpoint conveyed by this speech."). For purposes of its standing analysis, the Court need not assume that SIFMA will be successful on the merits where it fails to allege an essential element of its claim. The Court should not be asked to issue an advisory opinion on the First Amendment claim, only to find that no SIFMA member actually disagrees with the supposedly compelled speech, especially given SIFMA's contradictory allegations on point: it simultaneously asserts that its members would rather not make the disclosures, Resp., 8, but also that the Rules are unnecessary because SIFMA's members are already required to disclose the factors considered in making investment decisions. Am. Compl., ¶19, 145. SIFMA cannot have it both ways. Even if compliance costs could support standing in some situations, increased compliance costs to engage in speech with which one agrees (or, allegedly, already engages) is not a concrete or particularized First Amendment injury.

Further, SIFMA has not established associational standing because the participation of its individual members who object to the disclosures required by the Rules is required to adjudicate the compelled speech claim, as the claimed injury is personal to those members who actually disagree with the disclosures. In *Hanover Cnty. Unit of the NAACP v. Hanover Cnty.*, 461 F. Supp.

10

3d 280, 290 (E.D. Va. 2020), the district court, acknowledging that objection to the allegedly compelled speech is an essential element, held that the NAACP lacked associational standing to bring similar claims because individual member participation was required. "[T]he NAACP would have to introduce evidence showing which members objected to which speech and how each of the members were compelled to speak..." *Id.* The same reasoning applies here, mandating the participation of SIFMA's members. SIFMA's continued efforts to avoid professing member disagreement emphasizes the need for those members to be before the Court.

### b. *303 Creative* did not overrule *Zauderer* or *Central Hudson*.

SIFMA cites last summer's decision in *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023), to argue that this Court must jump straight to strict scrutiny, while simultaneously acknowledging (as *303 Creative* did) the continuing vitality of *Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626 (1985). *See* Resp., 3. But *303 Creative* is a smokescreen. It adds nothing new to SIFMA's argument, which ultimately falls back on its contention that *Zauderer* does not apply. *See* Resp., 25-27. *303 Creative* is distinguishable, too, on multiple fronts.

First, SIFMA fails to appreciate that *303 Creative* involved a matter of "pure speech," not a commercial disclosure. *Id.* at 582. The Court specifically noted that the service at issue—a website tailored to express the love story of soon to be married couples—was no ordinary commercial good or service, but was itself expressive speech, *id.* at 593-94, and the case largely focused on the plaintiff's sincere disagreement with the speech being compelled: content that contradicted her belief that marriage "is a union between one man and one woman is a sincerely held religious conviction." *Id.* at 582. Here, SIFMA does not and cannot claim that any disclosures its members make to their clients about how their money will be invested are pure, expressive speech. Nor could it. Commercial speech and expressive speech are treated differently under the First Amendment. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447

U.S. 557, 563 (1980) (the Constitution "accords a lesser protection to commercial speech than to other constitutionally guaranteed expression."). There is nothing expressive about advisors telling customers what factors are being considered when investing their money; financial disclosure cannot compare to laws forcing acceptance of, or advocacy for, a certain construct of marriage.

What's more, *303 Creative* itself acknowledges that *Zauderer's* rational basis scrutiny is still the correct standard to be applied to government regulations that compel "factual and uncontroversial" disclosures in a commercial transaction. *Id.* at 596. Cherry-picking the opinion to suggest that *Zauderer* was overruled and strict scrutiny automatically applies is disingenuous. Along the same lines, SIFMA faults Defendants for not addressing whether the Rules survive strict scrutiny. Resp., 24. But *Zauderer* is the proper standard here, and the Eighth Circuit has held that *Central Hudson* applies if *Zauderer* does not. *See 1-800-411-Pain Referral Serv., LLC v. Otto*, 744 F.3d 1045, 1055 (8th Cir. 2014) (applying *Zauderer* but noting that court should apply *Central Hudson* if it "determines commercial speech restrictions are content- or speaker-based")*.*

### c. The disclosures satisfy *Zauderer* because they are factual and uncontroversial.

Where commercial speech is at issue, as here, *Zauderer* teaches that "[b]ecause the extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides," a party faced with a disclosure requirement has only a minimal interest in withholding the information requested of him by law. 471 U.S. at 651. The Rules "impose a disclosure requirement rather than an affirmative limitation on speech…" triggering "the less exacting scrutiny described in *Zauderer*." *1-800-411-Pain Referral Serv.,* 744 F.3d at 1061.[17] The Rules do not prohibit any particular investments, particular advice, or particular speech. This "factual and uncontroversial" regime is subject to rational basis review.

---

[17] The Supreme Court has expressly noted that securities transactions are a prime example of when compelled disclosure is likely to pass muster. *See Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 796 n. 9

SIFMA first contends that the Rules are misleading, claiming: "[t]he state is requiring securities firms to tell their clients that consideration of social or nonfinancial objectives *will inherently jeopardize financial returns*." Resp., 25. But that is not what the Rules require. They merely require that if financial advisors consider certain nonfinancial factors, the client must be told that the advice is not "solely" based on financial criteria. This is logical and always true: considering a nonfinancial factor must mean that financial factors were not *the sole* consideration.

