**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| SECURITIES INDUSTRY AND FINANCIAL MARKETS ASSOCIATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 23-cv-04154-SRB |
| JOHN R. ASHCROFT, in his official capacity as Secretary of State of Missouri, et. al, | ) ) ) | |
| Defendants. | ) ) | |

## ORDER

Before the Court is Defendants John Ashcroft and Douglas Jacoby's (collectively the "Defendants") Motion to Dismiss. (Doc. #28.) For the reasons discussed below, the motion is DENIED.

## I. BACKGROUND

This case arises from rules regulating financial professionals promulgated by Missouri Secretary of State John Ashcroft. The two rules at issue became effective in July 2023. The first rule, "Dishonest or Unethical Business Practices by Broker-Dealers and Agents" (the "B-D Rule") states:

> [i]f a broker-dealer or agent incorporates a social objective or other nonfinancial objective into a discretionary investment decision to buy or sell a security or commodity for a customer, a recommendation and/or solicitation to a customer for the purchase or sale of a security or commodity, or the selection, or recommendation or advice to a customer regarding the selection, of a third-party manager or subadviser to manage the investments in the customer's account, then such broker-dealer or agent shall disclose to such customer the existence of such incorporation[.]

Mo. Code Regs. Ann. tit. 15, § 30-51.170(3)(A) (2023). The B-D Rule defines relevant terms, sets forth a disclosure obligation that requires written consent, and mandates that the disclosure

contain "substantially similar language" to language provided in the rule.  *See* Mo. Code Regs. Ann. tit. 15, §§ 30-51.170(3)(B)–(D) (2023).  The second rule, "Dishonest or Unethical Business Practices by Investment Advisers and Investment Adviser Representatives" (the "IA Rule"), uses similar language, but is applicable to investment advisers and investment adviser representatives. *See* Mo. Code Regs. Ann. tit. 15, § 30-51.172(3)(A) (2023).

Plaintiff the Securities Industry and Financial Markets Association ("SIFMA") represents "broker-dealers, investment banks and asset managers operating in the U.S. and global capital markets," including Benjamin F. Edwards & Co., Inc.; Edward D. Jones & Co., L.P.; LPL Financial LLC; PFS Investments Inc.; Raymond James Financial, Inc.; and Stifel Financial Corporation.  (Doc. #24, p. 9.)  SIFMA filed the instant suit against Defendants on August 10, 2023, seeking declaratory judgment and injunctive relief.  It asserts in Count One that the B-D Rule and IA Rule (collectively, the "Rules") are preempted by the National Securities Markets Improvement Act of 1996 ("NSMIA"), in Count Two that the Rules are preempted by the Employment Retirement Income Security Act of 1974 ("ERISA"), in Count Three that the Rules violate the First Amendment protection against compelled speech, and in Count Four that the Rules are unconstitutionally vague.  SIFMA subsequently filed an amended complaint, asserting the same four counts.  Defendants now move to dismiss the case for lack of subject matter jurisdiction and failure to state a claim.  SIFMA opposes the motion.  The parties' arguments are addressed below.

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) provides for the dismissal of a claim when the Court lacks subject matter jurisdiction.  When a defendant challenges a court's subject matter jurisdiction, the plaintiff has the burden of proving jurisdiction exists.  *Jones v. Carondelet*

*Health*, No. 12-CV-00213-BP, 2012 WL 12898834, at *1 (W.D. Mo. Aug. 17, 2012).  "In deciding a Rule 12(b)(1) motion, a district court is required to distinguish between a facial attack and a factual attack."  *Roberts v. Dep't of Veterans Affs.*, No. 20-CV-00076-RK, 2020 WL 7086103, at *2 (W.D. Mo. Dec. 2, 2020); *see also Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990).  In a facial challenge, the court reviews only the pleadings and "all of the factual allegations concerning jurisdiction are presumed to be true."  *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993).  The motion "is successful if the plaintiff fails to allege an element necessary for subject matter jurisdiction."  *Id.*  In a factual challenge to jurisdiction, a court may consider facts outside the pleadings and the non-moving party does not benefit from the presumption of truth.  *Osborn*, 918 F.2d at 729 n.6; *accord Mathews v. Fieldworks, LLC*, No. 20-CV-06057-RK, 2021 WL 1113205, at *5 (W.D. Mo. Mar. 23, 2021) (citation omitted) (noting that "[i]n a factual attack the moving party submits evidentiary materials such as affidavits or depositions to attack the jurisdictional allegations of the complaint, and the court may consider that evidence when determining whether it has subject matter jurisdiction").

