# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### CENTRAL DIVISION

|  |  |  |
|---|---|---|
| **SECURITIES INDUSTRY AND FINANCIAL MARKETS ASSOCIATION,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| v. | ) ) | **Case No. 2:23-CV-4154-SRB** |
| **JOHN R. ASHCROFT**, in his official capacity as Secretary of State of Missouri, and **DOUGLAS M. JACOBY**, in his official capacity as Missouri Securities Commissioner, | ) ) ) ) ) | |
| **Defendants.** | ) ) | |

## *AMICUS CURIAE* BRIEF OF THE NORTH AMERICAN SECURITIES ADMINISTRATORS ASSOCIATION, INC. IN SUPPORT OF DEFENDANTS

Respectfully submitted,

James R. Layton
Tueth Keeney Cooper Mohan Jackstadt P.C.
34 North Meramec Avenue, Suite 600
St. Louis, MO 63105
Tel: 314-880-3600
jlayton@tuethkeeney.com
Attorney of Record for *Amicus Curiae*

Zachary T. Knepper (Of Counsel)
Deputy General Counsel
North American Securities
Administrators Association, Inc.
750 First Street, NE, Suite 900
Washington, DC 20002
Tel: 202-683-2323
zknepper@nasaa.org

July 8, 2024

## CORPORATE DISCLOSURE STATEMENT

*Amicus* North American Securities Administrators Association, Inc. ("NASAA") affirms that it is a 501(c)(3) nonprofit membership organization incorporated in the District of Columbia. It has no parent corporation and has never issued stock or any other ownership interest. The organization's website is www.nasaa.org.

## CERTIFICATE OF COUNSEL

The undersigned counsel certifies that this brief is being filed separately from any other amicus brief and that this brief is necessary because NASAA has a unique perspective and expertise on legal issues raised in this matter. No person or entity other than amicus and its counsel authored this brief, in whole or in any part, and no person or entity other than amicus or its counsel has made a monetary contribution to the preparation and submission of this brief.

/s/ James R. Layton
James R. Layton

Attorney for *Amicus Curiae* North American
Securities Administrators Association, Inc.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

IDENTITY AND INTEREST OF *AMICUS CURIAE* .......................................... 1

ARGUMENT ............................................................................................................. 2

    I.    BACKGROUND AND APPLICABLE LEGAL STANDARDS ..................... 2

    II.    THE MISSOURI RULES ARE NOT PREEMPTED BY NSMIA ................. 5

        A.    The Missouri Rules Do Not Impermissibly Regulate
             Covered Securities ......................................................................... 6

        B.    The B-D Rule Does Not Impose an Impermissible
             Books and Records Obligation on Missouri Broker-Dealers ................. 9

        C.    The IA Rule Does Not Impermissibly Regulate SEC-Registered
             Investment Advisers ..................................................................... 16

    III.    THE MISSOURI RULES ARE NOT PREEMPTED BY ERISA ................. 20

        A.    The Missouri Rules Do Not "Relate To" ERISA Plans and
             Therefore Cannot Possibly Be Preempted by ERISA ......................... 20

        B.    The Missouri Rules Are State Securities Regulations Expressly
             Protected from Preemption by ERISA's Savings Clause ................... 22

CONCLUSION ......................................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*Amanda Acquisition Corp. v. Universal Foods Corp.*,
708 F. Supp. 984 (E.D. Wis. 1989)........................................................................... 4

*Bates v. Dow Agrosciences LLC*, 544 U.S. 431 (2005) ................................... 10, 11, 15

*California Div. of Labor Stds. Enf. v. Dillingham Constr.*, 519 U.S. 316 (1997) ................ 20, 21

*California v. Edward D. Jones & Co.*, 65 Cal. Rptr. 3d 130 (Cal. Ct. App. 2007) ................... 7, 8

*Capital Research & Mgmt. v. Brown*, 53 Cal. Rptr. 3d 770 (Cal. Ct. App. 2007) ..................... 7, 8

*Fast v. Applebee's Int'l Inc.*, 638 F.3d 872 (8th Cir. 2011)........................................... 3

*Fin. Solutions & Assocs. v. Carnahan*, 316 S.W. 3d 518 (Mo. Ct. App. W.D. 2010)................... 2

*Freightliner Corp. v. Myrick*, 514 U.S. 280 (1995)........................................................ 4

*In re Reuter*, 443 B.R. 427 (B.A.P. 8th Cir. 2011). ..................................................... 3

*Joseph v. Viatica Mgmt. LLC*, 55 P.3d 264 (Colo. Ct. App. 2002) ..................................... 3

*Leroy v. Great W. United Corp.*, 443 U.S. 173 (1979).................................................... 6

*Lindeen v. SEC*, 825 F.3d 646 (D.C. Cir. 2016) .......................................................... 5

*Maryland v. Louisiana*, 451 U.S. 725 (1981) ............................................................. 15

*Matassarin v. Lynch*, 174 F.3d 549 (5th Cir. 1999)...................................................... 23

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) ........................................................... 10

*New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
514 U.S. 645 (1995).................................................................................. 20, 21

*Papic v. Burke*, No. 05-cv-8511, 2007 WL 1019000 (Conn. Sup. Ct. Mar. 22, 2007) ................. 8

*Rice v. Norman Williams Co.*, 458 U.S. 654 (1982)....................................................... 4

*Robinhood Fin. LLC v. Massachusetts*, 492 Mass. 696 (2023) ......................................... 3, 4, 8

*SEC v. Timetrust, Inc.*, 28 F. Supp. 34 (N.D. Cal. 1939)................................................. 6

*Silverman v. Berkson*, 141 N.J. 412 (1995) ................................................................. 3

*Surgicore of Jersey City v. Anthem Life & Disab. Ins. Co.*, No. 19-cv-3482,
    2020 WL 5752227 (E.D.N.Y. Sep. 25, 2020) .................................................... 20

*United States v. Schulman*, No. 97-cr-315, 1998 WL 80179 (S.D.N.Y. 1998) .......................... 10

*Virginia Uranium v. Warren*, 139 S. Ct. 1894 (2019) .................................................. 4

*Wright Elec. v. Minn. State Bd. of Elec.*, 322 F.3d 1025 (8th Cir. 2003) ...................... 4

*Zuri-Invest AG v. Natwest Fin., Inc.*, 177 F. Supp. 2d 189 (S.D.N.Y. 2001) ................. 4

**Statutes and Legislative Materials**

15 U.S.C. § 77r ....................................................................................... 5, 6, 8, 9

15 U.S.C. § 78o ........................................................................................... 9, 11

15 U.S.C. § 78bb .............................................................................................. 6

15 U.S.C. § 80b-3a ...................................................................................... 6, 16

29 U.S.C. § 1144 ..................................................................................... 20, 21, 22

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203,
    124 Stat. 1376 (2010) ......................................................................... 9, 16

Employee Retirement Income Security Act of 1974, Pub. L. 93-406,
    88 Stat. 829 (1974) ................................................................. 2, 20, 21, 22, 23

