## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

SECURITIES INDUSTRY AND FINANCIAL )
MARKETS ASSOCIATION, )
                       )
        Plaintiff, )
                       )
v.                          )     Case No. 23-cv-04154-SRB
                       )
JOHN R. ASHCROFT, in his official capacity )
as Secretary of State of Missouri, and )
DOUGLAS M. JACOBY, in his official capacity )
as Missouri Securities Commissioner, )
                       )
        Defendants. )

## ORDER

      Before the Court are two motions for summary judgment: (1) Defendant John Ashcroft ("Ashcroft") and Douglas Jacoby's ("Jacoby") (collectively, the "Defendants") Motion for Summary Judgment (Doc. #69); and (2) Plaintiff Securities Industry and Financial Markets Association's ("Plaintiff") Motion for Summary Judgment, Declaratory Relief, and Permanent Injunction (Doc. #71).[1] On August 13, 2024, the Court presided over oral argument on the pending motions. For the reasons discussed below, Plaintiff's motion is GRANTED and Defendants' motion is DENIED.

## I. FACTUAL BACKGOUND

      For the purpose of resolving the pending motions, the following facts are uncontroverted by the parties or deemed to be uncontroverted by the Court.[2] The Court generally agrees with

---

[1] The cross-motions for summary judgment raise many of the same facts and legal arguments. The Court has reviewed all arguments raised by the parties, and the rulings herein dispose of both motions. Numerous Amicus Curiae Briefs have also been filed. (*See* Doc. #80, 90, 91, 100, 103.) The Court similarly reviewed those briefs to resolve the pending motions.

[2] All page numbers cited herein refer to the pagination automatically generated by CM/ECF.

Plaintiff that the pending motions largely turn on legal, not factual, issues. The parties' briefs span approximately 600 pages. Only those facts and issues necessary to resolve the pending motions are discussed below, and they are simplified to the extent possible. Additional facts relevant to the parties' arguments are discussed in Section III.

Plaintiff is a trade association for broker-dealers, asset managers (including investment advisers), and investment banks.[3] Defendant Ashcroft is the Secretary of State of Missouri. Defendant Jacoby is the Commissioner of the Missouri Securities Division (the "Division"). This case arises from two rules regulating financial professionals that were promulgated pursuant to the authority of Defendant Ashcroft acting in his official capacity as Missouri Secretary of State. Defendant Jacoby wrote and drafted the rules. The rules were subsequently issued by the Division and are found at 15 C.S.R. § 30-51.170 and 15 C.S.R. § 30-51.172 (collectively, the "Rules"). The Rules became effective in July 2023.

In general, the Rules require that securities firms and professionals obtain a signature from Missouri investors on consent forms before incorporating a "social objective" or other "nonfinancial objective" into their securities recommendations or investment advice. The written consent form must contain mandatory language that is set forth in the Rules, or language that is "substantially similar" thereto. Among other things, the mandatory language includes an express acknowledgment that securities recommendations or investment advice will result in investments and recommendations that are not solely focused on maximizing a financial return for the investor.

---

[3] Edward D. Jones & Co., L.P. ("Edward Jones") is a member of Plaintiff. Edward Jones has collected over 1,200 signed consent forms from clients that are attributable to the rules at issue. Edward Jones's "[b]ranch associates have collectively spent approximately 40-100 hours providing the disclosure required by the Rules, discussing the disclosure with clients and customers, obtaining required signatures from customers and clients, and archiving the consents for recordkeeping purposes." (Doc. #72, p. 26, ¶ 81.) Plaintiff relies on Edward Jones "to support its standing and claims[.]" (Doc. #105, p. 83.)

In particular, the first rule is captioned "Dishonest or Unethical Business Practices by Broker-Dealers and Agents" (the "B-D Rule"). The B-D Rule provides that:

(3) Failing to disclose to any customer or prospective customer the following material fact:

(A) *If a broker-dealer or agent incorporates a social objective or other nonfinancial objective into a discretionary investment decision to buy or sell a security or commodity for a customer*, a recommendation and/or solicitation to a customer for the purchase or sale of a security or commodity, or the selection, or recommendation or advice to a customer regarding the selection, of a third-party manager or subadviser to manage the investments in the customer's account, *then such broker-dealer or agent shall disclose to such customer the existence of such incorporation*:

(B) As used in this section, the following terms mean:

    1. "Agent," the same meaning as under section 409.1-102;

    2. "Broker-dealer," the same meaning as under section 409.1-102;

    3. "Incorporates a social objective," means the material fact to consider socially responsible criteria in the investment or commitment of customer funds for the purpose of seeking to obtain an effect other than the maximization of financial return to the customer;

    4. "Nonfinancial objective," means the material fact to consider criteria in the investment or commitment of customer funds for the purpose of seeking to obtain an effect other than the maximization of financial return to the customer;

    5. "Socially responsible criteria," any criteria that is intended to further, or is branded, advertised, or otherwise publicly described by the broker-dealer or agent as furthering, any of the following:

        A. International, domestic, or industry agreements relating to environmental or social goals;

        B. Corporate governance structures based on social characteristics; or

        C. Social or environmental goals;

(C) *The disclosure obligation under subsection (3)(A) is satisfied by providing clear and conspicuous prior disclosure and obtaining written acknowledgement and consent from the customer*. Written consent shall be obtained either—

> 1. At the establishment of the brokerage relationship; or
>
> 2. Prior to—
>
>> A. Effecting the initial discretionary investment for the customer's account;
>>
>> B. Providing the initial recommendation, advice, or solicitation regarding the purchase or sale of a security or commodity in a customer's account; or
>>
>> C. Selecting, or recommending or advising on the selection of, a third-party manager or subadviser to manage the investments in a customer's account;
>
> 3. Such disclosure, thereafter, shall be provided to the customer on an annual basis and, no less than every three (3) years, consented in writing by the customer; and

(D) *Written consent required under subsection (3)(C) shall contain language that is substantially similar to the following*:

> "I, [NAME OF CUSTOMER], consent to my [as applicable, NAME OF BROKER-DEALER OR AGENT] incorporating a social objective or other nonfinancial objective into any discretionary investment decision my [as applicable, BROKER-DEALER OR AGENT] makes for my account; any recommendation, advice, or solicitation my [as applicable, BROKER-DEALER OR AGENT] makes to me for the purchase or sale of a security or commodity; or the selection my [as applicable, BROKER-DEALER OR AGENT] makes, or recommendation or advice my [as applicable, BROKER-DEALER OR AGENT] makes to me regarding the selection of, a third-party manager or subadviser to manage the investments in my account. *Also, I acknowledge and understand that incorporating a social objective or other nonfinancial objective into discretionary investment decisions, recommendations, advice, and/or the selection of a third-party manager or subadviser to manage the investments, in regards to my account, will result in investments and recommendations/ advice that are not solely focused on maximizing a financial return for me or my account.*"

15 C.S.R. § 30-51.170(3) (emphasis supplied).

The second rule is captioned "Dishonest or Unethical Business Practices by Investment Advisers and Investment Adviser Representatives" (the "IA Rule"). The IA Rule contains similar language to the B-D Rule, including the disclosure and written consent requirements. The IA rule is applicable to investment advisers and investment adviser representatives. The IA Rule is found at 15 C.S.R. § 30-51.172(3). The failure of a broker-dealer or investment advisor to comply with the Rules can result in punishment, including civil and criminal penalties. *See* Mo. Rev. Stat. §§ 409.4-412(b), (d)(13); § 409.4-412(c), (d)(13); Mo. Rev. Stat. § 409.5-508(b).

On August 10, 2023, Plaintiff filed this lawsuit against Defendants. Plaintiff's Amended Complaint asserts the following claims: Count One—The Rules are Preempted by the National Securities Markets Improvement Act of 1996 ("NSMIA"); Count Two—The Rules are Preempted by the Employment Retirement Income Security Act of 1974 ("ERISA"); Count Three—The Rules Violate the First Amendment Protection Against Compelled Speech; and Count Four—the Rules are Unconstitutionally Vague.

Both parties now move for summary judgment under Federal Rule of Civil Procedure 56. Plaintiff moves the Court to "declare that the Rules are preempted and unconstitutional and should enjoin Defendants . . . from taking any steps to enforce the Rules." (Doc. #71, p. 2.) Defendants argue the Rules are not preempted, constitutional, and that summary judgment should be entered in their favor on all claims and requested relief. These issues are addressed below.

## II. LEGAL STANDARD

Under Rule 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of identifying "the basis for its

motion, and must identify those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quotations and alterations omitted). If the moving party makes this showing, "the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial." *Id.* (quotations omitted).

## III. DISCUSSION

### A. Plaintiff is Entitled to a Permanent Injunction.

Plaintiff moves for summary judgment and for a permanent injunction on Counts One through Count Four.[4] To obtain a permanent injunction, "the moving party [must] show actual success on the merits, rather than the fair chance of prevailing on the merits required for a standard preliminary injunction." *Oglala Sioux Tribe v. C & W Enters., Inc.*, 542 F.3d 224, 229 (8th Cir. 2008). "If a court finds actual success on the merits, it then considers the following factors in deciding whether to grant a permanent injunction: (1) the threat of irreparable harm to the moving party; (2) the balance of harms with any injury an injunction might inflict on other parties; and (3) the public interest." *Id.* Each factor is addressed below.

#### 1. Actual Success on the Merits

##### a. Count One—Whether the Rules are Preempted by NSMIA

In Count I, Plaintiff contends that NSMIA expressly preempts the Rules. Plaintiff argues the B-D Rule is preempted in part because it "requires broker-dealers to make and keep records that differ from federal requirements." (Doc. #72, p. 35.) Defendants argue the B-D Rule does

---

[4] Plaintiff also requests a declaratory judgment which is discussed below. The Court "can hear these . . . claims through its equitable powers regardless of 42 U.S.C. § 1983 because Congress has not shown an intent to foreclose this equitable relief." (Doc. #72, p. 33 n. 5.)

not conflict with federal law and that NSMIA contains a savings clause which protects the rule against preemption.