SIFMA's argument again veers off course, stating that because the DOL considers "ESG" issues to reflect financial considerations, the Rules cannot be factual. Resp., 25. But the Rules do not reference "ESG," or require anyone to say anything about it. Nor do they prohibit any professional from considering nonfinancial factors, as Plaintiff's brief seems to suggest. Resp., 25-26. SIFMA must attack the Rules as written, not its own contrived version.

SIFMA's nod to *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 472 (9th Cir. 2022), is equally unavailing. There, whether a disclosure was triggered was peculiarly within the mind of the state. *See id.* (requiring retailers to disclose that products were "known to [] California to cause cancer"). Here, it is exclusively and subjectively within the mind of the professional. There is no "technical requirement" or definition unfamiliar to those covered by the Rules, only their own subjective understanding and intent, of which they are the best judges.

SIFMA argues the disclosures cannot be "uncontroversial" because reasonable minds can disagree on the efficacy of "ESG" investments. Resp., 27. But if that were the test, no compelled disclosure would survive the First Amendment, particularly in today's climate of disagreement. Nor do the Rules "require[] scripts" that "express only one side of the debate over the merits of 'social objectives' investing..." *Id.* SIFMA's argument depends on its false characterization of the

(1988) ("Of course, the dissent's analogy to the securities field entirely misses the point. Purely commercial speech is more susceptible to compelled disclosure requirements.") (citation omitted).

Rules as position statements that social investing jeopardizes financial returns. Resp., 25. The disclosures do not say this and express no opinion on the merits of social investing. They simply require that the adviser tell the client if such factors are considered.

Finally, SIFMA contends that the Rules cannot survive even intermediate scrutiny under *Central Hudson* because SIFMA thinks that the state should use some other method, like a public information campaign, to prevent consumers from being deceived into investing in products they do not fully understand. Resp., 28. SIFMA does not contest that the State's interest in preventing consumer deception is substantial; it merely prefers different means to advance that interest. But here, a general public information campaign is not an adequate stand in for the minimal, direct, straightforward disclosures required by the Rules. That suggestion is a particularly poor fit given the context of the transactions covered and the relationships between the advisors and customers where, presumably, highly personal considerations and goals are factored into the investment advice. A one size fits all public information campaign would not adequately inform consumers regarding how incorporating nonfinancial objectives does or does not further their financial goals.

## VI. The Rules—which are triggered by a covered person's subjective agreement that they are acting for a nonfinancial purpose—are not vague.

SIFMA claims the Rules are unconstitutionally vague because it cannot understand when a disclosure is required. Resp., 29-30. But the key term here—"nonfinancial objective"—is clearly defined. See 15 C.S.R. §§ 30-51.170(3)(B)(4), 30-51.172(3)(B)(4). And the Rules are triggered by the financial professional's subjective agreement that they are acting for a "nonfinancial purpose." Thus, a disclosure is only required when covered parties subjectively believe exactly that which must be disclosed: that they are considering any factor other than financial outcome.

SIFMA tries to interject nonexistent uncertainty, claiming that a professional that "considers" but then rejects using a nonfinancial objective must still make a disclosure to the client,

14

Resp., 29. That contention finds no home in the text of the Rules. A nonfinancial objective means to "consider criteria *in the investment or commitment of customer funds* for the purpose of seeking to obtain an effect other than the maximization of financial return to the customer." 15 C.S.R. §§ 30-51.170(3)(B)(4), 30-51.172(3)(B)(4) (emphasis added). Only those criteria which factor into the "investment or commitment" trigger disclosure, not extraneous considerations that were abandoned and played no role in the ultimate decision on how to invest the client's funds.

SIFMA advances one last argument: that the Rules are vague because "a recommendation that is not designed to maximize profit risks violating the Rules" even when based on customers' disclosed objectives or preferences, like risk tolerance. Resp., 30. First, no such recommendation can "violate" the Rules, which do not prohibit investments or advice. Second, SIFMA is wrong to divorce risk and financial return. As Defendants argued in their first brief, volatility and risk impact the financial performance of an investment over time, and are properly considered when determining how to maximize an investment's financial return. Absurd constructions of the Rules do not render them vague, particularly where compliance turns on the professional's subjective agreement that their advice triggers the disclosure.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be granted.

Respectfully submitted this 21st day of December, 2023.

GRAVES GARRETT LLC

*/s/ Edward D. Greim*
Edward D. Greim
Missouri Bar No. 54034
James M. Humphrey
Missouri Bar No. 50200
Matthew R. Mueller
Missouri Bar No. 70263
Jackson C. Tyler
Missouri Bar No. 73115
GRAVES GARRETT LLC
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
Fax: (816) 222-0534
edgreim@gravesgarrett.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I certify that on December 21, 2023, I filed and served the foregoing on counsel of record for all parties via the CM/ECF system.

*/s/ Edward D. Greim*
Edward D. Greim
Counsel for Defendants

16