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a claim for "failure to state a claim upon which relief can be granted."  "To survive a motion to dismiss [for failure to state a claim], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Zink v. Lombardi*, 783 F.3d 1089, 1098 (8th Cir. 2015).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ash v. Anderson Merchs., LLC*, 799 F.3d 957, 960 (8th Cir. 2015) (quoting *Iqbal*, 556 U.S. at 678).  The Court must accept all facts alleged in the complaint as true

when deciding a motion to dismiss.  *See Data Mfg., Inc. v. United Parcel Serv., Inc.*, 557 F.3d 849, 851 (8th Cir. 2009) (noting "[t]he factual allegations of a complaint are assumed true and construed in favor of the plaintiff, even if it strikes a savvy judge that actual proof of those facts is improbable").  "In addressing a motion to dismiss, '[t]he court may consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record.'"  *Illig v. Union Elec. Co.*, 652 F.3d 971, 976 (8th Cir. 2011) (quoting *Mills v. City of Grand Forks*, 614 F.3d 495, 498 (8th Cir. 2010)).

## III.  DISCUSSION

Defendants argue that "SIFMA lacks associational standing, and all of its claims lack merit."  (Doc. #29, p. 10.)  SIFMA contends that "[t]he Supreme Court and the Eighth Circuit have routinely found that trade organizations like SIFMA have associational standing and a cause of action to challenge state laws, including on preemption grounds."  (Doc. #34, p. 10.)  These arguments are addressed in turn below.

### A.  Rule 12(b)(1) – Standing

#### 1.  IA Rule

Defendants assert that "SIFMA fails to allege its members' standing to challenge the IA Rule[,]" mainly because they are federally covered investment advisers, which the IA Rule specifically excludes.  (Doc. #29, p. 14.)  SIFMA contends that "the members' standing does not depend on whether the IA Rule 'applies' to them."  (Doc. #34, p. 14.)

"[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III."  *Am. Farm Bureau Fed'n v. U.S. Env't Prot. Agency*, 836 F.3d 963, 968 (8th Cir. 2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  "A plaintiff establishes standing by showing that [it] has suffered an injury in fact that is fairly traceable to

the challenged conduct of the defendant and that will likely be redressed by a favorable decision." *Id.*

> Associations . . . have standing to bring suit on behalf of their members, provided that the "members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."

*Id.* (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). "A plaintiff's burden to establish standing depends on the stage of litigation, and '[a]t the pleading stage, general factual allegations . . . may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Wieland v. U.S. Dep't of Health & Hum. Servs.*, 793 F.3d 949, 954 (8th Cir. 2015) (quoting *Lujan*, 504 U.S. at 561).

The Eighth Circuit has held that a plaintiff can establish an injury in fact by demonstrating compliance costs. *City of Kennett, Missouri v. Env't Prot. Agency*, 887 F.3d 424, 431 (8th Cir. 2018) (holding that there is "standing to challenge [the rule] where 'even if [the rule] does not cause injury by itself, it will give way to requirements,' which will 'cause compliance costs for [the plaintiff], a classic injury-in-fact'" (quoting *Am. Farm Bureau Fed'n v. EPA*, 792 F.3d 281, 293 (3d Cir. 2015))). Specifically,

> when a state or local law imposes compliance burdens on those it regulates or controls, and compliance is coerced by the threat of enforcement, the controversy is both immediate and real. And it is equally evident that those fees and regulatory burdens are traceable to the [defendant's] enforcement of the [law], and that enjoining that enforcement would redress the injury.

*Nebraska Beef Producers Comm. v. Nebraska Brand Comm.*, 287 F. Supp. 3d 740, 749 (D. Neb. 2018) (citing *Keller v. City of Fremont*, 719 F.3d 931, 947 (8th Cir. 2013); *Wieland*, 793 F.3d at 954–56; *Calzone v. Hawley*, 866 F.3d 866, 870 (8th Cir. 2017)). Even when a defendant argued that the "[m]andate cited by the [plaintiffs] as the source of their injury imposes no direct

5

obligation or requirement on them," the Eighth Circuit found that the mandate still caused their injury, being fairly traceable to the defendants' challenged conduct. *Wieland*, 793 F.3d at 954.

The Court finds that at this stage of the litigation, SIFMA has adequately alleged the first element of associational standing, despite Defendants' facial challenge. Under the IA Rule, an investment adviser is given "the same meaning as under section 409.1-102." Mo. Code Regs. Ann. tit. 15, § 30-51.172(B)(3) (2023). That section excludes "[a] federal covered investment adviser." Mo. Ann. Stat. § 409.1-102 (2003). While SIFMA does not contest that its members are federally covered investment advisers, which are excluded under the rule, they do allege that the IA Rule imposes compliance costs on SIFMA's members who have investment adviser representatives in Missouri.