H.B. 380, 92d Gen. Ass. (Mo. 2003) ............................................................... 3

H.R. Rep. No. 104-864 (1996) (Conf. Rep.) ....................................................... 9

H.R. Rep. No. 104-622 (1996) (Conf. Rep.) ..................................................... 10

H.R. Rep. No. 104-882 (1997) (Conf. Rep.) ..................................................... 18

Mo. Rev. Stat. § 409.1-102 ......................................................................... 6

Mo. Rev. Stat. § 409.3-301 ......................................................................... 2

Mo. Rev. Stat. § 409.4-401 ......................................................................... 2

Mo. Rev. Stat. § 409.4-402 ......................................................................... 2

Mo. Rev. Stat. § 409.4-403 .................................................................... 2

Mo. Rev. Stat. § 409.4-404 .................................................................... 2

Mo. Rev. Stat. § 409.4-412 .................................................................. 19

Mo. Rev. Stat. § 409.5-501 .................................................................... 2

Mo. Rev. Stat. § 409.5-502 .................................................................... 2

Mo. Rev. Stat. § 409.6-605 .................................................................. 19

National Securities Market Improvement Act of 1996, Pub. L. No. 104-290,
   110 Stat. 3416 (1996) ................................................................. *passim*

**Regulations**

15 C.S.R. § 30-51.170 .................................................................... *passim*

15 C.S.R. § 30-51.172 .................................................................... *passim*

17 C.F.R. § 240.15*l*-1 ....................................................... 11, 12, 14, 15

17 C.F.R. § 240.17a-3 .................................................................... *passim*

17 C.F.R. § 240.17a-4 ............................................................... 10, 11

17 C.F.R. § 275.203A-3 .................................................................. 17

02-032 Code Me. R. Ch. 515, § 4 ....................................................... 18

Ariz. Rev. Stat. § 44-3156 ............................................................. 18

Cal. Code Regs. tit. 10, § 260.236.2x ............................................... 18

D.C. Mun. Regs. tit. 26-B § 127 ....................................................... 18

Final Rule, *Regulation Best Interest:  The Broker-Dealer Standard of Conduct*,
   SEC Rel. No. 34-86031 (June 5, 2019),
   https://www.sec.gov/files/rules/final/2019/34-86031.pdf ........................... 13, 14, 15

Ga. Code Ann. § 10-5-35 ................................................................. 18

Okla. Admin. Code § 660:11-7-49 ....................................................... 18

**Other Authorities**

Brandon M. Hall, *ERISA Preemption of State Automatic Enrollment IRAs*,
34 A.B.A. J. LAB. & EMP. L. 477 (2020) ............................................................. 20, 21

Howard M. Friedman, *The Impact of NSMIA on State Regulation of Broker-
Dealers and Investment Advisers*, 53 BUS. LAW. 511 (1998)................................. 10

Joseph C. Long, 12 BLUE SKY LAW § 1.1 (2023) .......................................................... 2

Larry J. Pittman, *ERISA's Preemption Clause:  Progress Towards a
More Equitable Preemption of State Laws*, 34 IND. L. REV. 207 (2001)................................. 21

Linda M. Stevens, *The National Securities Markets Improvement Act (NSMIA)
Savings Clause:  A New Challenge to Regulatory Uniformity*,
38 U. BALT. L. REV. 445 (2009) ................................................................................. 5

Louis Loss & Edward M. Cowett, BLUE SKY LAW, 251 (Little, Brown and Co., 1958)................ 6

Merriam-Webster's Collegiate Dictionary (11th ed. 2003) ........................................... 17

Roberta S. Karmel, *Reconciling Federal and State Interests in
Securities Regulation in the United States and Europe*,
28 BROOK. J. INT'L L. 495 (2003) ............................................................................. 5

Robert N. Rapp and Fritz E. Berckmueller, *Testing the Limits of NSMIA
Preemption:  State Authority to Determine the Validity of Covered
Securities and to Regulate Disclosure*, 63 BUS. LAW. 809 (May 2008)................................... 7

The Federalist No. 45 (C. Rossiter ed. 1961) (J. Madison) .......................................... 2

UNIF. SECS. ACT of 2002 ............................................................................................. 3

## IDENTITY AND INTEREST OF *AMICUS CURIAE*

Formed in 1919, the North American Securities Administrators Association, Inc. ("NASAA") is the non-profit association of state, provincial, and territorial securities regulators in the United States, Canada, and México. NASAA has 68 members, including the securities regulators in all 50 U.S. states, the District of Columbia, Puerto Rico, the U.S. Virgin Islands, and Guam. Missouri is a NASAA member by and through the Securities Division of the Missouri Secretary of State's office. Defendant Douglas M. Jacoby is Missouri's member representative to NASAA.

The overriding mission of NASAA and its members is to protect investors, particularly retail investors, from fraud and abuse. NASAA supports its members in carrying out their investor protection and regulatory duties by, *inter alia*, promulgating model rules and statutes, coordinating examination sweeps and multi-state enforcement actions, and commenting on legislative and rulemaking proposals. NASAA also offers its legal analyses and policy perspectives to state and federal courts as *amicus curiae* in cases involving the interpretation of state and federal securities laws.

NASAA and its members have a substantial interest in this case because it holds the potential to affect the scope of state securities regulation. The gravamen of this case is the validity of two rules lawfully issued by the Missouri Secretary of State in June 2023 and codified at 15 C.S.R. § 30-51.170(3) (the "B-D Rule") and 15 C.S.R. § 30-51.172(3) (the "IA Rule," and, together with the B-D Rule, the "Missouri Rules") that regulate certain activities of broker-dealers, investment advisers, and their associated persons in the State of Missouri. *See* Am. Compl. for Decl. and Inj. ¶ 1 (filed Oct. 23, 2023). NASAA submits this brief to express its views on two issues raised in this litigation; namely, whether the Missouri Rules are preempted by the National

1

Securities Market Improvement Act of 1996, Pub. L 104-290, 110 Stat. 3416 (1996) ("NSMIA") or the Employee Retirement Income Security Act of 1974, Pub. L. 93-406, 88 Stat. 829 (1974) ("ERISA"). For the reasons described below, this Court should hold that the Missouri Rules are not preempted by NSMIA or ERISA. A contrary ruling by this Court would be inconsistent with the Missouri Securities Act and could be used in other contexts to undermine the authority of other state securities regulators.

## ARGUMENT

### I.     BACKGROUND AND APPLICABLE LEGAL STANDARDS

Securities regulation in the United States began at the state level. Kansas passed the first comprehensive securities law in 1911 and, by the time Congress began enacting securities laws in the 1930s, "virtually all the states had some form of securities act." Joseph C. Long, 12 BLUE SKY LAW § 1.1 (2023). Federal securities laws adopted in the 1930s have thus always co-existed with state securities laws. This framework is consistent with basic principles of federalism wherein the powers of the federal government are to be defined and all remaining power is left to the states. The Federalist No. 45, p. 292-93 (C. Rossiter ed. 1961) (J. Madison).