The Supremacy Clause of the United States Constitution provides that federal law is "the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., Art. VI, cl. 2. This clause "provides Congress with the power to pre-empt state law." *La. Pub. Serv. Comm'n v. Fed. Commc'ns Comm'n*, 476 U.S. 355, 368 (1986). A state law is pre-empted:

> when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law, when there is outright or actual conflict between federal and state law, where compliance with both federal and state law is in effect physically impossible, where there is implicit in federal law a barrier to state regulation, where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law, or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress.

*Id.* (internal citations omitted).

"Express preemption occurs where a federal law explicitly prohibits or displaces state regulation in a given field." *Johnson v. MFA Petroleum Co.*, 701 F.3d 243, 248 (8th Cir. 2012). "If the statute contains an express pre-emption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993). "Preemption is a question of law[.]" *Nat'l Bank of Commerce v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

Congress enacted NSMIA to alleviate the "redundant, costly, and ineffective dual federal/state regulatory" securities system. *Lindeen v. SEC*, 825 F.3d 646, 650 (D.C. Cir. 2016). NSMIA "designated the federal government to oversee nation-wide securities offerings while

allowing the states to retain control over small, regional or intrastate offerings." *Id.* As relevant

here, NSMIA contains an express preemption clause:

> **No law, rule, regulation, or order, or other administrative action of any State or political subdivision thereof shall establish** capital, custody, margin, financial responsibility, **making and keeping records**, bonding, or financial or operational reporting **requirements** for brokers, dealers, municipal securities dealers, government securities brokers, or government securities dealers **that differ from, or are in addition to, the requirements in those areas established under this chapter.**

15 U.S.C. § 78o(i)(1) (emphasis supplied).

Here, the parties agree that "NSMIA is a form of express preemption" but disagree

whether the B-D rule itself is preempted. (Doc. #72, p. 35; Doc. #105, p. 83.) Upon review of

the record and the parties' arguments, the Court finds the B-D Rule is expressly preempted by

NSMIA because it requires broker-dealers to make and keep record that differ from—and are in

addition to—federal requirements.

In particular, the Court agrees with Plaintiff that:

> If a broker-dealer "incorporates a social objective or other nonfinancial objective" in advising a customer, the B-D Rule requires the broker-dealer to "obtain[] written acknowledgment and consent from the customer." 15 C.S.R. § 30- 51.170(3)(C). The written consent document is required to "contain language that is substantially similar to" specific language scripted by the Rule. *Id.* § 30-51.170(3)(D) . . . . Broker-dealers are also required to keep the written consents. Defendants require broker-dealers to preserve copies of "all communications" with their customers. *See* 15 C.S.R. § 30- 51.120 (requiring broker-dealers to "make and maintain records as required for brokers or dealers" as required under 17 C.F.R. § 240.17a-3 and 17 C.F.R. § 240.17a-4) . . . . The B-D Rule also establishes recordkeeping requirements "that differ from, or are in addition to, the requirements in those areas established under" federal securities law. 15 U.S.C. § 78o(i)(1). The SEC has promulgated extraordinarily detailed rules about what types of records broker-dealers must make, and how long they must keep them. *See* 17 C.F.R. §§ 240.17a-3 & 240.17a-4. These federal rules do not include the multiple written acknowledgements and signed consents required by the B-D Rule.

(Doc. #72, p. 36, pp. 35-37.)

Defendants' arguments to the contrary are not persuasive. Defendants contend in part that "federal law already requires documentation of an investor's objectives, and so the BD Rule adds no new records." (Doc. #105, p. 87) (internal citation omitted). According to Defendants, the B-D Rule is not preempted because the requirements imposed therein are merely "parallel" to "the record-keeping requirements of federal law[.]" (Doc. #105, p. 87.) This argument is rejected for many of the reasons discussed above. Put simply, the B-D Rule requires broker-dealers to make and keep a new document that is not required by federal law. The signature requirement imposed by the Rules is also new and not required by federal law. These requirements are preempted by NSMIA.

Defendants also argue that "NSMIA saves the Rules from preemption as Missouri's exercise of police powers." (Doc. #105, p. 84.) To avoid preemption, Defendants rely on NSMIA's savings clause:

> Consistent with this section, the securities commission (or any agency or officer performing like functions) of any State shall retain jurisdiction under the laws of such State to investigate and bring enforcement actions with respect to fraud or deceit, or unlawful conduct by a broker or dealer, in connection with securities or securities transactions[.]

15 U.S.C. § 77r(c)(1) (internal numbering and lettering omitted). According to Defendants, this provision means that States retain jurisdiction over "fraudulent and deceitful conduct." (Doc. #105, p. 84.)

This argument is rejected. Section 77r(c)(1) expressly applies and is limited to "investigat[ing] and bring[ing] enforcement actions." 15 U.S.C. § 77r(c)(1). Defendants argue that the statute should not be construed as written, because "such actions would be rare, and unlikely to achieve their ends of client protection." (Doc. #105, p. 85.) However, the savings clause does not authorize a State to engage in rulemaking, particularly rulemaking that mandates

new legal requirements.  Because the statutory language is clear, the Court cannot enlarge or add language that does not exist.  *See National Ass'n of Mfgs. v. Dep't of Defense*, 583 U.S. 109, 128 (2018) (recognizing that a court cannot "override Congress' considered choice by rewriting the words of the statute").