Specifically, SIFMA alleges that "[a]s a result of the New Rules, [SIFMA's members are] undertaking ongoing compliance actions that [they] would not otherwise undertake, which include one or more of the following: making and keeping written consents and/or other records not required by federal regulations; creating policies and procedures; and/or training personnel." (Doc. #24-1, p. 3); *see also* (Doc. #24-2, p. 3; Doc. #24-3, p. 3; Doc. #24-4, p. 3; Doc. #24-5, p. 3; Doc. #24-6, p. 3). Thus, SIFMA adequately alleges that the IA Rule requires SIFMA's members "to incur costs and alter their business practices," which are compliance costs sufficient to demonstrate injury on behalf of their association. (Doc. #24, p. 34); *see also City of Kennett*, 887 F.3d at 431. This is true even if the IA Rule does not impose a direct obligation on SIFMA's members, but rather through the investment adviser representatives of SIFMA's members. *See Wieland*, 793 F.3d at 954. Given SIFMA's general factual allegations, the Court finds that it has adequately alleged its members have standing, fulfilling the first element of associational standing.

## 2.  No Disagreement with the Content of Disclosures

Defendants further assert that the "Amended Complaint . . . fails to identify any SIFMA member that disagrees with the content of the disclosures[,]" so SIFMA lacks standing.  (Doc. #29, p. 15.)  SIFMA argues that Defendants also "improperly conflate standing with the merits in arguing that SIFMA's members would have to attest active disagreement with the [Defendants'] prescribed statements, not just attest that they do not wish to amplify the [Defendants'] views." (Doc. #34, p. 15.)

The Court finds that Defendants' argument lacks support.  The cases Defendants cite do not stand for the proposition that SIFMA's members must disagree with the content of the disclosures to establish standing.  *See Glickman v. Wileman Bros. & Elliott*, 521 U.S. 457, 469 (1997) (holding that there were several reasons why the regulatory scheme did not violate the First Amendment, including that it does "not compel any person to engage in any actual or symbolic speech"); *Wooley v. Maynard*, 430 U.S. 705, 715 (1977) (finding that "the First Amendment protects the right of individuals to hold a point of view different from the majority and to refuse to foster . . . an idea they find morally objectionable"); *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018) (finding that "compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command, and in most contexts, any such effort would be universally condemned").  Thus, whether SIFMA's members disagree with the Rules pertains to the merits of the First Amendment claim, rather than whether they have standing to assert it.  Further, SIFMA's members do assert that the Rules "require [SIFMA's members] to provide consent statements to Missouri customers on controversial political and policy issues, that [SIFMA's members] did not provide before and . . . would not provide if the [Rules'] enforcement were

7

enjoined." (Doc. #24-1, pp. 3–4); *see also* (Doc. #24-2, p. 4; Doc. #24-3, p. 4; Doc. #24-4, p. 4; Doc. #24-5, p. 4; Doc. #24-6, p. 4). Thus, the Court finds that SIFMA has adequately alleged standing because Defendants' arguments that SIFMA's members do not object to the speech compelled by the Rules lack merit as it pertains to the standing analysis.

### 3. Claims Require Participation of SIFMA's Individual Members

Defendants argue that SIFMA fails to show how "the Court [would] grant relief without individual members as plaintiffs[,]" the third element of associational standing. (Doc. #29, p. 17.) SIFMA argues that "[t]he Eighth Circuit and its district courts have consistently held, to the contrary, that claims for declaratory and injunctive relief—as opposed to damages—do not require individual members' participation." (Doc. #34, p. 17.)

"The Supreme Court has expressly explained that if an association 'seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured.'" *Nebraska Beef Producers*, 287 F. Supp. 3d at 750 (quoting *Warth v. Seldin*, 422 U.S. 490, 515 (1975)); *see also Arkansas Med. Soc., Inc. v. Reynolds*, 6 F.3d 519, 528 (8th Cir. 1993) ("[T]he plaintiffs seek injunctions, a declaratory judgment, and other prospective relief . . . [and t]hese types of relief have been recognized as legitimate goals for litigation brought by representative organizations[,] . . . not require[ing] the participation of individual members." (citation omitted)). "It is only when an association seeks relief in damages for alleged injuries to its members, or other relief that must be specifically tailored to the individual injury of a member, that an individual member's participation may be required." *Nebraska Beef Producers*, 287 F. Supp. 3d at 750.