At root, state and federal securities laws are intended to be remedial statutes that protect the public from harm. *Fin. Solutions & Assocs. v. Carnahan*, 316 S.W. 3d 518, 527 (Mo. Ct. App. W.D. 2010). The Missouri Securities Act serves this purpose for Missouri's citizens by, for example, setting standards for the registration of broker-dealers, broker-dealer agents, investment advisers, and investment adviser representatives (*e.g.*, MO. REV. STAT. §§ 409.4-401 – 404), regulating the offer and sale of certain securities (*e.g.*, MO. REV. STAT. § 409.3-301), and prohibiting fraudulent or abusive practices (*e.g.*, MO. REV. STAT. §§ 409.5-501 – 502). The text

of the Missouri Securities Act is based on—and indeed is a virtual verbatim adoption of—the Uniform Securities Act of 2002.[1]

State securities regulators have broad authority to issue rules regulating the securities industry, and courts should interpret these rules liberally to reflect the remedial purposes of state securities laws. *E.g.*, *Robinhood Fin. LLC v. Massachusetts*, 492 Mass. 696, 707-08 (2023); *Silverman v. Berkson*, 141 N.J. 412, 417 (1995); *Joseph v. Viatica Mgmt. LLC*, 55 P.3d 264, 267 (Colo. Ct. App. 2002); *In re Reuter*, 443 B.R. 427, 436 (B.A.P. 8th Cir. 2011).

Secretary Ashcroft adopted the Missouri Rules in June 2023 pursuant to his rulemaking authority under the Missouri Securities Act. *See* Defendants' Suggestions in Support of Motion for Summary Judgment at xxii – xxiv (filed Jun. 10, 2024) (hereinafter, "Defendants' MSJ Suggestions"). This Court should defer to the Secretary on the meaning of the Missouri Rules unless his interpretation is "plainly erroneous or inconsistent" with the text of the Missouri Securities Act. *Fast v. Applebee's Int'l Inc.*, 638 F.3d 872, 878 (8th Cir. 2011) (citing *Auer v. Robbins*, 519 U.S. 452 (1997)). However, Plaintiff argues, *inter alia*, that the Missouri Rules are preempted by NSMIA and ERISA. Plaintiff is incorrect. Plaintiff's argument stretches the concept of preemption beyond its legal boundaries and this Court should reject it.

Federal law can preempt a state's securities laws or regulations either expressly, such as through an act of Congress or, indirectly, through an irreconcilable conflict between the two. *See*

---

[1]     *Compare* H.B. 380, 92d Gen. Ass. (Mo. 2003), https://house.mo.gov/billtracking/bills03/bills/hb380.htm, and UNIF. SECS. ACT of 2002, available at https://www.nasaa.org/wp-content/uploads/2021/09/2002-Uniform-Securities-Act.pdf. The Uniform Securities Act of 2002 is a model state securities statute developed by the Uniform Law Commission (with two prior versions being the Uniform Securities Act of 1956 and the Revised Uniform Securities Act of 1985). Copies of these three model acts are available on NASAA's website at https://www.nasaa.org/industry-resources/uniform-securities-acts/.

*Virginia Uranium v. Warren*, 139 S. Ct. 1894, 1901 (2019).[2]  Where Congress has sought to preempt state securities laws, it has done so unambiguously.  State securities laws and regulations therefore should be presumed valid, and courts should find preemption only if a congressional intent to preempt the states is clear or if there is an irreconcilable conflict between federal and state law.  *Wright Elec. v. Minn. State Bd. of Elec.*, 322 F.3d 1025, 1031 (8th Cir. 2003); *Robinhood,* 492 Mass. at 717-18.  A preemptive conflict will exist between federal law and a state's securities law if it is impossible to comply with both regimes or if the state law stands as an obstacle to Congress's intent in the federal securities laws.  *See Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995).  However, mere hypothetical conflicts are insufficient, *Rice v. Norman Williams Co*., 458 U.S. 654, 659 (1982), and it is immaterial if the purpose of a state law conflicts with the purpose of federal law, *Amanda Acquisition Corp. v. Universal Foods Corp.*, 708 F. Supp. 984, 1003 (E.D. Wis. 1989).  Plaintiff in this matter therefore must prove either that (a) federal law expressly preempts the Missouri Rules, or (b) an irreconcilable conflict exists between federal law and the Missouri Rules such that (i) it is *impossible* for Plaintiff's members to comply with both regimes or (ii) the Missouri Rules *stand as an obstacle* to Congress's objectives under federal law. Plaintiff cannot meet this high bar.

---

[2]    There is a third type of preemption, known as "field preemption," whereby state laws and regulations are deemed preempted because federal law has so completely occupied an area of the law that there is no room left for the states to regulate.  However, field preemption is not at issue in this case because it is "well-settled" that field preemption does not apply to securities law matters. *Zuri-Invest AG v. Natwest Fin.*, *Inc*., 177 F. Supp. 2d 189, 195 (S.D.N.Y. 2001) (quoting *Baker*, *Watts & Co. v. Miles & Stockbridge*, 876 F.2d 1101, 1107 (4th Cir.1989)).  The federal securities laws have existed side-by-side with state securities laws for nearly a century and Congress has repeatedly preserved this structure (including through explicit carve-outs for state authority as discussed further below).

## II.    THE MISSOURI RULES ARE NOT PREEMPTED BY NSMIA

The most significant congressional legislation to impose boundaries between federal and state securities regulation was the National Securities Market Improvement Act of 1996 ("NSMIA").    Prior to NSMIA, state and federal securities laws and regulations routinely overlapped.    Congress enacted NSMIA to reduce redundancies and inefficiencies in the then-existing state and federal securities regulatory framework.    *See*, *e.g.*, *Lindeen v. SEC*, 825 F.3d 646, 650 (D.C. Cir. 2016); Linda M. Stevens, *The National Securities Markets Improvement Act (NSMIA) Savings Clause:  A New Challenge to Regulatory Uniformity*, 38 U. BALT. L. REV. 445, 452 (2009).  In particular, NSMIA preempted the states in three areas relevant to this case:  (a) regulation of so-called "covered securities;" (b) regulation of certain broker-dealer activities, including required books and records; and (c) regulation of large investment advisers.    *See* Roberta S. Karmel, *Reconciling Federal and State Interests in Securities Regulation in the United States and Europe*, 28 BROOK. J. INT'L L. 495, 509 (2003).    On each of these three subjects, though, Congress preserved state authority through savings clauses written into the federal securities laws that apply to this case.

As to (a) above, after preempting state regulation of certain federal covered securities in NSMIA, Congress included a savings clause to preserve state authority "to investigate and bring enforcement actions with respect to fraud or deceit, or unlawful conduct by a broker or dealer" in these offerings.    *See* NSMIA § 102 (codified as 15 U.S.C. § 77r(c)(1)).    Congress also preserved state authority to require notice filings and filing fees, including for issuances of "covered securities."  *Id.* (codified as 15 U.S.C. § 77r(c)(2)).