For these reasons, and the additional reasons stated by Plaintiff, the Court finds the B-D Rule is expressly preempted by NSMIA.[5]

The parties also dispute whether the IA Rule is preempted by NSMIA.  NSMIA also contains a preemption clause regarding state regulation of federally registered investment advisors and their supervised persons.  This provision provides that:

> **No law of any State** or political subdivision thereof requiring the registration, licensing, or qualification as an investment adviser or supervised person of an investment adviser **shall apply to any person**— that is registered under [15 U.S.C. § 80b-3] as an investment adviser, or that is a supervised person of such person, **except that a State may license, register, or otherwise qualify any investment adviser representative** who has a place of business located within that State.

15 U.S.C. § 80b-3a(b)(1)(A) (emphasis supplied).

When NSMIA was made law, the SEC noted:

> The Coordination Act gives the Commission primary responsibility to regulate advisers that remain registered with the Commission by preempting state regulation of those advisers. . . . States retain authority over Commission-registered advisers under state investment adviser statutes to investigate and bring enforcement actions with respect to fraud or deceit against an investment adviser or a person associated with an investment adviser; to require filings, for notice purposes only, of documents filed with the Commission; and to require payment of state filing, registration, and licensing fees.

---

[5] The Court similarly agrees with Plaintiff that the B-D Rule is barred by conflict-preemption.  "Conflict preemption exists where a party's compliance with both federal and state law would be impossible or where state law would pose an obstacle to the accomplishment of congressional objectives."  *In re Aurora Dairy Corp. Organic Milk*, 621 F.3d 781, 794 (8th Cir. 2010).  Here, "[a]llowing each state to impose its own unique set of recordkeeping requirements on brokerdealers would produce exactly the sort of 'patchwork quilt' of state regulation that Congress eliminated by passing NSMIA."  (Doc. #72, p. 37.)

Rules Implementing Amendments to the Investment Advisers Act of 1940, 62 Fed. Reg. 28125 (May 22, 1997). Congress intended that "states should play an important and logical role in regulating small investment advisers whose activities are likely to be concentrated in their home state," while "[l]arger advisers, with national businesses, should be registered with the [SEC] and be subject to national rules." S. Rep. No. 104-293, at 4.

Upon review of the foregoing and of the parties' arguments, the Court finds that the IA Rule is preempted by NSMIA. The parties agree that "the IA Rule applies to qualifying investment adviser representatives of federally covered investment advisers." (Doc. #72, p. 39); (Doc. #105, p. 22, ¶ 41.) Similar to the B-D Rule, the IA Rule is preempted because it impermissibly imposes new and different State regulatory obligations that are not required by federal law.

Defendants emphasize that "investor advisor" is defined in the IA Rule to exclude federally covered investment advisers. Mo. Rev. Stat. § 409.1-102(15); 15 C.S.R. § 30-51.172(3)(B)(2); (Doc. #70, p. 66.) However, the Court agrees with Plaintiff that the IA Rule "still impermissibly regulates investment advisers by creating compliance obligations for advisory firms." (Doc. #72, p. 40.) Finally, the requirements of the IA Rule far exceed NSMIA's authorization for states to "license, register, or otherwise qualify any investment adviser representative." 15 U.S.C. § 80b-3a(b)(1).[6] Consequently, and for the additional reasons stated by Plaintiff, the Court finds the IA Rule is expressly preempted by NSMIA.

For these reasons, Plaintiff has shown actual success on the merits on Count One.

---

[6] For reasons similar to those discussed above, the Court rejects Defendants' argument that the IA Rule somehow qualifies as a state "investigat[ion]" or "enforcement action[] with respect to fraud or deceit." 15 U.S.C. § 80b-3a(b)(2).

### b. Count Two—Whether the Rules are Preempted by ERISA

In Count Two, Plaintiff alleges the Rules are preempted by ERISA. "Congress enacted ERISA to protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information . . . by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans[.]" *Wilson v. Zoellner*, 114 F.3d 713, 715 (8th Cir. 1997) (quoting 29 U.S.C. § 1001(b)). "To meet the goals of a comprehensive and pervasive Federal interest and the interests of uniformity with respect to interstate plans, Congress included an express preemption clause in ERISA for the displacement of State action in the field of private employee benefit programs." *Wilson*, 114 F.3d at 715 (cleaned up) (citation and quotation marks omitted).

ERISA's express preemption clause provides that:

> [t]he provisions of this subchapter and subchapter III shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title.

29 U.S.C. § 1144(a) (2006).

As explained by the Eighth Circuit:

> The Supreme Court has constructed a two-part inquiry for determining whether a state law is preempted under this "relates to" provision. Under this analysis, a state law "relates to" an ERISA plan within the meaning of § 1144(a) if it (1) expressly refers to an ERISA plan, or (2) has a connection with such a plan.