The Court finds that the relief requested would not require the participation of individual members, so SIFMA has sufficiently demonstrated standing to pursue its claims.  SIFMA seeks declaratory and injunctive relief, so it can be supposed that this prospective relief would benefit its members.  *See Nebraska Beef Producers*, 287 F. Supp. 3d at 750.  The Defendants' only support for their proposition that SIFMA's claims would require individual participation is *American Farm Bureau Federation*, a case where the Eighth Circuit only addressed the first element of associational standing, rather than the third element contested here.  *See* 836 F.3d at 968.  Thus, the Court finds that the relief requested does not require individual participation of SIFMA's members because "SIFMA's requested relief—invalidation of the Rules—would resolve each member's injuries."  (Doc. #34, p. 17.)

### B. Rule 12(b)(6) – Failure to State a Claim for Preemption Claims

Defendants argue that SIFMA has failed to adequately allege its preemption claims. Defendants contend that "[a]s NSMIA and ERISA apply here, they are rules for regulators, ultimately intended to benefit investors/consumers, and do not create federal rights. SIFMA's preemption claim does not arise from its members' federal rights, and therefore cannot proceed under § 1983."  (Doc. #29, p. 19.)  SIFMA argues that "[i]t is well-established that plaintiffs can seek the aid of federal courts when confronted with state or local rules that are preempted by federal law, such as NSMIA and [ERISA]."  (Doc. #34, p. 18.)

"Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'"  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)).  "[T]he Supremacy Clause, of its own force, does not create rights enforceable under § 1983."  *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 107 (1989) (footnote omitted).  "The availability of a § 1983

9

claim based upon the Supremacy Clause depends upon whether the federal statute that preempts state law creates a federal right." *N. Nat. Gas Co. v. Munns*, 254 F. Supp. 2d 1103, 1117 (S.D. Iowa 2003).

"However, the Supreme Court has . . . made clear that a party may apply directly to federal court for relief based on an affirmative claim of preemption." *First Nat. Bank of E. Arkansas v. Taylor*, 907 F.2d 775, 776 n.3 (8th Cir. 1990). More specifically, "[t]he Supreme Court has long recognized that a plaintiff may invoke the equitable powers of the federal courts in order to seek 'relief against state officers who are violating, or planning to violate, federal law,' including on the basis of preemption under the Supremacy Clause." *Minnesota Auto. Dealers Ass'n v. Stine*, No. 15-2045 (JRT/KMM), 2016 WL 5660420, at *8 (D. Minn. Sept. 29, 2016) (quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015)); *see also Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983) (noting that a court's equitable powers allows a plaintiff to sue to "enjoin state officials from interfering with federal rights"). "[W]hether [the plaintiff] may proceed in equity against the [defendant] depends on whether Congress 'inten[ded] to foreclose equitable relief[.]'" *Stine*, 2016 WL 5660420, at *8 (quoting *Armstrong*, 135 S. Ct. at 1384–85). The Supreme Court has noted that

> equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied. The great principles of equity, securing complete justice, should not be yielded to light inferences, or doubtful construction.

*Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) (citation and quotation marks omitted).

As for ERISA preemption specifically, courts have considered whether ERISA preempts various state laws, including anti-discrimination laws. *See Shaw*, 463 U.S. at 91. Specifically,

"Section 514(a) of ERISA, 29 U.S.C. § 1144(a), pre-empts 'any and all State laws insofar as they may now or hereafter relate to any employee benefit plan' covered by ERISA." *Id.* Additionally, Courts have considered whether NSMIA preempts state regulations governing securities transactions. *See Temple v. Gorman*, 201 F. Supp. 2d 1238, 1243 (S.D. Fla. 2002) ("Thus, the Court must consider whether Florida law is preempted by NSMIA.")

Here, the Court finds that SIFMA adequately alleges a cause of action for preemption. SIFMA argues that its claims arise "under federal law, including . . . the Court's inherent equitable powers." (Doc. #24, p. 10.) While Defendants argue that § 1983 does not provide a cause of action for SIFMA's preemption claims, through its equitable powers, this Court can hear preemption claims. *See Taylor*, 907 F.2d at 776 n.3. This Court finds that Congress did not intend to foreclose equitable relief for preemption claims involving ERISA and NSMIA, given that other courts have held the same when evaluating these types of preemption claims. *See Shaw*, 463 U.S. at 91; *see also Gorman*, 201 F. Supp. 2d at 1243. Thus, the Court finds that SIFMA adequately alleges a cause of action for preemption.