As to (b) above, NSMIA limited state authority to regulate broker-dealer books and records but Congress nonetheless left intact the broad authority already contained in Section 28

of the Securities and Exchange Act of 1934 ("Exchange Act") for state securities regulators "to investigate and bring enforcement actions" for violations of state securities laws—including as to broker-dealers. *See* 15 U.S.C. § 78bb(f)(4).[3]

As to (c) above, despite NSMIA's assignment of regulatory responsibility for large investment advisers to the SEC, Congress nevertheless preserved state authority to police fraudulent or deceitful conduct by SEC-registered advisers[4] and to "license, register, or otherwise qualify any investment adviser representative" of these SEC-registered advisers. *See* NSMIA § 303 (codified as 15 U.S.C. § 80b-3a(b)(1)(A)). As will be shown below, these three savings clauses safeguard the Missouri Rules from Plaintiff's NSMIA preemption challenges.

### A. The Missouri Rules Do Not Impermissibly Regulate Covered Securities

Prior to the enactment of NSMIA, an issuer seeking to offer securities throughout the United States had to comply with standards set by the U.S. Securities and Exchange Commission ("SEC") and by each of the states in which the securities were offered. NSMIA simplified requirements for securities issuers by creating a new category of securities (which NSMIA termed "covered securities") and assigning responsibility for regulating these offerings to the SEC. *See* NSMIA § 101 (codified as 15 U.S.C. § 77r(a). Covered securities include securities traded on national securities exchanges, mutual fund shares, and certain private placements. *Id.* (codified as 15 U.S.C. § 77r(b)). After NSMIA, states could require issuers of covered securities to file

---

[3]  Section 28 has existed in the Exchange Act since it was enacted in 1934. *See Leroy v. Great W. United Corp.*, 443 U.S. 173, 182 n.13 (1979). A similarly broad savings clause for state authority has existed in the Securities Act of 1933 since its inception as well. *See SEC v. Timetrust, Inc.*, 28 F. Supp. 34, 41 n.26 (N.D. Cal. 1939).

[4]  "Fraud" and "deceit," in the context of the state and federal securities laws, are not limited to common-law fraud or deceit. *See*, *e.g.*, Louis Loss & Edward M. Cowett, BLUE SKY LAW, 251 (Little, Brown and Co., 1958). *Accord* MO. REV. STAT. § 409.1-102(9) ("'Fraud', 'deceit', and 'defraud' are not limited to common law deceit.").

notices of these offerings and pay state filing fees, but states could no longer register covered securities offerings themselves.[5]

What is important to understand for this case, however, is that NSMIA's preemption of state authority vis-à-vis covered securities offerings is limited to the *issuance* of such securities. NSMIA does not preempt states from regulating how broker-dealers, investment advisers, or their associated persons make recommendations, transact in, or provide investment advice with respect to any securities offering. For this reason, Plaintiff's claim that the Missouri Rules are preempted because they conflict with the SEC's authority to regulate covered securities offerings is simply wrong. The Missouri Rules do not attempt to re-assert state review and registration authority over covered securities offerings; instead, they regulate the conduct of broker-dealers, investment advisers, and their associated persons who sell or advise clients about these securities. The Missouri Rules therefore are not preempted by NSMIA's assignment to the SEC of registration responsibility for covered securities offerings.

The issue of state authority to regulate broker-dealer sales of covered securities was addressed by two California appellate courts issuing separate decisions in 2007. In *Capital Research & Mgmt. v. Brown*, 53 Cal. Rptr. 3d 770 (Cal. Ct. App. 2007), and *California v. Edward D. Jones & Co.*, 65 Cal. Rptr. 3d 130 (Cal. Ct. App. 2007), two California appellate courts held that NSMIA did not preempt the state from regulating broker-dealer and investment adviser conduct in connection with covered securities sales. Specifically, both cases involved alleged misconduct by the defendant broker-dealers and investment advisers related to their practices for selling covered securities (specifically, mutual fund shares) without disclosing to their customers

---

[5]     For an overview of NSMIA's impact on the securities offering process, see Robert N. Rapp and Fritz E. Berckmueller, *Testing the Limits of NSMIA Preemption: State Authority to Determine the Validity of Covered Securities and to Regulate Disclosure*, 63 BUS. LAW. 809 (May 2008).

that they had revenue-sharing agreements with the issuers that materially benefitted the defendants. *See Brown*, 53 Cal. Rptr. 3d at 774; *Edward Jones*, 65 Cal. Rptr. 3d at 132. The defendants argued this issue was not actionable under California state law because NSMIA alone set the standards for covered securities sales. *Id.* The California courts disagreed. Both courts found that NSMIA's covered securities savings clause (15 U.S.C. § 77r(c)(1)) squarely permitted the state law claims. The *Brown* court explained its reasoning succinctly as follows: "It is the wholesale distributor's conduct that is at issue in this case (and the enabling conduct of the adviser), not the sufficiency of the disclosures" made by the issuer. *Brown*, 53 Cal. Rptr. 3d at 776. "What this means is that the [state] cannot sue [the issuer] to force it to change its disclosure documents, but [the state] can sue [the broker-dealer and investment adviser defendants] to force *them* to disclose their oral agreements with the shelf-space brokers." *Id.* (emphasis in original). *Accord Edward Jones*, 65 Cal. Rptr. 3d at 138 (holding that the preemption challenge "fails because the [state's] action is a type of action expressly permitted" by NSMIA). The analyses and outcomes in *Brown* and *Edward Jones* have been supported by other courts and the same result should follow here. *See Robinhood*, 492 Mass. at 718 (upholding state broker-dealer fiduciary duty rule against preemption challenges and citing *Brown* and *Edward Jones* in support); *Papic v. Burke*, No. 05-cv-8511, 2007 WL 1019000, at *5 (Conn. Sup. Ct. Mar. 22, 2007) (upholding state enforcement authority in covered securities offering and citing *Brown* in support).

The Missouri Rules do not attempt to regulate the disclosure documents used by issuers of covered securities, nor the manner in which they are offered by the issuer. Rather, the Missouri Rules regulate the conduct of broker-dealers, investment advisers, and their associated persons who sell or recommend securities to customers. This is entirely permissible under NSMIA's

covered securities savings clause, which preserved state authority "with respect to (i) fraud or deceit, or (ii) unlawful conduct" in the sale of a covered security. *See* NSMIA § 102 (codified as 15 U.S.C. § 77r(c)(1)(A)).

To give due effect to every word in this savings clause, "unlawful conduct" must be read to encompass something beyond fraud and deceit. The legislative history of NSMIA bears this out. As explained in a congressional report accompanying NSMIA, Congress "intended to permit state securities regulators to continue to exercise their police power" over covered securities offerings to "prevent fraud and broker-dealer sales practice abuses" with respect to such offerings. H.R. Rep. No. 104-864, at 40 (1996) (Conf. Rep.). A state's decision to set its own conduct standards for broker-dealers and investment advisers, such as Missouri has done through the B-D Rule and the IA Rule, is precisely the type of "police power" that Congress preserved for the states.