*Shea v. Esensten*, 208 F.3d 712, 717 (8th Cir. 2000). "To determine the existence of [a] forbidden connection, the . . . Court . . . 'look[s] both to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive [and] to the nature of

the effect of the state law on ERISA plans.'"  *Id.* at 718 (quoting *California Div. of Lab.*

*Standards Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 325 (1997) (internal quotations

and citation omitted)).

> In addressing the effect of the state law on an ERISA plan, [the Court] consider[s] a variety of factors, including: [1] whether the state law negates an ERISA plan provision, [2] whether the state law affects relations between primary ERISA entities, [3] whether the state law impacts the structure of ERISA plans, [4] whether the state law impacts the administration of ERISA plans, [5] whether the state law has an economic impact on ERISA plans, [6] whether preemption of the state law is consistent with other ERISA provisions, and [7] whether the state law is an exercise of traditional state power.

*Id.* (quoting *Wilson v. Zoellner*, 114 F.3d 713, 717 (8th Cir. 1997)).

Applying this legal framework to the record, the Court finds that the Rules "relate to" an

ERISA plan by having "a connection with such plan."  *See Shea*, 208 F.3d at 717.  In particular,

the Rules interfere with ERISA by restricting what investments may be recommended or

selected, and by mandating disclosure and recordkeeping requirements not required by ERISA.

*See id.*  As explained by Plaintiff:

> the Rules govern central matters of plan administration by purporting to alter the very core of ERISA:  its comprehensive set of rules setting forth in detail how fiduciaries may and may not perform their federally assigned functions with respect to the ERISA plan . . . .  ERISA fiduciaries are required to comply with those obligations in the manner set forth by the federal agency that oversees ERISA, which is the Department of Labor ("DOL"). DOL's regulations help give further content to these duties and specifically permit fiduciaries to consider social or nonfinancial objectives in certain circumstances.  By restricting ERISA fiduciaries' authority to recommend or select investments for social or nonfinancial reasons . . . the Rules directly interfere with DOL's statutory authority to define the specific things ERISA fiduciaries may, or may not, do . . . . the Rules [also] interfere . . . by imposing significant additional disclosure and recordkeeping requirements on ERISA fiduciaries who consider social or nonfinancial objectives in the ways that ERISA permits, particularly through the Rules' prescribed written consents. *See* 15 C.S.R. §§ 30-51.170(3), 30-51.172(3).

(Doc. #72, pp. 43-46) (internal citations omitted).

Defendants' arguments to the contrary have been considered and are rejected. Defendants contend, in part, that the Rules' "record-keeping requirements are 'innocuous and peripheral' and do not interfere with ERISA plan administration." (Doc. #105, p. 93.) The Court disagrees for the reasons discussed throughout this Order.

Defendants also contend the Rules are not preempted under ERISA's savings clause. In relevant part, the savings clause preserves "any law of any State which regulates . . . securities." 29 U.S.C. § 1144(b)(2)(A); *see also Prudential Ins. Co. of Am. v. Nat'l Park Med. Ctr., Inc.*, 413 F.3d 897, 908 (8th Cir. 2005). Defendants argue the "Rules are clearly securities regulations" and "do not create a private cause of action or provide for a legal remedy, as required to be excluded from the savings clause." (Doc. #105, p. 93-94) (citations omitted).

Upon review, the Court finds the savings clause does not save the Rules from preemption. "[A] state law that can arguably be characterized" as falling under the savings clause may still be preempted if the law "pose[s] an obstacle" to ERISA's "comprehensive remedial scheme." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 217-18 (2004). Here, the Rules present such an obstacle. As explained by Plaintiff, "the conflict is especially clear because a DOL ERISA regulation authorizes the exact fiduciary activities that Defendants seek to curtail. By creating a non-ERISA prohibition against ERISA-compliant fiduciary advice, the Rules undermine ERISA's exclusive enforcement scheme and are therefore preempted." (Doc. #72, pp. 45-46 (citations omitted).

For these reasons, and for the additional reasons stated by Plaintiff, Plaintiff has shown actual success on the merits on Count Two.

### c. Count Three—Whether the Rules Violate the First Amendment

In Count III, Plaintiff alleges the Rules violate the First Amendment. As set forth above, the Rules impose a written consent requirement that must be "substantially similar" to the following language.

> Also, I acknowledge and understand that incorporating a social objective or other nonfinancial objective into discretionary investment decisions, recommendations, advice, and/or the selection of a third-party manager or subadviser to manage the investments, in regards to my account, will result in investments and recommendations/ advice that are not solely focused on maximizing a financial return for me or my account."

15 C.S.R. §§ 30-51.170(3)(D), 30- 51.172(3)(D). Plaintiff contends this requirement compels speech that is scripted, inaccurate, controversial, and thus, unconstitutional. Defendants argue the written requirement is constitutional because it is "(1) factual and uncontroversial, (2) related to the good or services the speaker provides, and (3) reasonably related to a sufficient government interest." (Doc. #105, p. 96.) (citations omitted)[7]

"The First Amendment declares in part that 'Congress shall make no law . . . abridging the freedom of speech.'" *1-800-411-Pain Referral Serv., LLC v. Otto*, 744 F.3d 1045, 1054 (8th Cir. 2014) (quoting U.S. Const. amend. I).[8] "The Constitution 'accords a lesser protection to commercial speech than to other constitutionally guaranteed expression.'" *Id.* (quoting *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 563 (1980)). "However, commercial speech is still protected 'from unwarranted governmental regulation.'" *Id.* (quoting *Cent. Hudson*, 447 U.S. at 561).