### 1. NSMIA

First, Defendants assert that the IA Rule does not regulate the persons or conduct preempted by NSMIA. Specifically, Defendants argue that NSMIA "invit[es] state regulation of the IAs' representatives." (Doc. #29, p. 21.) However, SIFMA contends that "[t]he IA Rule is preempted because it exceeds the authority reserved to states under NSMIA" to regulate the investment adviser representatives of SIFMA's members. (Doc. #34, p. 25.)

Under NSMIA,

> [n]o law of any State . . . requiring the registration, licensing, or qualification as an investment adviser or supervised person of an investment adviser shall apply to any person . . . that is registered under section 80b-3 of this title as an investment adviser, or that is a supervised person of such

11

person, except that a State may license, register, or otherwise qualify any investment adviser representative who has a place of business located within that State[.]

15 U.S.C. § 80b-3a(b)(1) (2019). When NSMIA was made law, the Securities Exchange

Commission ("SEC") noted:

> The Coordination Act gives the Commission primary responsibility to regulate advisers that remain registered with the Commission by preempting state regulation of those advisers. . . . States retain authority over Commission-registered advisers under state investment adviser statutes to investigate and bring enforcement actions with respect to fraud or deceit against an investment adviser or a person associated with an investment adviser; to require filings, for notice purposes only, of documents filed with the Commission; and to require payment of state filing, registration, and licensing fees.

Rules Implementing Amendments to the Investment Advisers Act of 1940, 62 Fed. Reg. 28125

(May 22, 1997). Further,

> [w]hile the bill makes amendments to four separate federal securities statutes (the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Company Act of 1940, and the Investment Advisers Act of 1940) its key provisions, taken together, focus on the need to delineate more clearly the securities law responsibilities of the federal and state governments.

S. Rep. 104-293, at 2 (1996). "Larger advisers, with national businesses, should be registered

with the Commission and be subject to national rules." S. Rep. 104-293, at 4 (1996).

At this stage, the Court finds that SIFMA adequately alleges that NSMIA preempts the

IA Rule. As previously discussed in the Court's standing analysis, SIFMA alleges that the IA

Rule regulates SIFMA's members through their investment adviser representatives in Missouri.

Specifically, SIFMA alleges that the investment advisor representatives in Missouri must now

obtain written consent forms from customers to comply with the IA Rule and that the IA Rule

requires federally covered investment advisers who have supervisory responsibilities to keep

new records to comply with the IA Rule. The Court finds that SIFMA adequately alleged that the IA Rule regulates them, but we are not out of the woods yet.

The Court next turns to whether SIFMA has adequately alleged that this regulation is preempted by federal law. While NSMIA allows states to "license, register, or otherwise qualify any investment adviser representative," SIFMA alleges that the IA Rule does not regulate the licensing, registering, or qualifying of investment adviser representatives. 15 U.S.C. § 80b-3a(b)(1) (2019). The Court agrees. SIFMA adequately alleges that the IA Rule regulates what investment adviser representatives must disclose to their clients, which is distinct from the areas of state regulation permitted by NSMIA. Further, it appears that Congress intended for NSMIA to broadly preempt state regulation of federally covered investment advisers except in three distinct areas. *See* Rules Implementing Amendments to the Investment Advisers Act of 1940, 62 Fed. Reg. 28125 (May 22, 1997) ("[NSMIA] preempts not only a state's specific registration, licensing, or qualification requirements, but all regulatory requirements imposed by state law on Commission-registered advisers relating to their advisory activities or services, except those provisions that are specifically preserved by the Coordination Act.") Thus, the Court finds that SIFMA has adequately alleged that NSMIA preempts the IA Rule because it regulates investment adviser representatives and federally covered investment advisers beyond what is permitted by NSMIA.

Defendants further argue that the B-D Rule is not preempted by NSMIA because "the B-D Rule does not require anyone to make or keep records 'that differ from' or are 'in addition to' federal requirements. SEC rules already allow for the disclosure of investment objectives in a Customer Account Record, which is all these Rules do." (Doc. #29, p. 23.) SIFMA contends that "NSMIA expressly preempts the B-D Rule." (Doc. #34, p. 22.)

NSMIA mandates that:

> [n]o law, rule, regulation, or order, or other administrative action of any State or political subdivision thereof shall establish capital, custody, margin, financial responsibility, making and keeping records, bonding, or financial or operational report requirements for brokers, dealers, municipal securities dealers, government securities brokers, or government securities dealers that differ from, or are in addition to, the requirements in those areas established under this chapter.

15 U.S.C. § 78o(i)(1). This language "preempts State laws that impose financial responsibility and reporting requirements inconsistent with or exceeding requirements established under the Exchange Act." H. Rep. No. 104-622 at 36 (1996).