## B. The B-D Rule Does Not Impose an Impermissible Books and Records Obligation on Missouri Broker-Dealers

A second way Congress preempted states through NSMIA was to limit state regulation of certain broker-dealer obligations. Specifically, NSMIA Section 103 amended the Exchange Act to prohibit states from establishing requirements for "capital, custody, margin, financial responsibility, *making and keeping records*, bonding, or financial or operational reporting . . . that differ from, or are in addition to, the requirements in those areas established under this title." 15 U.S.C. § 78o(i)(1) (emphasis added).[6] With no factual analysis, and with conclusory legal reasoning, Plaintiff asserts the B-D Rule is preempted because it supposedly requires broker-dealers to create and maintain books and records that "differ from, or are in addition to," records

---

[6] NSMIA Section 103 was originally codified as Section 15(h) of the Exchange Act (15 U.S.C. § 78o(h)) but was later recodified as Section 15(i) (15 U.S.C. § 78o(i)) in 2010. *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, 124 Stat. 1376, at § 929X (2010) ("Dodd-Frank Act").

required by the SEC. *See* Suggestions in Support of Plaintiff's Motion for Summary Judgment, Declaratory Relief, and Permanent Injunction at 28 (filed Jun. 10, 2024) (hereinafter, "Plaintiff's MSJ Suggestions") (citing Exchange Act Rules 17a-3 (17 C.F.R. § 240.17a-3) and 17a-4 (17 C.F.R. § 240.17a-4) in support).

NASAA has not found, and the parties have not cited, any decision interpreting the meaning of Section 103.[7] However, while the preemptive reach of Section 103 is a matter of first impression, this Court does not need to write on a blank slate.[8] The U.S. Supreme Court has clearly and repeatedly held in other contexts that substantially similar statutory language to Section 103 did not preempt state laws or regulations that were consistent with federal law. *See Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 447 (2005) (holding that federal product labeling and packaging standards under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") did not preempt different state standards notwithstanding FIFRA's express preemption of state laws that were "in addition to or different from" FIFRA because the state law at issue was "equivalent to, and fully consistent with," FIFRA); *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 495 (1996) (finding that the Medical Device Amendments of 1976 ("MDA") did not prohibit state requirements "different from, or in addition to" the requirements of the MDA because the state requirements "parallel[ed]" federal law). This interpretation of the scope of Section 103 finds support in NSMIA's legislative history. *See* H.R. Rep. No. 104-622 at 36 (1996) (Conf. Rep.) (stating NSMIA preempts state requirements that are "inconsistent with or exceed[]" federal requirements). It is also the reading that best effectuates the statutory text, as it demonstrates

---

[7] One published decision references Section 103, but only to note it was inapt to that case. *See United States v. Schulman*, No. 97-cr-315, 1998 WL 80179, at *2 (S.D.N.Y. 1998).

[8] For a discussion of the many legal ambiguities surrounding the meaning of this NSMIA provision, see Howard M. Friedman, *The Impact of NSMIA on State Regulation of Broker-Dealers and Investment Advisers*, 53 Bus. Law. 511 (1998).

Congress' intent in Section 103 "to draw a distinction between state . . . requirements that are pre-empted and those that are not." *Bates*, 544 U.S. at 449.[9]

Under the appropriate reading of Section 103, Plaintiff's argument fails because it ignores the ways in which the B-D Rule fits within the requirements of the relevant SEC rules. Although Exchange Act Rules 17a-3 and 17a-4 do not require broker-dealers to create the specific record required under the B-D Rule (*see* 17 C.F.R. §§ 240.17a-3, 17a-4), that fact is not dispositive because the SEC recordkeeping requirements most relevant to this matter are flexible, principles-based rules that require broker-dealers to create and keep certain *kinds* of records, but they do not mandate the precise contents of those records. The records required by the B-D Rule are "equivalent to, and fully consistent with" the SEC's books and records rules, *Bates*, 544 U.S. at 447, because they are of a kind that is already required to be created and maintained under the SEC rules, specifically Exchange Act Rule 17a-3(a)(35) and Regulation Best Interest, 17 C.F.R. § 240.15*l*-1.[10]

Exchange Act Rule 17a-3(a)(35) states that "[f]or each retail customer to whom a recommendation of any securities transaction or investment strategy involving securities is or will be provided," broker-dealers are required to make and keep "(i) A record of all information collected from and provided to the retail customer pursuant to [Regulation Best Interest] . . . ." 17

<hr />

[9]     *See also id.* at 448-49 (rejecting the argument that the "parallel requirements" reading would give rise to a "crazy-quilt of . . . requirements different from the one defined by FIFRA itself" and explaining that, when faced with competing plausible interpretations, the court "would nevertheless have a duty to accept the reading that disfavors preemption").

[10]     Leaving aside the B-D Rule's consent requirement, it is important to note that NSMIA Section 103 provides no basis whatsoever for the preemption of the B-D Rule's disclosure requirement (15 C.S.R. §§ 30-51.170(3)(A), (B)) because NSMIA Section 103 says nothing about state regulation of business and sales conduct standards, including disclosure requirements. *See* 15 U.S.C. § 78o(i)(1). To the extent that broker-dealers are required to make and preserve records of "communications" with customers under Exchange Act Rule 17a-4(b)(4) (*see* Plaintiff's MSJ Suggestions at 28 (citing Exchange Act Rules 17a-3 and 17a-4)), that recordkeeping requirement comes from the SEC and cannot serve as a basis to conclude the B-D Rule yields a "different" or "addition[al]" state recordkeeping requirement.

C.F.R. § 240.17a-3(a)(35). This requirement is germane to this case because the B-D Rule, like Regulation Best Interest itself, establishes requirements for the information that broker-dealers must obtain from, and provide to, their customers when making investment recommendations. The B-D Rule's requirements fit within the contours of the flexible, principles-based terms of Regulation Best Interest and Exchange Act Rule 17a-3(a)(35).