---

[7] Defendants raise additional preliminary arguments, including that the written requirement is not compelled speech. Defendants also argue "the Rules simply say that which must always be true: incorporating a social or nonfinancial objective necessarily requires that the investment is 'not solely focused on maximizing a financial return.'" (Doc. #105, p. 96.) These arguments are rejected for the reasons stated herein and by Plaintiff.

[8] The First Amendment is applicable to States through the Fourteenth Amendment. *See Republican Party of Minn. v. White*, 416 F.3d 738, 748 (8th Cir. 2005).

The Supreme Court has articulated two levels of scrutiny under *Central Hudson* and *Zauderer v. Off. of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626 (1985), to evaluate whether disclosure requirements violate the First Amendment. The Supreme Court has "applied a lower level of scrutiny to laws that compel disclosures . . . of 'purely factual and uncontroversial information about the terms under which . . . services will be available[.]'" *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2372 (2018) (quoting *Zauderer*, 471 U.S. at 651). Specifically, "[u]nder *Zauderer*, disclosure requirements for commercial speech are constitutional so long as they are 'reasonably related to the State's interest in preventing deception of consumers' and are not so 'unjustified or unduly burdensome' that they 'chill[] protected commercial speech.'" *Otto*, 744 F.3d at 1053 (quoting *Zauderer*, 471 U.S. at 651).

If the law does not qualify for the lower level of scrutiny under *Zauderer*, courts have employed a heightened level of scrutiny under *Central Hudson*.

> The well-known *Central Hudson* inquiry, [intermediate scrutiny] in turn, employs a four-part standard to test the constitutionality of laws burdening commercial speech: (1) whether the commercial speech at issue concerns unlawful activity or is misleading; (2) whether the governmental interest is substantial; (3) whether the challenged regulation directly advances the government's asserted interest; and (4) whether the regulation is no more extensive than necessary to further the government's interest.

*Id.* at 1055.

Here, the Court finds *Central Hudson* is applicable and that the Rules must pass intermediate scrutiny. *Zauderer* does not apply because the written consent requirement does not consist of only "purely factual . . . information." *Becerra*, 138 S. Ct. at 2372.[9] The written consent requires the customer to "acknowledge and understand that incorporating a social

---

[9] However, the Court finds the Rules violate the First Amendment even if *Zauderer's* lower of scrutiny applied.

objective or other nonfinancial. . . *will result* in investments and recommendations/advice that are *not* solely focused on maximizing a financial return for me or my account." 15 C.S.R. §§ 30-51.170(3)(D), 30- 51.172(3)(D) (emphasis supplied).  Stated differently, the customer must "acknowledge[] their choice to surrender higher returns for non-financial objectives."  (Doc. #72, p. 47.)

The Court agrees with Plaintiff that this is "not purely factual" and is misleading:

> DOL has determined in its ERISA rulemaking that ESG issues—Defendants' paradigmatic "non-financial objective[]," "may present purely financial considerations" and thus may constitute "proper components of the fiduciary's primary analysis" of investment choices.  Additionally, DOL has explained that an investment professional may use "nonfinancial criteria" such as corporate good citizenship as a tiebreaker between two otherwise equivalent securities without compromising profitability.

(Doc. #72, p. 48.)

The Court further finds that *Zauderer* does not apply because the speech compelled by the Rules is not uncontroversial.  On July 18, 2023, Defendant Ashcroft published an article in the Missouri Times titled "Opinion: It's Time to Rein In ESG" ("MT Op-Ed").  (Doc. #72, p. 21.)  In the MT Op-Ed, Defendant Ashcroft stated: "ESG and the Corporate Equality Index (CEI) are part of the so-called 'ethical investing' movement being pushed by progressives, activist shareholders, and proxy voters, driving investments toward liberal priorities that are in conflict with investors' interests."  (Doc. #72, p. 21.)  These statements discussing political priorities are not uncontroversial and may be considered in determining the appropriate level of scrutiny to be applied.  *See Planned Parenthood Minn. v. Rounds*, 530 F.3d 724, 736 (8th Cir. 2008) (considering party's affidavits in addition to the bare text of the required disclosure).

Because *Zauderer* does not apply, the Court must next determine whether the Rules survive intermediate scrutiny.  *Otto*, 744 F.3d at 1053.  The Court finds the Rules cannot survive,

because they are "more extensive than necessary to further the government's interest." *Id.* at 1055. The parties dispute whether the governmental interest was to prevent "fraud and deceit in the complex areas of securities and investing" and/or to protect against "liberal priorities that are in conflict with investors' interests." (Doc. #72, p. 50; Doc. #105, p. 103.)