The B-D Rule requires the broker-dealer to "obtain[] written acknowledgement and consent from the customer." Mo. Code Regs. Ann. tit. 15, § 30-51.170(3)(C) (2023). The Rule prescribes that the written acknowledgment must include "language substantially similar to" language provided in the B-D Rule. Mo. Code Regs. Ann. tit. 15, § 30-51.170(3)(D) (2023). Further, it requires that the disclosure form "be provided to the customer on an annual basis," with the broker-dealer obtaining additional signed consent forms "no less than every three (3) years." Mo. Code Regs. Ann. tit. 15, § 30-51.170(3)(C)(3) (2023).

Here, the Court finds that SIFMA adequately alleges that the B-D Rule is preempted by NSMIA. SIFMA alleges that the B-D Rule requires its members to obtain and preserve consent forms, which is "making and keeping records[,]" and preempted by NSMIA. 15 U.S.C. § 78o(i)(1). While SEC Rule 17a-3(a)(17) does require broker-dealers to create a "Customer Account Record" containing certain minimum information as to each customer, SIFMA alleges that the "Customer Account Record" does not require anything like the disclosure form mandated by the B-D Rule. *See* 17 C.F.R. § 240.17a-3 ("For each account with a natural person as a customer or owner: [a]n account record including the customer's or owner's name, tax identification number, address, telephone number, date of birth, employment status (including

14

occupation and whether the customer is an associated person of a member, broker or dealer), annual income, net worth (excluding value of primary residence), and the account's investment objectives.") Thus, the Court finds that SIFMA has alleged that the B-D Rule requires SIFMA's members to create documents "that differ from, or are in addition to" the federal requirements, which the Court finds adequately states a claim for preemption. 15 U.S.C. § 78o(i)(1).

Defendants also assert that SIFMA's claim that the Rules are preempted by 15 U.S.C. § 77r(a)(3) "misconstrues the Rules entirely" because NSMIA regulates securities, while the Rules regulate "affected persons." (Doc. #29, pp. 24–25.) SIFMA contends that "Defendants argu[ment] that Section 77r(a)(3) does not apply because the Rules regulate firms and people, not covered securities . . . misconstrues the broad scope of preemption under NSMIA." (Doc. #34, p. 28) (quotation marks and citation omitted).

NSMIA provides that:

> Except as otherwise provided in this section, no law, rule, regulation, or order, or other administrative action of any State or any political subdivision thereof—shall directly or indirectly prohibit, limit, or impose conditions, based on the merits of such offering or issuer, upon the offer or sale of any [covered security].

15 U.S.C. § 77r(a)(3). "[S]tates may not . . . prohibit, limit or impose any merit-based conditions on the offer or sale of the preempted securities." S. Rep. No. 104-293 at 28 (1996).

Here, the Court finds that SIFMA has adequately alleged that the Rules are preempted by NSMIA because they indirectly impose merit-based conditions on the sale of securities. SIFMA alleges that the Rules "impose an extra hurdle before certain covered securities can be offered to Missouri investors, based on the substantive characteristics of those securities." (Doc. #34, p. 28.) Thus, the Court finds that SIFMA adequately alleges a preemption claim based on Section 77r(a)(3).

## 2. ERISA

Defendants argue that ERISA does not preempt the Rules because "the Rules only apply to Covered Persons' activities as securities professionals[,]" and ERISA's Savings Clause explicitly permits State regulation of securities. (Doc. #29, p. 26.) Additionally, Defendants argue that the Rules do not "'relate to' ERISA plans[,]" so the Rules are not preempted by ERISA. (Doc. #29, p. 26.) SIFMA contends that assuming the Rules regulate securities, "the Supreme Court has instructed that state laws that fall within Section 1144(b)(2)(A) are still preempted when—as here—they threaten ERISA's 'comprehensive remedial scheme.'" (Doc. #34, pp. 30–31) (quoting *Aetna Health Inc. v. Davila*, 542 U.S. 200, 217–18 (2004)). Further, they assert that "the Rules govern central matters of plan administration by regulating core ERISA fiduciary functions[,]" and are therefore preempted. (Doc. #34, p. 29.)

> Under ERISA

> [t]he provisions of this subchapter and subchapter III shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title.

29 U.S.C. § 1144(a) (2006).

> The Supreme Court has constructed a two-part inquiry for determining whether a state law is preempted under this "relates to" provision. Under this analysis, a state law "relates to" an ERISA plan within the meaning of § 1144(a) if it (1) expressly refers to an ERISA plan, or (2) has a connection with such a plan.