First, the B-D Rule is consistent with the principles underlying the Regulation Best Interest disclosure obligation. Regulation Best Interest requires broker-dealers to "full[y] and fair[ly]" disclose, in writing, "all material facts relating to the scope and terms of the relationship with the retail customer." 17 C.F.R. § 240.15*l*-1(a)(2)(i)(A). This includes, *inter alia*, "[t]he *type and scope of services* provided to the retail customer, including *any material limitations on the securities or investment strategies* involving securities that may be recommended to the retail customer." 17 C.F.R. § 240.15*l*-1(a)(2)(i)(A)(3) (emphases added).[11] Although Regulation Best Interest provides examples of information that must be provided to customers about the broker-customer relationship, the SEC has emphasized that the items in the text of Regulation Best Interest are the minimum required, not an exhaustive list. *See* Final Rule, *Regulation Best Interest: The Broker-Dealer Standard of Conduct*, SEC Rel. No. 34-86031 (June 5, 2019) ("Reg BI Adopting Release") at 132 ("The material facts identified in Regulation Best Interest are the minimum . . . ."), 132-33 (explaining that the scope of the disclosure obligation is limited only by materiality (citing *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988))), and 144 ("emphasiz[ing]" that the items in the text are the minimum and that "broker-dealers and such associated persons thus will need to consider, based on the facts and circumstances, whether there are other material facts relating to the scope and

---

[11]     Broker-dealers also must have written policies and procedures reasonably designed to ensure these disclosures are made. *See* 17 C.F.R. § 240.15*l*-1(a)(2)(iii).

terms of the relationship with the retail customer that need to be disclosed"), https://www.sec.gov/files/rules/final/2019/34-86031.pdf. The SEC has also explained that the required disclosures would include "the general basis for a broker-dealer's or an associated person's recommendations (*i.e.*, what might commonly be described as the firm's or associated person's investment approach, philosophy, or strategy)" and "[t]he process by which a broker-dealer and an associated person develop their recommendations[.]" Reg BI Adopting Release at 188. That is exactly what the B-D Rule seeks to do. The SEC further explained that "material limitations" to disclose would include the fact that the broker-dealer recommends only products with, or products from issuers with, certain characteristics. *See id.* at 178-79. That is also what the B-D Rule seeks to do.

Exchange Act Rule 17a-3(a)(35) by its terms requires broker-dealers to make and keep records of all of the disclosures described above. *See* 17 C.F.R. § 240.17a-3(a)(35)(i). Again, the B-D Rule does the same thing. Further, and of critical relevance to the preemption challenge in this case, the SEC explained that Exchange Act Rule 17a-3(a)(35) would require broker-dealers to create new records that they were not otherwise required to make and keep under preexisting rules. *See* Reg BI Adopting Release at 370 ("[T]he Commission believes it is important, including for examination purposes, that broker-dealers separately retain records that specifically demonstrate compliance with Regulation Best Interest and new paragraph (a)(35) of Rule 17a-3 . . . ."). Furthermore, the SEC specifically contemplated the need for broker-dealers to tailor, supplement, clarify, or update written disclosures where appropriate, including the use of new or otherwise different documents to provide the necessary information. *See id.* at 222 (noting that necessary information may be found in, *inter alia*, account agreements, relationship guides, and fee schedules), 224 (stating that "disclosures may need to be tailored . . . if the standardized disclosure

13

does not sufficiently identify the material facts"), 225 (stating that "[i]n most instances, broker-dealers will need to provide additional information beyond that contained in" standardized disclosure documents), 228 ("recogniz[ing] that a broker-dealer may need to supplement, clarify, or update written disclosure it has previously made").

In sum, Regulation Best Interest requires broker-dealers to keep and update records of the same type of disclosures contemplated by the B-D Rule, and Regulation Best Interest explicitly does *not* mandate the form of these records. Thus, the fact that the B-D Rule requires the creation of a record is not inconsistent with Regulation Best Interest. It is not enough merely to say as Plaintiff does that the document itself—the written consent—is not required by federal rules. Instead, Plaintiff needs to show that the B-D Rule requires records that are different from or in addition to federal requirements. To win its claim, Plaintiff must juxtapose the B-D Rule against a federal record. It has not done so—and, indeed, *it cannot do so*—because the SEC is agnostic about what records a broker-dealer may use to satisfy the requirements described above.

Second, the B-D Rule is also consistent with the principles underlying the Regulation Best Interest care obligation. Regulation Best Interest requires broker-dealers to "[h]ave a reasonable basis to believe that the recommendation is in the best interest of a particular retail customer [and that] a series of recommended transactions . . . is not excessive and is in the retail customer's best interest when taken together." 17 C.F.R. § 240.15*l*-1(a)(2)(ii)(B) and (C). This determination must be based on the customer's "investment profile," *id.*, as well as "the potential risks, rewards, and costs associated with the recommendation," *id.* at § 240.15*l*-1(a)(ii)(B). Both considerations require broker-dealers to obtain information from their customers, and Exchange Act Rule 17a-3(a)(35) requires broker-dealers to make and keep records of all information provided to and received from retail customers. Regulation Best Interest defines "Retail customer investment

profile" to include certain factors, but as with the disclosure obligation, these factors are a non-exhaustive, minimum list.  *See* 17 C.F.R. § 240.15*l*-1(b)(2); Reg BI Adopting Release at 275 (acknowledging that factors not listed "may be relevant . . . under certain facts and circumstances" and noting "that the list of factors is non-exhaustive").  Nonetheless, the "investment profile" should include information about the customer's other investments, investment objectives, and risk tolerance, among other things.  17 C.F.R. § 240.15*l*-1(b)(2).  Accordingly, a customer's affirmative consent to the incorporation of certain factors into a broker-dealer's recommendation—regardless of what those factors are—dovetails cleanly with the foregoing definition and the information required to be obtained from customers generally.

By requiring disclosure and affirmative consent, the B-D Rule aims to ensure that a broker-dealer has a conversation with its customer that helps form a reasonable basis for the resulting recommendations made to that customer. Therefore, rather than frustrating the purpose of Regulation Best Interest, the customer interactions contemplated by the B-D Rule are consistent with federal purposes.  Given that the B-D Rule can fit comfortably into the principles-based requirements of Exchange Act Rule 17a-3(a)(35) and, more particularly, the disclosure and care obligations of Regulation Best Interest, this Court can and should find that the B-D Rule does not establish "requirements for . . . making and keeping records . . . that differ from, or are in addition to, the requirements in [federal law]" and is therefore not preempted under Section 103 of NSMIA. Instead, this Court should find that the B-D Rule requirements are equivalent to, and fully consistent with, federal law.  *See Bates,* 443 U.S. at 448-49 (explaining that, when faced with competing plausible interpretations, the court "would nevertheless have a duty to accept the reading that disfavors preemption"); *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981) (preemption analysis "starts with the basic assumption that Congress did not intend to displace state law").

### C. The IA Rule Does Not Impermissibly Regulate SEC-Registered Investment Advisers

Defendants correctly aver that the IA Rule is a valid exercise of the Secretary's broad powers under the Missouri Securities Act to define and proscribe fraudulent or deceitful conduct by investment advisers and their associated persons, *see* Defendants' MSJ Suggestions at xxii-xxiv, 4-7, and that the IA Rule is not preempted by NSMIA because the IA Rule does not apply to SEC-registered investment advisers except to the extent that it operates as part of the state's licensing structure for investment adviser representatives, which is preserved from preemption. *Id.* at 10. Because the IA Rule defines standards of conduct that Missouri can enforce through its power to license, it should also be found by this Court to fall within the Secretary's broad and explicitly preserved authority to license investment adviser representatives.