But regardless of the governmental interest, the Rules are more extensive than necessary. To the extent the Rules were intended to prevent fraud and deceit, the written content requirement is not narrowly tailored. For example, the Rules could have been more narrowly and carefully worded to avoid being inaccurate and/or misleading. To the extent the Rules were geared toward addressing a policy debate, Defendants had "a less coercive method of publicizing their views on 'social' investing." (Doc. #72, p. 50.) For example, Defendants could have "embark[ed] on a 'public-information campaign' to advance their desired message 'without burdening a speaker with unwanted speech.'" (Doc. #72, p. 51) (citing and quoting *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 775 (2018)).

For these reasons, and the additional reasons stated by Plaintiff, Plaintiff has shown actual success on the merits on Count Three.

### d. Count Four—Whether the Rules are Unconstitutionally Vague

In Count Four, Plaintiff alleges the Rules are unconstitutionally vague. Plaintiff contends summary judgment should be entered in its favor because the "Rules are unconstitutionally vague for several reasons." (Doc. 72, p. 52.) Defendants argue in part that the "Rules require no complicated or prolonged analysis to determine if compliance is required." (Doc. #105, p. 106.) These issues are addressed below.

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television*

*Stations, Inc.*, 567 U.S. 239, 253 (2012). "Under the void-for-vagueness doctrine, a law is unconstitutional if it fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Smith v. Truman Rd. Dev.*, LLC, 414 F. Supp. 3d 1205, 1239 (W.D. Mo. 2019) (quoting *Musser v. Mapes*, 718 F.3d 996, 1000 (8th Cir. 2013) (internal quotations omitted)). When, as here, a facial challenge is asserted, the plaintiff must "establish that no set of circumstances exist under which [the challenged provision] would be valid." *Phelps-Roper v. City of Manchester*, 697 F.3d 678, 685 (8th Cir. 2012) (en banc).

Upon review of the record and the parties' arguments, the Court finds that the Rules are unconstitutionally vague. As explained by Plaintiff:

> the Rules fail to adequately define "nonfinancial objective." They state "'[n]onfinancial objective,' means the material fact to consider criteria in the investment or commitment of customer funds for the purpose of seeking to obtain an effect other than the maximization of financial return to the customer." 15 C.S.R. § 30-51.170(3)(B)(4); 15 C.S.R. § 30-51.172(3)(B)(4). The Rules leave many concepts in this definition unexplained. Read one way, this definition could be construed to apply when recommending a conservative investment strategy that is consistent with a client's conservative risk tolerance because such an approach will not maximize financial return. Defendants have provided no written guidance on the Rules, SUMF ¶ 38, such as what is meant by "maximization of financial return," which is not a recognized phrase in the securities laws. Taken at face value, this phrase plausibly could be read to refer to those investment strategies that provide the highest potential returns on the amounts invested, even when such strategies are the riskiest. On top of that problem, the Rules' definition of "nonfinancial objective" could be construed to encompass merely thinking about recommending such a strategy, even if the professional decides in the end not to recommend it, because the definition is triggered by the criteria that the professional "consider[s]." Defendants have not issued any guidance on these points, either, to inform what counts as "seeking to obtain an effect other than the maximization of financial return" or what counts as "consider[ing]" the relevant criteria.

(Doc. #72, pp. 52-53.)[10]

---

[10] Defendants "admit that the Rules do not contain an explicit definition of . . . the term 'consider.'" (Doc. #105, p. 20, ¶ 36.)

The vagueness of the Rules is particularly troublesome given the penalties for failure to comply. The parties agree that a violation can be punished in many ways, including the loss of registration, a civil penalty of up to $25,000 for each violation, and—if the violation was willful—criminal penalties. (Doc. #72, p. 18, ¶ 33-35; Doc. #105, p. 20, ¶¶ 33-35.) The Court further rejects Defendants' argument that the Rules are not vague because Edward Jones "demonstrated its understanding that the Rules applied to some of its employees and that it understood how to comply with the Rules." (Doc. #112, p. 19.) As explained by Plaintiff, "this argument does not insulate the Rules from a vagueness challenge. Just because one member has applied the Rules to collect consents does not mean they provide sufficient clarity." (Doc. #113, p. 127.) Under all these circumstances, the Rules are unconstitutionally vague.

For these reasons, and the additional reasons stated by Plaintiff, Plaintiff has shown actual success on the merits on Count Four.

## 2.  Plaintiff Has Shown Irreparable Harm

Because Plaintiff has shown actual success on the merits, the next requirement to obtain a permanent injunction is showing irreparable harm. As discussed above, the Rules infringe upon and violate Plaintiff's First Amendment rights. "The loss of First Amendment freedoms . . . unquestionably constitutes irreparable injury." *Crow v. Watson Chapel Sch. Dist.*, 540 F.3d 752, 762 (8th Cir. 2008) (citations and quotations omitted). Additionally, the Eighth Circuit has recognized that if a state law if preempted, irreparable harm exists when "the continued enforcement of the relevant provisions  . . . would result in irreparable economic loss[.]" *Bank One, Utah v. Guttau*, 190 F.3d 844, 850 (8th Cir. 1999); *see also Prudential Ins. Co. of Am. v. Nat'l Park Med. Ctr., Inc.*, 154 F.3d 812, 832 (8th Cir. 1998) (finding permanent injunction warranted when state law was preempted by ERISA).