*Shea v. Esensten*, 208 F.3d 712, 717 (8th Cir. 2000). "To determine the existence of [a] forbidden connection, the . . . Court . . . 'look[s] both to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive [and] to the nature of the effect of the state law on ERISA plans.'" *Id.* at 718 (quoting *California Div. of Lab. Standards Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 325 (1997) (internal quotations and citation omitted)).

> In addressing the effect of the state law on an ERISA plan, [the Court] consider[s] a variety of factors, including: [1] whether the state law negates an ERISA plan provision, [2] whether the state law affects relations between primary ERISA entities, [3] whether the state law impacts the structure of ERISA plans, [4] whether the state law impacts the administration of ERISA plans, [5] whether the state law has an economic impact on ERISA plans, [6] whether preemption of the state law is consistent with other ERISA provisions, and [7] whether the state law is an exercise of traditional state power.

*Id.* (quoting *Wilson v. Zoellner*, 114 F.3d 713, 717 (8th Cir. 1997)).

However, "ERISA's broad preemption of state law is limited by the 'savings clause,' under which ERISA shall not 'be construed to exempt or relieve any person from any law of any State which regulates . . . [securities.]'" *Prudential Ins. Co. of Am. v. Nat'l Park Med. Ctr., Inc.*, 413 F.3d 897, 908 (8th Cir. 2005) (quoting 29 U.S.C. § 1144(b)(2)(A)). When enacting ERISA, Congress intended to

> protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

29 U.S.C. § 1001(b). Thus, "ERISA's civil enforcement remedies were intended to be exclusive." *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 54 (1987). Further, the Supreme Court held that "[t]he existence of a comprehensive remedial scheme can demonstrate an 'overpowering federal policy' that determines the interpretation of a statutory provision designed to save state law from being pre-empted." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 216–17 (2004) (quoting *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 375 (2002)). Thus, "[u]nder ordinary principles of conflict pre-emption, then, even a state law that can arguably be characterized as 'regulating [securities]' will be pre-empted if it provides a separate vehicle to

assert a claim for benefits outside of, or in addition to, ERISA's remedial scheme." *Id.* at 217–18.

Here, the Court finds that SIFMA adequately alleges that the Rules "relate to" ERISA. SIFMA alleges that the Rules regulate broker-dealers and investment advisers who are otherwise regulated by ERISA when managing employee retirement funds. *See Shea*, 208 F.3d at 718. Further, SIFMA alleges that the Rules will impact the administration of ERISA plans by requiring advisers to obtain and preserve consent forms otherwise not required by ERISA. *See id.* SIFMA asserts that:

> [b]y imposing conditions on ERISA fiduciaries' authority under federal law to recommend or select investments for social or nonfinancial reasons—an authority reinforced by binding federal regulations—the Rules directly interfere with core fiduciary functions, with the relations among ERISA fiduciaries and the plans they serve, and with the structure and administration of ERISA plans.

(Doc. #34, pp. 29–30.) The Court finds this sufficient at this stage of the litigation to assert that the Rules "relate to" ERISA to support their preemption claim. Further, assuming the Rules regulate securities, the Court finds that SIFMA adequately alleges that the Rules interfere with ERISA's "comprehensive remedial scheme," exempting it from ERISA's Savings Clause because a "state law seek[s] to provide relief for what [is], in substance, alleged breaches of ERISA's fiduciary duties—including accusations that 'an ERISA fiduciary gave an ERISA plan [holder] inadequate investment advice[.]'" (Doc. #34, p. 31) (quoting *Dudley Supermarket, Inc. v. Transamerica Life Ins. & Annuity Co.*, 302 F.3d 1, 3-4 (1st Cir. 2002)).

## C. Rule 12(b)(6) – Failure to State a Claim for First Amendment Claim

Defendants argue that the Rules do not violate the First Amendment because the Rules can survive intermediate and rational basis scrutiny. SIFMA argues that they have adequately

asserted that the Rules violate the First Amendment and cannot survive rational basis or intermediate scrutiny.

"The First Amendment declares in part that 'Congress shall make no law . . . abridging the freedom of speech.'" *1-800-411-Pain Referral Serv., LLC v. Otto*, 744 F.3d 1045, 1054 (8th Cir. 2014) (quoting U.S. Const. amend. I). "The Constitution 'accords a lesser protection to commercial speech than to other constitutionally guaranteed expression.'" *Id.* (quoting *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 563 (1980)). "However, commercial speech is still protected 'from unwarranted governmental regulation.'" *Id.* (quoting *Cent. Hudson*, 447 U.S. at 561).