Before NSMIA, the SEC and state securities regulators had broadly similar and equal regulatory authority over broker-dealers and investment advisers. But whereas Congress kept a dual federal and state regulatory structure for broker-dealers, Congress separated the regulation of investment advisers. In broad brush, NSMIA assigned regulatory responsibility for large investment advisers and mutual fund advisers to the SEC ("SEC-registered investment advisers"), while state securities regulators were assigned responsibility for small to mid-sized advisers ("state-registered investment advisers") *as well as all individual investment adviser representatives*. *See* NSMIA § 303 (codified as 15 U.S.C. § 80b-3a).[12] As relevant here, NSMIA preserved state authority to "license, register, or otherwise qualify any investment adviser representative" with a place of business in the state. *Id.* (codified as 15 U.S.C. § 80b-3a(b)(1)(A)).

---

[12] Congress initially set the dividing line for investment adviser registration between the SEC and the states at $25 million in assets under management ("AUM"). *See* NSMIA § 303 (codified as 15 U.S.C. § 80b-3a(a)(1)(A)). Congress subsequently raised this dividing line to $100 million in AUM as part of the Dodd-Frank Act. *See* Pub. L. No. 111-203 § 410.

This state authority extends to investment adviser representatives of both state-registered and SEC-registered investment advisers. Plaintiff argues that the IA Rule constitutes impermissible indirect regulation of SEC-registered investment advisers. *See* Plaintiff's MSJ Suggestions at 31. But Plaintiff overstates the impact of the IA Rule, and the IA Rule does not operate as Plaintiff asserts.

No federal statute or SEC regulation addresses what it means for states to "*license*, *register*, or otherwise *qualify*" investment adviser representatives of SEC-registered investment advisers.[13] Plain dictionary definitions of each of term yield the following:

- license (verb) – to permit or authorize, especially by formal license;

- register (verb) – to make or secure entry of in a register;

- qualify (verb) – to fit by training, skill, or ability for a special purpose; to declare competent or adequate (certify); to invest with legal capacity (license).

*See* Merriam-Webster's Collegiate Dictionary, 717, 1017, 1048 (11th ed. 2003). These definitions recognize a centralized (*e.g.*, governmental) process to assess, record and monitor the competency of others to engage in a particular activity.

Although the process among the states to license, register and qualify investment adviser representatives is fairly uniform, there are some variations in state practices. To obtain and maintain licensure, states generally require an individual to pass a NASAA qualification examination (such as (i) the Uniform Investment Adviser Law Examination (Series 65) or (ii) NASAA's Uniform Combined State Law Examination (Series 66) in combination with the General Securities Representative Examination (Series 7) and the Securities Industry Essential

---

[13] Advisers Act Rule 203A-3 defines *who* is an investment adviser representative under federal law, but it does not attempt to set boundaries on the regulation of investment adviser representatives as between the SEC and the states. *See* 17 C.F.R. § 275.203A-3.

Examination offered by the Financial Industry Regulatory Authority, Inc.)[14] or obtained a qualifying professional designation (such as Certified Financial Planner®).[15]  But this is not the only requirement.  Some states additionally require investment adviser representatives to be fingerprinted.  *See*, *e.g.*, ARIZ. REV. STAT. § 44-3156(C)(3); 02-032 CODE ME. R. Ch. 515, § 4(1)(C).  Other states require full criminal background checks.  *E.g.*, GA. CODE ANN. § 10-5-35(b)(1); D.C. MUN. REGS. tit. 26-B § 127.1.  And many states require ongoing compliance with investment adviser representative continuing education requirements.  *E.g.*, CAL. CODE REGS. tit. 10, § 260.236.2; OKLA. ADMIN. CODE § 660:11-7-49.[16]

These variances in state investment adviser representative licensing requirements existed prior to NSMIA, and Congress preserved state authority in this area when developing NSMIA. *See* H.R. Rep. No. 104-882 at 37 (1997) (Conf. Rep.) ("The authority of State officials and the SEC to investigate and bring enforcement actions against any investment adviser for fraud or deceit is preserved, as well as the State authority for setting licensing requirements of investment adviser representatives with a place of business in the licensing State.").  These variances in state requirements inevitably result in differing recordkeeping requirements for SEC-registered investment advisers who employ associated persons residing in those states, but such variances are nevertheless wholly in keeping with the right of states to establish licensing, registration, and qualification standards for those associated persons.  Importantly, NSMIA does not preempt state

---

[14]     For background on the Series 65 and Series 66 examinations, see https://www.nasaa.org/exams/general-exam-information/.

[15]     For example, the *NASAA Model Rule: Examination Requirements for Investment Adviser Representatives* identifies five professional designations that states should consider accepting for licensure in lieu of the Series 65 exam.  *See* https://www.nasaa.org/wp-content/uploads/2024/05/Examination-Requirements-for-Investment-Adviser-Representatives_5-6-2024.pdf.

[16]     The Investment Adviser Representative Continuing Education ("IAR CE") program is managed by NASAA.  For information about the IAR CE program, *see* https://www.nasaa.org/industry-resources/investment-advisers/investment-adviser-representative-continuing-education/.

variances in recordkeeping requirements related to the registration, qualification, and licensing of investment adviser representatives. Just the opposite; by preserving the ability for states to license, register and qualify investment adviser representatives, NSMIA explicitly tolerates variances in the recordkeeping requirements imposed on SEC-registered investment advisers as a result.

The fact that the IA Rule imposes a state-specific requirement on Missouri investment adviser representatives does not make it invalid; some variation in state licensure requirements is a time-honored feature of state securities regulation. Rather, the Secretary has authority under the broad rule-writing powers conferred by the Missouri Securities Act (*see* MO. REV. STAT. § 409.6-605) to establish the IA Rule and require that all investment adviser representatives licensed in the state, including those affiliated with SEC-registered investment advisers, comply with it. The Missouri Securities Act confers authority on the Secretary to enforce the IA Rule as a licensing measure because the Secretary can revoke the licensure of any investment adviser representative that fails to comply with it. *See* MO. REV. STAT. §§ 409.4-412(b), (d)(13) (authorizing the Secretary to revoke the registration of an investment adviser representative who has engaged in a dishonest or unethical practice). In sum, Plaintiff's argument that the IA Rule is preempted because it has indirect effects on SEC-registered investment advisers who employ Missouri-licensed investment adviser representatives must fail because such indirect effects are a necessary consequence of explicitly preserved state authorities.

### III. THE MISSOURI RULES ARE NOT PREEMPTED BY ERISA

#### A. The Missouri Rules Do Not "Relate To" ERISA Plans and Therefore Cannot Possibly Be Preempted by ERISA

Congress enacted ERISA to set uniform nationwide standards for the regulation of pension funds and other employee benefit plans. Defined benefit pension plans and defined contribution plans (*e.g.*, 401(k) plans) are examples of employee benefit plans subject to ERISA.

When Congress enacted ERISA in 1974, it included a broad preemption provision stating that ERISA would "supersede any and all State laws insofar as they may now or hereafter *relate to*" ERISA plans. 29 U.S.C. § 1144(a) (emphasis added). We concur with the Defendants' analysis of the binding precedent in this Circuit that the B-D Rule and the IA Rule do not "relate to" ERISA and therefore cannot be preempted by it. *See* Missouri Suggestions at 14.