Defendants argue irreparable harm is not present because the written consent requirement only requires "substantially similar" language. Defendants contend that any harm arising from a decision to "exactly mimic the language of the Consent Requirement" would be "self-inflicted" and not irreparable. (Doc. #105, p. 108.) This argument is not persuasive, and, as explained by Plaintiff "only highlights the Rules' vagueness." (Doc. #107, p. 193, n. 23.) It is not clear "what alternative language would satisfy Defendants, much less what alternative language could do so while accommodating regulated parties' First Amendment rights to avoid speaking unwanted messages." (Doc. #107, p. 193, n. 23.)

For these reasons, Plaintiff has shown irreparable harm absent a permanent injunction.

### 3. The Balance of Harms Weigh in Favor of a Permanent Injunction

As set forth above, the Rules are preempted by federal law and violate Plaintiff's constitutional rights. This significant harm outweighs any interest Defendants may have in the Rules and enforcing them. The balance of harms factor weighs in favor of a permanent injunction.

### 4. A Permanent Injunction is in the Public Interest

The public has a compelling interest in protecting First Amendment rights. *Crow*, 540 F.3d at 762. "[T]he public has no interest in enforcing an unconstitutional" or preempted state law/regulation. *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). The public interest factor also weighs in favor of permanent injunctive relief.

Finally, Plaintiff requests the injunction be issued "statewide . . . permanently enjoining the[] [Rules'] enforcement." (Doc. #72, p. 55.) Defendants respond that the "requested relief goes too far" and that Plaintiff "must demonstrate standing for each claim . . . and for each form of relief[.]" (Doc. #105, p. 110) (citing and quoting *TransUnion LLC v. Ramirez*, 594 U. S. 413,

431 (2021)).  According to Defendants, Plaintiff's claims only relate to certain portions of the Rules and that the Rules cannot be "fully invalidate[d]."  (Doc. #105, p. 110)

Upon review, the Court finds that the Rules should be enjoined, statewide, and in their entirety.  As for standing, Defendants' motion for summary judgment does not move for judgment on the issue of standing.  (Doc. #113, p. 9) ("Defendants do not even argue standing, either in their opposition to SIFMA's motion for summary judgment or in their own motion.) Defendants' opposition to Plaintiff's motion for summary judgment only raises the issue of standing at the conclusion of their brief, and only as to the relief requested by Plaintiff.  The Court previously found that Plaintiff had adequately alleged standing.  (Doc. #39, pp. 4-6.)  For those reasons, and the additional reasons stated in Plaintiff's motion for summary judgment (Doc. #72, pp. 28-33), the Court finds that Plaintiff has standing to pursue the claims and relief requested herein.

As for appropriate relief, the Court finds a statewide injunction is warranted.  Plaintiff has shown a violation of its constitutional rights, and that those violations would be suffered by others in the future.  Because the constitutional violations in this case are not based on unique facts or circumstances, a statewide permanent injunction is warranted.  *Rogers v. Bryant*, 942 F.3d 451, 458 (8th Cir. 2019) (holding that "injunctive relief should extend statewide because the violation established—the plain unconstitutionality of Arkansas's . . . law—impacts the entire state of Arkansas").

The Court further rejects Defendants' request to leave some portions of the Rules intact and finds that the Rules should be enjoined in their entirety.  As explained by Plaintiff, there are:

> numerous independent constitutional deficiencies in the Rules, and even if one could excise all the responsible language nothing comprehensible would be left. If Defendants think that they can promulgate some pared down version of the Rules that comply with federal law, it is their prerogative to do

so.  They have not, and it is not this Court's responsibility—or function—to promulgate the legally-compliant regulations that Defendants declined to promulgate themselves.

(Doc. #107, p. 200.)

For all of these reasons, Plaintiff is also entitled to a declaratory judgment that the Rules are preempted by NSMIA and ERISA, are unconstitutional under the First and Fourteenth Amendments of the United States Constitution, and are impermissibly vague under the Fourteenth Amendment of the United States Constitution.  28 U.S.C. § 2201 (Declaratory Judgment Act).

## IV.  CONCLUSION

Accordingly, it is ORDERED that:

(1) Defendant John Ashcroft and Douglas Jacoby's Motion for Summary Judgment (Doc. #69) is DENIED;

(2) Plaintiff Securities Industry and Financial Markets Association's Motion for Summary Judgment, Declaratory Relief, and Permanent Injunction (Doc. #71) is GRANTED;

(3) The following Missouri regulations are hereby declared to be preempted and unconstitutional:  15 C.S.R. § 30-51.170 and 15 C.S.R. § 30-51.172; and

(4) a statewide permanent injunction is hereby entered prohibiting Defendants and their officers, employees, and agents from implementing, applying, or taking any action whatsoever to enforce 15 C.S.R. § 30-51.170 and 15 C.S.R. § 30-51.172.

**IT IS SO ORDERED.**

/s/ Stephen R. Bough

STEPHEN R. BOUGH

Dated: August 14, 2024                    UNITED STATES DISTRICT JUDGE