The Supreme Court has developed two levels of scrutiny under *Central Hudson* and *Zauderer v. Off. of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626 (1985), to evaluate whether disclosure requirements violate the First Amendment. The Supreme Court has "applied a lower level of scrutiny to laws that compel disclosures . . . of 'purely factual and uncontroversial information about the terms under which . . services will be available[.]'" *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2372 (2018) (quoting *Zauderer*, 471 U.S. at 651). Specifically, "[u]nder *Zauderer*, disclosure requirements for commercial speech are constitutional so long as they are 'reasonably related to the State's interest in preventing deception of consumers' and are not so 'unjustified or unduly burdensome' that they 'chill [ ] protected commercial speech.'" *Otto*, 744 F.3d at 1053 (quoting *Zauderer*, 471 U.S. at 651). If the law does not qualify for the lower level of scrutiny under *Zauderer*, courts have employed a heightened level of scrutiny under *Central Hudson*.

> The well-known *Central Hudson* inquiry, [intermediate scrutiny] in turn, employs a four-part standard to test the constitutionality of laws burdening commercial speech: (1) whether the commercial speech at issue concerns unlawful activity or is misleading; (2) whether the governmental interest is

substantial; (3) whether the challenged regulation directly advances the government's asserted interest; and (4) whether the regulation is no more extensive than necessary to further the government's interest.

*Id.* at 1055.

The Court finds that SIFMA adequately alleges that the Rules violate the First Amendment.  SIFMA alleges that *Zauderer* is inapplicable because "[t]he state is requiring securities firms to tell their clients that consideration of social or nonfinancial objectives will inherently jeopardize financial returns[, which] . . . is not purely factual," as environmental, social, and governance objectives are not predictors of profitability and can serve as a "tiebreaker" between two otherwise equivalent securities.  (Doc. #34, p. 33.)  Further, SIFMA alleges that the speech is controversial "because the Rules' required scripts express only one side of a debate over the merits of 'social objectives' [when] investing."  (Doc. #34, p. 35.)  SIFMA also alleges that Defendant Ashcroft acknowledged as much in his "public description of the Rules," describing these types of social objectives as "driv[ing] investments toward liberal priorities that are in conflict with investors' interests[.]"  (Doc. #34, p. 35) (citation omitted).  Thus, the Court finds that SIFMA adequately alleges that *Zauderer* is inapplicable, and even if it was, the Rules could not survive this level of scrutiny.  Additionally, SIFMA adequately alleges that the Rules would not survive intermediate scrutiny under *Central Hudson* because there are "less coercive method[s] of publicizing [Defendants'] views about 'social' investing," which Defendants do not contest.  (Doc. #34, p. 36.)  Thus, the Court finds that SIFMA has adequately alleged a First Amendment violation at this early stage.

### D.  Rule 12(b)(6) – Failure to State a Claim for Vagueness Claim

Defendants argue that "[f]ailing to define every term used in the Rules does not render them constitutionally infirm."  (Doc. #29, p. 38.)  SIFMA contends that "the Rules fail to

adequately . . . define the term 'nonfinancial objective[,]' . . . [and t]he Rules provide no guidance regarding what it means to 'consider' a nonfinancial objective."  (Doc. #34, p. 37.)

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  "Under the void-for-vagueness doctrine, a law is unconstitutional if it fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *Smith v. Truman Rd. Dev.*, LLC, 414 F. Supp. 3d 1205, 1239 (W.D. Mo. 2019) (quoting *Musser v. Mapes*, 718 F.3d 996, 1000 (8th Cir. 2013) (internal quotations omitted)). "[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity."  *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)).

The Court finds that SIFMA adequately alleges that the Rules are unconstitutionally vague.  A nonfinancial objective is defined in the Rules as "to consider criteria in the investment or commitment of customer funds for the purpose of seeking to obtain an effect other than the maximization of financial return to the customer."  Mo. Code Regs. Ann. tit. 15, §§ 30-51.170(3)(B)(4) (2023), 30-51.172(3)(B)(4) (2023).  SIFMA alleges that "consider" could be applied to routine investment advice and there is no guidance as to how consider is defined, or what extent of consideration qualifies under the Rules.  The Court finds these claims sufficient to plead a claim for unconstitutional vagueness.

## IV. CONCLUSION

Accordingly, it is ORDERED that Defendants John Ashcroft and Douglas Jacoby's Motion to Dismiss (Doc. #28) is DENIED.  Defendants' request for oral argument is also hereby DENIED.

**IT IS SO ORDERED.**

/s/ Stephen R. Bough
STEPHEN R. BOUGH
UNITED STATES DISTRICT JUDGE

Dated: January 5, 2024