Defendants' position is the correct reading of the law. ERISA preemption is a "complicated area of law, often confounding both jurists and attorneys alike." *Surgicore of Jersey City v. Anthem Life & Disab. Ins. Co.*, No. 19-cv-3482, 2020 WL 5752227, at *2 (E.D.N.Y. Sep. 25, 2020). The U.S. Supreme Court's current ERISA preemption jurisprudence is rooted in *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645 (1995). *See* Brandon M. Hall, *ERISA Preemption of State Automatic Enrollment IRAs*, 34 A.B.A. J. LAB. & EMP. L. 477, 485 (2020). *Travelers* and subsequent Supreme Court decisions (including *California Div. of Labor Stds. Enf. v. Dillingham Constr.*, 519 U.S. 316 (1997)) yield the following principles that should guide—and bind—this Court.

This Court should start from a presumption that ERISA does not preempt the Missouri Rules. *See Travelers*, 514 U.S. at 654 ("we have never assumed lightly that Congress has derogated state regulation, but instead have addressed claims of pre-emption with the starting presumption that Congress does not intend to supplant state law"). To overcome this presumption,

Plaintiff must convince this Court "that there is something in the practical operation of [the Missouri Rules] to indicate that [they are] the type of law that Congress specifically aimed to have ERISA supersede."  Larry J. Pittman, *ERISA's Preemption Clause:  Progress Towards a More Equitable Preemption of State Laws*, 34 IND. L. REV. 207, 268 n.285 (2001).  Specifically, Plaintiff here must show that the Missouri Rules impermissibly "relate to" ERISA-covered plans within the meaning of 29 U.S.C. § 1144(a), which the Supreme Court has interpreted to require either (a) that the Missouri Rules "make reference to" ERISA plans, or (b) that the Missouri Rules have a "prohibited connection with" ERISA plans.  *See* Hall, 34 A.B.A. J. LAB. & EMP. L. at 480-81 (discussing *Travelers*, 514 U.S. at 656).  However, the Missouri Rules meet neither of these two legal prongs.

First, for the Missouri Rules to impermissibly "make reference to" ERISA plans, the Supreme Court requires that the Missouri Rules act "immediately and exclusively" on ERISA plans or that ERISA plans be essential to the operation of the Missouri Rules.  *See id.* at 481 (discussing *Dillingham Constr.*, 519 U.S. at 324-25).  Neither of these holds.  The Missouri Rules never mention ERISA or ERISA-covered plans, nor do the Missouri Rules focus on accounts of ERISA plans.  The Missouri Rules do not mention account types at all.  Instead, the Missouri Rules apply to conduct by broker-dealers, investment advisers, and their associated persons irrespective of ERISA.

Second, to find that the Missouri Rules have a "prohibited connection" with ERISA plans, Supreme Court precedent requires a showing that the Missouri Rules (i) mandate employee benefit structures or administration, (ii) bind employers or ERISA plan administrators to particular choices or preclude uniform plan administration (thereby effectively functioning as a regulation on ERISA plans), or (iii) provide an alternative enforcement mechanism to the one contained in ERISA.  *See*

*id.* (discussing *Travelers*, 514 U.S. at 658-60).  Again, the Missouri Rules do none of these things.  The Missouri Rules impose no duties or responsibilities on ERISA plans or fiduciaries in their roles as plans and fiduciaries.  Rather, the Missouri Rules impose duties and responsibilities on broker-dealers, agents, investment advisers and investment adviser representatives by virtue of their status as registered persons.  The fact that Missouri securities firms and securities professionals subject to the Missouri Rules may also be ERISA fiduciaries is immaterial.

Furthermore, the Missouri Rules do not conflict with ERISA.  The Missouri Rules do not bind a person subject to them to make, or refrain from making, any particular investment choice or recommendation.  The Missouri Rules instead require registered firms and persons merely to disclose and seek acknowledgement if they incorporate non-financial considerations into their investment advice or recommendations.  Nothing in ERISA precludes this.  Missouri broker-dealers, investment advisers and their associated persons that are also ERISA fiduciaries can comply both with the Missouri Rules and their obligations under ERISA.  Compliance with the Missouri Rules will be their responsibility as securities professionals and any association they may have to ERISA plans or accounts will not be impacted by their compliance with them.

### B.  The Missouri Rules Are State Securities Regulations Expressly Protected from Preemption by ERISA's Savings Clause

Even if this Court were to reach a contrary conclusion and hold that the B-D Rule and the IA Rule somehow "relate to" ERISA-covered plans, they still would not be preempted because of Congress's express preservation for state securities regulation in ERISA.  Immediately after ERISA's broad preemptive language in 29 U.S.C. § 1144(a), Congress included a savings clause to expressly preserve state laws "which regulate[] insurance, banking, or securities."  29 U.S.C. § 1144(b)(2)(A).  This savings clause has been litigated extensively in the context of the intersections between ERISA and state insurance laws.  However, this savings clause has been litigated only

22

infrequently in the context of state securities laws.  What is more, these few securities cases have dealt solely with private causes of action under state securities laws and whether those causes of action were valid as to ERISA-covered plans or accounts.  *E.g.*, *Matassarin v. Lynch*, 174 F.3d 549 (5th Cir. 1999) (evaluating the validity of a private plaintiff's claims under ERISA, the federal securities laws and state securities laws).  Notably, we can find no case in which any court has invalidated a state securities regulation on grounds that the regulation was preempted by ERISA.

In light of the above, the Court should decline Plaintiff's efforts to stretch ERISA beyond existing statutory and common law guardrails to preempt the valid exercise of state authority governing the conduct of broker-dealers and investment advisers.

## **CONCLUSION**

This Court should find that the Missouri Rules were valid exercises of the Secretary's broad rule-writing and antifraud authority under the Missouri Securities Act and therefore that the Missouri Rules are not preempted by NSMIA or ERISA.

Respectfully Submitted

NORTH AMERICAN SECURITIES
ADMINISTRATORS ASSOCIATION, INC.

By,

/s/ James R. Layton
James R. Layton

Attorney for *Amicus Curiae*
North American Securities
Administrators Association, Inc.

Tueth Keeney Cooper Mohan Jackstadt P.C.
34 North Meramec Avenue, Suite 600
St. Louis, Missouri 63105
Tel:  314-880-3600
jlayton@tuethkeeney.com

Zachary T. Knepper (Of Counsel)
Deputy General Counsel
North American Securities
Administrators Association, Inc.
750 First Street, NE, Suite 900
Washington, DC 20002
Tel:  202-683-2323
zknepper@nasaa.org

Dated:  July 8, 2024

## CERTIFICATE OF SERVICE

I hereby certify that that on July 8, 2024, I electronically filed the foregoing brief with the

Clerk of the Court using the CM/ECF system to send notification of such filing to all counsel of

record.


/s/ James R. Layton
James R. Layton


Attorney for *Amicus Curiae*
North American Securities
Administrators Association, Inc.